FILED

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

2013 FEB 19 PM 12: 10

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FL
JACKSONVILLE FLORIDA

RENE ALVAREZ, SIMONE ALVAREZ
ANTHONY ANGLADA, ADAM
ARBITMAN, JOSEPH BEGLEY,
JOSEPH BENDIG, DONNA BENDIG,
DOLORES A. BENSON, BRIAN
BONIFANT, MAURA BONIFANT,
LANA BOTELHO, ROBERT BOTELHO,
RONALD BRANCH, JR., REBECCA
BRANUM, DANIEL BROWN, MARTHA
BROWN, MARCUS BROWN, THOMAS
BUSH III, CYNTHIA E. BUSH, RACHEL
J. CANNON, JOHN CANNON, LAURA
CANNON, MICHAEL CASHMAN,
JULIE CASHMAN, BETTINA
CATALANO, MARY CINDRIC C/O
THOMAS CINDRIC, PERSONAL
REPRESENTATIVE OF HER ESTATE,
THOMAS CINDRIC, GENA CINDRIC,
KURT CORONT, CLARA CORONT,
NICKLOUS COOPER, CLARA
COSGROVE C/O MR. AND MRS.
STEVE HORN, PERSONAL
REPRESENTATIVES, JOHN COX,
WANDA COX, KYLE CRAIG,
MICHAEL CRAW, SHARON CRAW,
MONTYE CRAWFORD, GLADYS
CRESPO, JAMES T. DAVIDSON, MARY
BETH DAVIDSON, WESTON DAVIS,
LORI DAVIS, COLETTE DENNEHY,
ROBERT DEVINE, BARBARA
DEVINE, JAMES DICAPRIO, TRACY
DONAHUE, SUSAN DONAHUE,
FRANK R. DOYLE, JR., GAIL FAGAN,
JOE FIGUEROA, JACQUELINE E.
FRUGE, WILFRED FRUGE, MILTON
GALANOS, KELLY GALANOS,
DOUGLAS GARNER, LAURIE
GARNER, HAROLD GARNER, JIMMIE
C. GARZA, NANCY L. GARZA,
SANDRA GILLEY, SANDRA GOETZ,
DAVID GRANT, RONALD GRIMES,

CASE NO. 3:13-cv-174-J-99TJC-MCR

1

SHIGEMI GRIMES, MARK HAMLET,
THERESA HAMLET SANDRA HILL,
JOHN KELLEY JR., KRISTINE
KELLEY, JOHN KELLEY III, LARRY S.
KLUMB, LEANNE M. KLUMB,
EDWARD KOHN, KEITH KRUSKALL,
GLADYS KRUSKALL, JAMES
KRUTAK, ELSA KRUTAK, JOEY
LENSEIGNE, DEBORAH LOFTUS-
ERRTHUM, LOFTUS CHILDREN'S
BENEFIT FUND, ROBERT MARCHI,
COLLEEN MARCHI, ANTHONY AND
JEAN MAROTTA,  JULIE MAROTTA
C/O ANTHONY MAROTTA, PHILLIP
M. MARTIN, JANICE MARTIN,
THOMAS MARTIN, KAREN MARTIN,
BRIAN MILLER, KRYSSA
MILLER,  ELAINE MORGAN,WALTER
MORRISON, ELAINE MORRISON,
SEAN O'BRIEN, MICHAEL PARRA,
KIMBERLY PRIBBLE, MITCHELL L.
PRICE, JAMI PRICE, BRIAN QUIRK,
VICTORIA QUIRK, JENNIFER
RANGER, DEREK RANGER, RICHARD
RECK, CAROL RECK, HARRY G.
RICHARDS, JOHN RILEY, MONICA
RILEY, MICHAEL J. ROSELLE, J.
ANDREW OSENHAMER,
MICHAEL RUSSO, MARY SALAZAR,
ALBERT SCHREIBER, JO ANNE
SCHREIBER, RICK SELL, DONALD
SHRUHAN, JAMES SLATER, TAMARA
SLATER,  WILLIAM L. SMITH,
CYNTHIA J. SMITH, SCOTT SNYDER,
STEPHEN SNYDER, DEBORAH
SOURINI, MICHAEL STANTON,
ROBERTA STANTON, ANDREW
THOMPSON, OLIVIA THOMPSON,
KRISTINE TIERNEY, KATHY TILLEY,
MARK TROUVILLE, MARY ELLEN
TROUVILLE, ROBERT VAN GUNDY,
NANETTE VAN GUNDY,  ROBERT
VANCE, JAMES WOOLLEY, NANCY
WOOLLEY, STEVEN S. ZELLERS,
RUTH A. ZELLERS,

                    Plaintiffs,

2

v.

UNITED STATES OF AMERICA,

                              Defendant.

### COMPLAINT
### (And Demand for Jury Trial)

Plaintiffs named above bring this action against Defendant the United States of America

pursuant to the provisions of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671 *et*

*seq.*, and in support state as follows:

## I.   INTRODUCTION

1.     This action arises from a Ponzi scheme operated by Kenneth Wayne McLeod

which targeted as its victims federal law enforcement employees and other active and retired

employees of the United States.   For at least two decades, McLeod was hired by various federal

agencies to conduct retirement education and planning seminars across the country and, in

connection with those seminars, to provide specific financial investment advice to those in

attendance.  Often, McLeod's victims were required to attend these agency-sponsored retirement

education and planning seminars featuring McLeod and trusted McLeod because of the

endorsements openly given to McLeod by high-ranking officials within various agencies.

2.     Federal law enforcement employees and other federal employees who attended

agency-sponsored retirement education and planning seminars featuring McLeod typically were

required to complete a personal financial questionnaire in advance of the seminar for the purpose

of allowing McLeod to analyze the employee's personal retirement situation and goals.  McLeod

used the personal information collected on the questionnaires to provide specific financial

investment advice to his clients/victims.

3

3.      When providing federal law enforcement employees and other active and retired employees of the United States specific financial investment advice, McLeod often solicited clients to invest in a purported bond fund, which McLeod called the "FEBG Bond Fund," that McLeod represented was backed by long-term government securities. McLeod promised his clients guaranteed, tax-free returns of eight to ten percent annually in the FEBG Bond Fund.

4.      McLeod pitched investment in the FEBG Bond Fund as a loan to FEBG, where the client's principal would remain secured and untouched for a period of years and the interest would be paid in part to the investor and in part to FEBG to "fund the business model for the FEBG Family of Companies and to start-up and/or acquire additional companies deemed appropriate in [FEBG's] quest to solidify [FEBG's] presence in the federal and state employees marketplace." The terms of the "loan" were often set forth in a "promissory note" McLeod gave to investors. *See* examples attached at **Exhibit 1.**

5.      In reality, the FEBG Bond Fund did not exist. McLeod never invested his clients' money in government securities, and the money paid to McLeod was never generating tax-free returns of eight to ten percent annually.

6.      McLeod operated the FEBG Bond Fund as a Ponzi scheme. McLeod simply used funds obtained from newer investors to pay some interest and returns to older investors, giving the false impression that the client's money had been invested in the FEBG Bond Fund as McLeod represented. McLeod used most of the money invested by his clients in the FEBG Bond Fund to provide funds to himself and to his companies, which included F&S Asset Management Group, Inc. ("FSAMG") and the Federal Employee Benefits Group, Inc. ("FEBG"). To perpetuate the fraudulent scheme, McLeod sent investors correspondence regarding their investments, including bogus FEBG Bond Fund account statements.

4

7.     McLeod used his clients' money to live a lavish lifestyle and to bolster his image within the federal law enforcement community.  Between 2005 and June 2010 alone, McLeod spent more than $1 million on promotional expenses to entertain high ranking government officials and his friends, including paying for stadium box seats and an annual trip for him and forty of his friends to the Super Bowl.

## II.    PLAINTIFFS

8.     Rene and Simone Alvarez are residents of Arizona and employees at Customs and Border Protection ("CBP").  After meeting Kenneth McLeod ("McLeod") at a Drug Enforcement Administration ("DEA") sponsored retirement seminar, they invested $115,000 in the FEBG Bond Fund ("the Fund").

9.     Anthony Anglada is a resident of Virginia and an employee of the DEA.  After he met McLeod at a DEA sponsored retirement seminar, he invested $216,000 in the Fund.

10.    Adam Arbitman is a resident of Florida.  After meeting McLeod through his mother, who herself had met him through a DEA sponsored retirement seminar, Mr. Arbitman invested $45,000 in the Fund.

11.    Joseph Begley is a resident of Pennsylvania and an employee of the DEA.  After meeting McLeod at a DEA sponsored retirement seminar, he invested $5,050 in the Fund.

12.    Joseph and Donna Bendig are residents of Indiana.  Mr. Bendig was an employee of CBP.  After meeting McLeod at a CBP sponsored presentation, the Bendigs invested $200,000 in the Fund.

13.    Dolores Benson is a resident of Florida and was an employee of Immigration and Customs Enforcement ("ICE").  She met McLeod through her supervisor, Rachel Cannon, who met McLeod at an ICE sponsored retirement seminar.  After meeting McLeod, Ms. Benson invested $4,415 in the Fund.

5

14.     Brian and Maura Bonifant are residents of California. Brian Bonifant is an employee of the DEA. After meeting McLeod at a DEA sponsored retirement seminar, they invested $128,000 in the Fund.

15.     Robert and Lana Botelho are residents of Georgia. Mr. Botelho was an employee of the DEA. After meeting McLeod at a DEA sponsored retirement seminar, the Botelhos invested $143,773 in the Fund.

16.     Ronald Branch is a resident of Florida and an ICE employee. After meeting McLeod at an ICE sponsored retirement seminar, he invested $110,000 in the Fund.

17.     Rebecca Branum is a resident of Illinois and was an employee of the DEA. After meeting McLeod at a DEA sponsored retirement seminar, she invested $35,000 in the Fund.

18.     Daniel and Martha Brown are residents of New Jersey. Mr. Brown is an employee of the DEA. After meeting McLeod at a DEA sponsored retirement seminar, they invested $7,000 in the Fund.

19.     Marcus Brown is a resident of New York and was an employee of the DEA. After meeting McLeod at a DEA sponsored retirement seminar, he invested $70,000 in the Fund.

20.     Thomas and Cynthia Bush are residents of West Virginia. Mr. Bush was an employee of the Federal Bureau of Investigation ("FBI"). Mr. Bush met McLeod through a mutual acquaintance at the DEA. This acquaintance had first met McLeod at a DEA sponsored retirement seminar. After meeting McLeod, the Bushes invested $205,000 in the Fund.

21.     John and Laura Cannon are residents of Florida. Their daughter, Rachel Cannon, was an employee of ICE. Rachel Cannon met McLeod through a DEA sponsored retirement seminar and subsequently introduced him to her parents. After meeting McLeod, John and Laura Cannon invested $277,055 in the Fund.

22.     Rachel Cannon is a resident of Florida and was an employee of ICE. After meeting McLeod at an ICE sponsored retirement seminar, she invested $309,000 in the Fund.

23.     Bettina Catalano is a resident of Maryland. Her son-in-law, Thomas Cindric, was an employee of the DEA. Mr. Cindric attended a DEA sponsored retirement seminar and subsequently introduced her to McLeod. After meeting McLeod, Ms. Catalano invested $75,000 in the Fund.

24.     Michael and Julie Cashman are residents of New Hampshire. Mr. Cashman was an employee of the DEA. After meeting McLeod at a DEA sponsored retirement seminar, they invested $1,057,000 in the Fund.

25.     Mary Cindric was a resident of Maryland. Her son, Thomas Cindric, was an employee for the DEA. Mr. Cindric met Mr. McLeod at a DEA sponsored retirement seminar and subsequently introduced him to his mother. After meeting Mr. McLeod, Ms. Cindric invested $275,000 in the Fund.

26.     Thomas and Gena Cindric are residents of Maryland. Thomas Cindric was an employee of the DEA. After meeting McLeod at a DEA sponsored retirement seminar, the Cindrics invested $48,000 in the Fund.

27.     Nicklous Cooper is a resident of Texas and was an employee of the DEA. After meeting McLeod at a DEA sponsored retirement seminar, he turned the management of his retirement portfolio over to McLeod. As a result, Mr. Cooper lost $92,977.38 in principal.

28.     Kurt and Clara Coront are residents of Florida. Mr. Coront was an employee of the DEA. After meeting McLeod at a DEA sponsored retirement seminar, the Coronts invested $458,500 in the Fund.

29.     Clara Cosgrove is a resident of Virginia. Ms. Cosgrove's son-in-law, Steve Horn, was an employee of the DEA. Mr. Horn attended a DEA sponsored retirement seminar and

7

subsequently introduced her to McLeod. After meeting McLeod, Ms. Cosgrove invested $85,000 in the Fund.

30.    John and Wanda Cox are residents of Florida. Mr. Cox was an employee of the Federal Aviation Administration ("FAA"). After meeting McLeod at an FAA sponsored retirement seminar, the Coxes invested $22,850 in the Fund.

31.    Kyle Craig is a resident of New Mexico and was an employee of ICE. After meeting McLeod at an ICE sponsored retirement planning seminar, he invested $25,000 with the Fund.

32.    Michael and Sharon Craw are residents of Georgia. Rachel Cannon, an employee of ICE and a plaintiff in this matter, met Mr. McLeod at a CBP sponsored retirement seminar and subsequently introduced him to the Craws. After meeting McLeod, the Craws invested $265,253 in the Fund.

33.    Montye Crawford is a resident of Arkansas. Her husband, Scott Crawford, is an employee of ICE. While he was employed at ICE, Mr. Crawford met McLeod during an ICE sponsored retirement seminar. After meeting McLeod, the Crawfords invested $85,000 in the Fund.

34.    Gladys Crespo is a resident of New Jersey. Her daughter and son-in-law, Gladys and Keith Kruskall, are employees of the DEA. Mr. and Mrs. Kruskall met McLeod at a DEA sponsored retirement seminar and subsequently recommended him to Ms. Crespo. After this recommendation, Ms. Crespo invested $112,535 in the Fund.

35.    James and Mary Beth Davidson are residents of Georgia. Mr. Davidson was an employee of the DEA. After meeting McLeod at a DEA sponsored retirement seminar, the Davidsons invested $44,403 in the Fund.

36.     Weston and Lori Davis are residents of Georgia.  Mr. Davis was an employee of the U.S. Fish and Wildlife Service ("FWS").  Shortly before Mr. Davis was transferred there, the Okefenokee National Wildlife Refuge had sponsored a retirement seminar given by McLeod.  Mr. Davis contacted a fellow Okefenokee employee and McLeod client, Bev Derouin.  After meeting McLeod when he came for a follow up visit with the staff, the Davises invested $896,550 in the Fund.

37.     Colette Dennehy is a resident of Virginia and was an employee of ICE.  After meeting McLeod at an ICE sponsored retirement seminar, she invested $50,000 in the Fund.

38.     Barbara and Robert Devine are residents of Arizona.  Mr. Devine was an employee of ICE and Mrs. Devine was an employee of the DEA.  After meeting McLeod at DEA and ICE sponsored retirement seminars, the Devines invested $60,000 in the Fund.

39.     James DiCaprio is a resident of Florida and was an employee of the DEA.  After meeting McLeod at a DEA sponsored retirement seminar, he invested $95,000 in the Fund.

40.     Tracy and Susan Donahue are residents of Virginia.  Mr. Donahue is an employee of the DEA.  After meeting McLeod at a DEA sponsored retirement seminar, they invested $36,000 in the Fund.

41.     Frank Doyle is a resident of California and was an employee of the FBI.  After meeting McLeod at an FBI sponsored retirement seminar, he invested $100,000 in the Fund.

42.     Gail Fagan is a resident of Arizona and is an employee of the DEA.  After meeting McLeod at a DEA sponsored retirement seminar, she invested $518,000 in the Fund.

43.     Joe Figueroa is a resident of Arizona and an employee of the DEA.  After meeting McLeod at a DEA sponsored retirement seminar, he invested $176,000 in the Fund.

44.     Jacqueline Fruge is a resident of Florida and an employee of the FBI.  After meeting McLeod at an FBI sponsored retirement seminar, she invested $30,000 in the Fund.

45.     Wilfred Fruge is a resident of Louisiana and the father of Jacqueline Fruge. After Ms. Fruge introduced her father to McLeod, he invested $1,000,000 in the Fund.

46.     Milton and Kelly Galanos are residents of Kentucky. Milton Galanos is an employee of the DEA. After meeting McLeod at a DEA sponsored retirement seminar, they invested $32,549.02 in the Fund.

47.     Douglas and Laurie Garner are residents of Florida. Mr. Garner is an employee of CBP. After meeting McLeod at a CBP sponsored retirement seminar, the Garners invested $170,000 in the Fund.

48.     Harold Garner is a resident of Florida and was an employee of CBP. After meeting McLeod at a CBP sponsored retirement seminar, he invested $599,728 in the Fund.

49.     Jimmie and Nancy Garza are residents of Arizona. Mr. Garza was an employee of the DEA. After meeting McLeod at a DEA sponsored retirement seminar, they invested $13,000 in the Fund.

50.     Sandra Gilley is a resident of Kansas. Her son-in-law, Tyler Graham, was an employee of the DEA. Mr. Graham met McLeod at a DEA sponsored retirement seminar and subsequently introduced him to Ms. Gilley. After meeting McLeod, Ms. Gilley invested $98,000 in the Fund.

51.     Sandra Goetz is a resident of Michigan. Her friend, James Sourini, was an employee of the DEA. Mr. Sourini met McLeod at a DEA sponsored retirement seminar and subsequently introduced him to Ms. Goetz. After meeting McLeod, Ms. Goetz invested $100,000 in the Fund.

52.     David and Lisa Grant are a residents of Michigan. David Grant was an employee of the DEA. After meeting McLeod at a DEA sponsored retirement seminar, they  invested $40,000 in the Fund.

53.     Ronald and Shigemi Grimes are residents of Virginia.  Mr. Grimes in an ICE employee.  After meeting Mr. McLeod at an ICE sponsored retirement seminar, Mr. and Mrs. Grimes invested $145,500 in the Fund.

54.     Mark and Theresa Hamlet are residents of the United States.  Mr. Hamlet is an employee of the DEA.  After meeting McLeod at a DEA sponsored retirement seminar, the Hamlets invested $350,000 in the Fund.

55.     Sandra Hill is a resident of Florida.  She and her life partner, Edward Kohn, were both employees of ICE.  Mr. Kohn attended an ICE sponsored retirement seminar and subsequently introduced Ms. Hill to McLeod.  After meeting McLeod, Ms. Hill invested $100,000 in the Fund.

56.     John Kelley III is a resident of Colorado and an employee of ICE.  After meeting McLeod at an ICE sponsored retirement seminar, he invested $95,000 in the fund.

57.     John and Kristine Kelley are residents of Washington.  Mr. Kelley was an employee of CBP.  After meeting McLeod at a CBP sponsored retirement seminar, they invested $502,000 in the Bond.

58.     Larry and Leanne Klumb are residents of Florida.  Mr. Klumb was an employee of the FBI.  After meeting McLeod at an FBI sponsored retirement seminar, they invested $100,000 from their special needs daughter's trust in the Fund.

59.     Edward Kohn is a resident of Florida and an employee of ICE.  After meeting McLeod at an ICE sponsored retirement seminar, he invested $675,000 in the Fund.

60.     Keith and Gladys Kruskall are residents of New Jersey.  Mr. and Mrs. Kruskall are employees of the DEA.  After meeting McLeod at a DEA sponsored retirement seminar, they invested $525,386 in the Fund.

11

61.     James and Elsa Krutak are residents of Tennessee.  Mr. Krutak was an FBI employee.  After meeting McLeod at an FBI sponsored retirement seminar, they invested $775,000 in the Fund.

62.     Joey Lenseigne is a resident of Texas and was an employee of the DEA.  After meeting McLeod at a DEA sponsored retirement seminar, he invested $20,000 in the Fund.

63.     Deborah Loftus-Errthum is a resident of Illinois.  Her late husband, Terrance Loftus, was an employee of the DEA and met McLeod at a DEA sponsored retirement seminar. When Mr. Loftus died in the line of duty, Mrs. Loftus began investing her retirement funds and Mr. Loftus's life insurance proceeds with McLeod.  In addition, she invested the funds set aside for her children, the Loftus Children's Benefit Fund ("Children's Fund").  After she met McLeod, Mrs. Loftus invested money from all three funds, contributing a total of $1,269,661 to the Fund.

64.     Robert and Colleen Marchi are residents of California.  Mr. Marchi is an employee of the DEA.  After meeting McLeod at a DEA sponsored retirement seminar, they invested $363,000 in the Fund.

65.     Anthony and Jean Marotta are residents of Maryland.  Mr. Marotta was an employee of the DEA.  After meeting McLeod at a DEA sponsored retirement seminar, they invested $405,000 in the Fund.

66.     Julie Marotta is a resident of New York.  Her son, Anthony Marotta, introduced her to McLeod.  After meeting McLeod, she invested $50,000 in the Fund.

67.     Phillip and Janice Martin are residents of Florida.  Mr. Martin was an employee of the DEA.  After meeting McLeod at a DEA sponsored retirement seminar, they invested $146,000 in the fund.

68.     Thomas and Karen Martin are residents of Georgia and were employees of ICE. After meeting McLeod at an ICE sponsored retirement seminar, they invested $225,000 in the Fund.

69.     Brian and Kryssa Miller are residents of California. Mr. Miller is an employee of the DEA. After meeting McLeod at a DEA sponsored retirement seminar, they invested $250,000 in the Fund.

70.     Elaine Morgan is a resident of Georgia. Her son-in-law, Mr. Weston Davis, is an employee of FWS. After Mr. Davis met McLeod through employees at FWS, he introduced McLeod to Ms. Morgan. After meeting McLeod, she invested $1,075,000 in the Fund.

71.     Walter and Elaine Morrison are residents of Virginia. Mr. Morrison is an employee of the DEA. After hearing about the DEA's retirement seminars, he contacted McLeod. After meeting McLeod, the Morrison's invested $35,815 in the Fund.

72.     Sean O'Brien is a resident of Texas and was an employee of the DEA. After meeting McLeod at a DEA sponsored retirement seminar, he invested $6,800 in the Fund.

73.     Michael Parra is a resident of New Mexico and was an employee of the DEA. After meeting McLeod at a DEA sponsored retirement seminar, he invested $252,145 in the Fund.

74.     Kimberly Pribble is a resident of Arizona and was an employee of the DEA. After meeting McLeod at a DEA sponsored retirement seminar, she invested $25,000 in the Fund.

75.     Mitchell and Jami Price are residents of Florida. Mr. Price was an employee of the DEA. After meeting McLeod at a DEA sponsored retirement seminar, they invested $43,355 in the Fund.

76.    Brian and Victoria Quirk are residents of the United States, currently serving abroad. Mr. Quirk was an employee of the DEA. After meeting McLeod at a DEA sponsored retirement seminar, they invested $82,000 in the Fund.

77.    Derek and Jennifer Ranger are residents of Georgia. After their friend, Brian Quirk, a DEA employee, met McLeod through a DEA sponsored retirement seminar, he introduced McLeod to them. After meeting McLeod through Mr. Quirk, the Rangers invested $200,000 in the Fund.

78.    Richard and Carol Reck are residents of New Jersey. Mr. Reck was an employee of the DEA. After meeting McLeod at a DEA sponsored retirement seminar, they invested $160,000 in the Fund.

79.    Harry Richards is a resident of Missouri and was an employee of the DEA. After meeting McLeod at a DEA sponsored retirement seminar, he invested $217,904 in the Fund.

80.    John and Monica Riley are residents of Missouri. Mr. Riley was an employee of the DEA. After meeting McLeod at a DEA sponsored retirement seminar, they invested $400,000 in the Fund.

81.    Michael Roselle is a resident of Arizona and was an employee of ICE. After meeting McLeod at an ICE sponsored retirement seminar, he invested $50,000 in the Fund.

82.    J. Andrew Rosenhamer is a resident of Georgia. Rachel Cannon, then a CBP employee, introduced the Michael and Sharon Craw to McLeod, who in turn introduced McLeod to Mr. Rosenhamer. Mr. Rosenhamer asked for and received permission from CBP to attend one of the CBP retirement seminars. After attending the seminar, he invested $180,001 in the Fund.

83.    Michael Russo is a resident of Kentucky and was an employee of the FBI. While employed by the FBI, Mr. Russo was assigned to the DEA, where he attended a DEA sponsored retirement seminar. After meeting McLeod there, he invested $60,829 in the Fund.

14

84.    Mary Salazar is a resident of Massachusetts and was an employee of the DEA. After meeting McLeod at a DEA sponsored retirement seminar, she invested $495,425 in the Fund.

85.    Albert and Jo Anne Schreiber are residents of Washington.  Mr. Schreiber was an employee of ICE. After meeting McLeod at an ICE sponsored retirement seminar, they invested $95,000 in the Fund.

86.    Rick Sell is a resident of Nevada and was an employee of ICE.  After meeting McLeod at an ICE sponsored retirement seminar, he invested $350,000 in the Fund.

87.    Donald Shruhan is a resident of the United States, currently serving abroad, and was an employee of ICE. After meeting McLeod at an ICE sponsored retirement seminar, he invested $200,000 in the Fund.

88.    James and Tamara Slater are residents of Virginia.  Mr. Slater was an employee of the DEA.  A DEA co-worker had previously attended the DEA sponsored retirement seminar where he met McLeod.  Subsequently, the co-worker introduced the Slaters to McLeod.  After meeting McLeod, they invested $65,000 in the Fund.

89.    William and Cynthia Smith are residents of Florida.  Mr. Smith was an employee of the United States Postal Service ("USPS").  After meeting McLeod at a USPS sponsored retirement seminar, they invested $150,000 in the Fund.

90.    Scott Snyder is a resident of Arizona and was an employee of the DEA.  After meeting McLeod at a DEA sponsored retirement seminar, he invested $90,000 in the Fund.

91.    Stephen Snyder is a resident of Maryland and was an employee of ICE.  After meeting McLeod at an ICE sponsored retirement seminar, he invested $50,000 in the Fund.

92.     Debra Sourini is a resident of Florida.  Her late husband, James Sourini, was an employee of the DEA.  After meeting McLeod at a DEA sponsored retirement seminar, they invested $1,940,979 in the Fund.

93.     Michael and Roberta Stanton are residents of Florida.  Mr. Stanton was a social acquaintance of McLeod's who noticed that federal law enforcement agencies gave McLeod an unusually high level of access.  This, coupled with the unusually high number of federal law enforcement personnel that McLeod enrolled as clients, led the Stantons to believe McLeod to be exceptionally trustworthy.  Based on this reasonable belief, they invested $100,000 in the Fund.

94.     Andrew and Olivia Thompson are residents of Pennsylvania.  Mr. Thompson is an employee of the DEA.  After meeting McLeod at a DEA sponsored retirement seminar, they invested $80,000 in the Fund.

95.     Kristine Tierney is a resident of Massachusetts and was an employee of the DEA. After meeting McLeod at a DEA sponsored retirement seminar, she invested $95,000 in the Fund.

96.     Kathy Tilley is a resident of Florida.  Ms. Tilley was a friend of Robert Vance. Mr. Vance was an employee of McLeod.  Mr. Vance, knowing that McLeod had extraordinary access to federal agencies and employees, believed that McLeod ran a legitimate investment service.  Based on this reasonable believe, Mr. Vance convinced Ms. Tilley to invest $98,000 in the Fund.

97.     Mark and Mary Ellen Trouville are residents of Florida and were employees of the DEA.  After meeting McLeod at a DEA sponsored retirement seminar, they invested $75,000 in the Fund.

98.     Ronald and Nanette Van Gundy are residents of Arizona.  Ms. Van Gundy is an employee of the DEA.  After meeting McLeod at a DEA sponsored retirement seminar, they

16

allowed McLeod to manage their retirement account. After seven years of McLeod's management, the Van Gundys lost $11, 863 in principal.

99.    Robert Vance is a resident of Florida and was an employee of McLeod. Mr. Vance noticed that McLeod had unprecedented access to federal agencies and an exceptional amount of federal law enforcement clients. Mr. Vance reasonably thought that McLeod could only have obtained this kind of access after those agencies thoroughly vetted him. Based on this reasonable belief, Mr. Vance invested $100,000 in the Fund.

100.    James and Nancy Woolley are residents of Illinois. Mr. Woolley was an employee of the DEA. After meeting McLeod at a DEA sponsored retirement seminar, they invested $181,872 in the Fund.

101.    Steven and Ruth Zellers are residents of Florida. Mr. Zellers was an employee of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). While an employee of ATF, Mr. Zellers learned from other federal agents that McLeod provided financial advice to other federal agents and agencies, but he was unable to attend a retirement seminar. Mr. Zellers thus contacted McLeod independently, based on his belief that federal agencies had vetted McLeod. After meeting with McLeod, the Zellers invested $100,000 in the Fund.

### III.    DEFENDANT

102.    Pursuant to 28 U.S.C. § 2674, there is only one Defendant – the United States of America. However, the United States is hereby named a defendant based on the negligent and wrongful acts of one or more of the following agencies, acting through its employees and agents:

    a.    Drug Enforcement Administration ("DEA")

    b.    U.S. Immigration and Customs Enforcement ("ICE")

    c.    National Security Agency ("NSA")

    d.    Federal Bureau of Investigation ("FBI")

e.  Federal Aviation Administration ("FAA")

f.  Naval Criminal Investigation Service ("NCIS")

g.  Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF")

h.  Defense Criminal Investigation Service ("DCIS")

i.  U.S. Postal Service ("USPS")

j.  U.S. Fish and Wildlife Service ("FWS")

k.  U.S. Customs and Border Protection ("CBP")

l.  General Services Administration ("GSA")

## IV.    JURISDICTION & VENUE

103.    The Plaintiffs' bring their claims against the United States pursuant to the Federal

Tort Claims Act (28 U.S.C. §2671, *et seq.*) and 28 U.S.C. §1346(b).  The Plaintiffs' claim money

damages for losses proximately caused by the negligence and wrongful acts of various federal

employees who, within the scope of their office and employment, negligently engaged and

endorsed McLeod to conduct retirement education and planning seminars for federal law

enforcement and other employees of the United States, negligently failed to supervise McLeod to

insure agency seminars did not involve providing specific financial investment advice to those in

attendance, negligently failed to properly vet and/or investigate McLeod and FEBG over a

twenty-year period, and negligently failed to adhere to ethical rules that would have prevented

McLeod's long-term fraudulent scheme.  These employees acted within the scope of their duties

as employees of the United States, under circumstances where the United States, if it were a

private person, would be liable to the Plaintiffs under the laws of the State of Florida.

104.    As set forth more fully herein, the actions of the United States involved repeated

failures to follow nondiscretionary obligations created by statute, regulation, and/or policy, all of

which are not protected by the discretionary function exception of the Federal Tort Claims Act.

105.    The Plaintiffs have fulfilled all requirements of 28 U.S.C. § 2675, including timely filing administrative claims and waiting the statutory six months before deeming their administrative claims denied.

106.    Venue is proper pursuant to 28 U.S.C. § 1391 in that all, or a substantial part of the events forming the basis of these claims occurred in the Middle District of Florida.  Despite the Plaintiffs' diverse geographic locations, every, or nearly every negligent federal agency involved herein contacted and retained McLeod through his office in Jacksonville, Florida.

## V.    FACTS COMMON TO ALL COUNTS

107.    In 1986, Congress passed the Federal Employees Retirement System Act ("FERS Act").  The FERS Act marked a radical departure from previous fixed pension schemes and allowed federal employees a greater say in their retirement.  It provided better retirement education opportunities and forced federal employees to make retirement decisions at an earlier stage in their career.

108.    Consistent with the FERS Act, all federal agencies have, since at least 1986, provided retirement education and training to federal employees eligible to participate in the FERS.  Pursuant to 5 U.S.C. § 8350, enacted in 1986, Congress required the Director of the Office of Personnel Management ("OPM") to establish a training program for specified "retirement counselors" at each federal agency who, in turn, have been required to conduct federal employee retirement training at least once every three months within their respective agencies.  The retirement training provided by agency retirement counselors has always been designed to promote fully informed retirement decisions by federal employees through education and understanding of federal benefits; it has never been for the purpose of providing specific financial investment advice to federal employees.

19

109.    In 2004, Congress passed the Thrift Savings Plan Open Elections Act ("TSP Act"), codified at 5 U.S.C. § 8350 *note*. This law did not supersede the FERS Act; it expanded the requirement to provide retirement training to include financial literacy and education. Among other things, the TSP Act directed the OPM to develop and implement a financial literacy and education strategy for federal employees, which was designed to better educate federal employees on the need for retirement savings and investment, and to aid employees in retirement planning. The TSP Act further required OPM to submit a report to Congress of the financial literacy and education strategy developed under the statute.

110.    In 2005, OPM submitted its Retirement Financial Literacy and Education Strategy ("OPM Retirement Strategy") to the Congress. A copy of OPM's Report to the Congress is attached hereto as **Exhibit 2**. The OPM Retirement Strategy, consistent with historical policy and practice, places upon the employing federal agency the primary responsibility for the delivery of retirement financial education to its employees.

111.    Describing "Agency Responsibilities," the OPM Retirement Strategy required each federal agency to "develop a retirement financial education plan based on the education model in [the OPM] strategy." As part of each agency's required retirement financial education plan, the OPM Retirement Strategy, consistent with prior policy, directed that "[a]gencies **must insure that their financial education activities** are informational and educational in nature and that they **do not provide specific financial investment advice**." *See* **Exhibit 2** at 11 (emphasis added). Thus, established policy prescribed a course of conduct that each agency was required to follow; the policy was not discretionary because it contained no element of judgment or choice. Berkovitz v. United States, 486 U.S. 531, 536 (1988).

112.    For more than 20 years, McLeod travelled around to various government agencies to conduct FEBG employee benefits counseling and planning seminars. These government

agencies paid FEBG up to $15,000 for each educational seminar. FEBG, under McLeod's leadership, held itself out as a "financial services and benefits consulting firm focused on Federal retirement options" and "dedicated to the complex issues surrounding special group employees, including Law Enforcement Officers, Firefighters and Air Traffic Controllers."

113. As part of McLeod's services, and contrary to the OPM Retirement Strategy directive, FEBG provided personalized benefits analysis and financial investment advice specific to government employees' retirement plans and their financial portfolios. McLeod provided seminar attendees with a questionnaire to be completed in advance of the seminar, which inquired about their salary, retirement plan, and savings account allocations, among other things. *See* **Exhibit** 3. Government employees who completed the questionnaire and returned it to FEBG received an individually customized projection of their retirement income and personalized financial investment advice from McLeod. Agencies routinely scheduled individual meetings between McLeod and seminar attendees to permit McLeod to provide tailored, specific financial investment advice to agency employees in direct contravention of the OPM Retirement Strategy.

114. As part of his specific financial investment advice, McLeod often recommended to government employees that they invest in the FEBG Bond Fund. In addition, FEBG provided recommended allocations among TSP retirement account funds and offered to make changes in the account for employees who provided McLeod their username and password. FEBG clients could also chose to become clients of FSAMG and have McLeod manage their money. Although FSAMG had other clients, most were also FEBG clients.

115. Agencies hiring McLeod knew that FEBG was providing specific financial investment advice to their employees as part of their retirement financial education activities. In fact, a Government Service Administration ("GSA") Multi Award Schedule contract awarded to

FEBG expressly called for FEBG to provide specific financial investment advice to government employees.

116.    Although McLeod and FEBG had been conducting seminars at government agencies for years, FEBG responded to a GSA solicitation (Solicitation 2FYA-WA-030003-B) for "instructor led training" services in December 2003. Per GSA's request, FEBG supplemented its offer with a commercial price list. The commercial price list submitted by FEBG expressly described Course No. 27-200 as a "Personal Benefits Analysis," which included the preparation of a "financial analysis Stage 1 booklet" for employees. *See* **Exhibit 4.** After receiving the price list, GSA awarded FEBG contract number GS-02F-0082S.

### The Ponzi Scheme

117.    When McLeod met federal employees at the retirement seminars, he used the extensive personal and financial information revealed in the personal benefits analysis questionnaire to provide specific financial investment advice, including advice regarding investment in the FEBG Bond Fund. McLeod sometimes referred to the FEBG Bond Fund as the "FEBG Special Fund" or the "FEBG Fund."

118.    McLeod promised investors in the FEBG Bond Fund guaranteed returns of eight to ten percent and told investors that their principal would be invested in and secured by government bonds. McLeod stated that the Fund invested only in long-term government securities which provided a thirteen percent return. McLeod told investors he used the three to five percent spread to expand FEBG and his other businesses, and that the federal government guaranteed the principal, which would remain untouched.

119.    McLeod further told investors that their principal would be locked up in the fund for up to eight years, supposedly due to the long term nature of the funds underlying the government securities. McLeod gave investors the option of rolling over their quarterly interest

payments back into the Fund to earn compound growth, which most investors did. This allowed McLeod to perpetuate the Ponzi scheme.

120.    McLeod did not typically provide investors with any offering documents for the purported bond fund. McLeod pitched investment in the FEBG Bond Fund as a "loan" to FEBG, where the client's principal would remain secured and untouched for a period of years and the interest would be paid in part to the investor and in part to FEBG. Investors often received a "FEBG, Inc. Special Fund" promissory note, which outlined the terms of the investment. The promissory note typically explained that part of the interest earned would be used by FEBG to "fund the business model for the FEBG Family of Companies and to start-up and/or acquire additional companies deemed appropriate in [FEBG's] quest to solidify [FEBG's] presence in the federal and state employees marketplace." *See* **Exhibit 1**.

121.    Some investors received memos or emails from McLeod and FEBG acknowledging receipt of their investment in the FEBG Bond Fund and guaranteeing a set rate of return. Many of these emails outlined the terms of investing in the FEBG Bond Fund in a manner consistent with the promissory notes given to some investors. *See* examples at **Exhibit 5**.

122.    McLeod also provided many investors with bogus FEBG Bond Fund account statements he created on FEBG letterhead. These statements show the amount of the investors' investment along with inflated account balances reflecting purported interest earned. *See* examples at **Exhibit 6**.

123.    Unknown to Plaintiffs, the FEBG Bond Fund did not exist and McLeod never invested his clients' money in anything. Instead, he used new investor funds to pay previous investors' interest and principal, spending the rest himself.

124.    Plaintiffs did not discover McLeod's fraudulent scheme until after June 22, 2010, when McLeod committed suicide.  McLeod sent out a cryptic email a few days before he killed himself in which he stated it was necessary to "terminate the FEBG Fund," and that Plaintiffs "should expect to be contacted in the coming days or weeks by the regulators charged with this termination/task," but did not reveal that the FEBG Bond Fund had been a Ponzi scheme.  The Security and Exchange Commission filed an Emergency Complaint against McLeod's estate and companies on June 24, 2010 in the United States District Court for the Southern District of Florida, CIV-Moreno 10-22078, alleging fraud in violation of various federal securities laws and seeking injunctive and other relief.  Before these events, none of the Plaintiffs had any actual knowledge that anything was wrong with their accounts.  Some Plaintiffs had tried to redeem their investments, only to have McLeod tell them lies, such as there would be a delay in payment because the government was in arrears sending interest checks on the underlying bonds, or because of the purportedly long-term nature of the bonds.  Many investors, including many of the Plaintiffs, lost everything.

125.    Both active and retired government employees invested in the FEBG Bond Fund.  Some investors rolled over their entire federal retirement and savings into the Fund or invested their inheritances, proceeds from home sales and their children's tuition savings.  The purported safety of the FEBG Bond Fund was an important factor that influenced Plaintiffs to invest in the Fund.  McLeod told Plaintiffs that the Fund's clients included "high level members of Congress, federal judges, and agency heads."  This message was reinforced when senior agency officials, many of whom McLeod claimed were also investors in the FEBG Bond Fund, openly endorsed McLeod at agency seminars and recommended his financial services to junior employees.

126.    Continued access to government employees was a fundamental part of McLeod's ability to perpetuate his fraudulent scheme.  When agencies lacked money to pay FEBG for retirement education seminars in later years, McLeod agreed to conduct them for free.

127.    To win the favor and endorsement of senior agency officials, McLeod and FEBG sponsored lavish parties and paid for trips to sporting events.  Between 2005 and June 2010, McLeod spent more than $1 million on promotional expenses to entertain high ranking government officials and friends, including paying for stadium box seats and an annual trip for him and forty of his friends to the Super Bowl.

128.    McLeod also offered to lend his expertise and financial support to certain law enforcement activities to curry favor with senior agency officials.  Upon information and belief, McLeod was permitted to manage funds in the DEA Survivor Benefit Fund.  On one occasion, DEA Administrator Michele Leonhart accepted a large financial donation from McLeod in the presence of her senior executive service team and showered McLeod with accolades.

129.    McLeod's efforts to win the support and endorsement of senior agency officials were successful.  Upon information and belief, many senior agency officials both invested in the FEBG Bond Fund (thereby giving them a direct financial interest in the Fund's success) and recommended the FEBG Bond Fund to others within their agencies.  Senior agency officials, some having a direct financial interest in FEBG and operating under a conflict of interest, also continued to engage McLeod and FEBG for the purpose of providing retirement financial advice and education seminars.  The identity of senior agency officials who invested in the FEBG Bond Fund is known to the United States.  Upon information and belief, the FBI seized FEBG records and McLeod's computer hard drives shortly after McLeod's death.  These records will contain the identity of each investor in the FEBG Bond Fund.

130.    Although McLeod held himself out as an expert on the federal retirement system, he was, in reality, not capable of handling his own finances and retirement planning.  McLeod's history includes previously filing for Chapter 7 bankruptcy protection.  Both McLeod and another investment company McLeod owned, called "Federal Employee Investment Services, Inc.," had consistent tax deficiencies with the Internal Revenue Service ("IRS") since at least 1990.  Additionally, McLeod claimed he held a masters degree in finance and was working on a PHD from the Wharton School of Business, when in reality, McLeod never graduated from college.  Even a cursory inquiry into McLeod's qualifications and history would have revealed this troubled past.

131.    Not everyone was impressed with McLeod's services.  Upon information and belief, the Director of Training at the DEA Academy in Quantico, Virginia, John McCarty, banned McLeod from further access to the Academy in or about 2006 and communicated this to the highest levels of leadership within the DEA.  McCarty found McLeod to be unstable and incompetent, and recommended that DEA leadership prevent McLeod from having further access to DEA employees.  McCarty's warnings were ignored and senior leaders continued to engage McLeod at agency sponsored retirement education seminars across the country.  McLeod even received federal credentials to enable him to have easier access to federal law enforcement facilities.

**Federal Procurement Regulations**

132.    48 C.F.R. § 9.103 sets forth the policy of the United States that, "[p]urchases shall be made from, and contracts shall be awarded to, responsible prospective contractors only."  Additionally, this regulation provides that no purchase or award may be made "unless a

26

contracting officer makes an affirmative determination of responsibility." If the contracting

officer cannot make an affirmative showing, he must presume non-responsibility.

133.    To consider a contractor "responsible," 48 C.F.R. § 9.104-1 requires that the

contractor must, among other things, "have a satisfactory record of integrity and business ethics,"

"have adequate financial resources," and "have the necessary organization, accounting and

operational controls, and technical skills."

134.    For years, in disregard of the foregoing policy, McLeod was engaged to provide

retirement financial education and advice. McLeod lacked a record of integrity and business

ethics, lacked adequate financial resources, and did not possess the necessary accounting and

operational controls to prevent the operation of the Ponzi scheme.

135.    Even when FEBG was awarded a standing GSA services contract in 2006,

contracting officers failed to perform even a cursory investigation of McLeod, FEBG, or any of

his related entities. A quick review of McLeod's history would have revealed his bankruptcy

and tax deficiencies, and a momentary check into the FEBG Bond Fund, the product senior

agency officials knew McLeod was soliciting employees to invest in, would have immediately

revealed that the Fund did not even exist.

### Ethics Regulations and Laws

136.    The success of McLeod's fraudulent scheme depended upon his continued access

to federal employees. McLeod's continued access to agency employees was accomplished, in

large part, because of his close personal relationships with senior agency officials. Many of

those relationships flourished notwithstanding specific ethical prohibitions that should have

prevented McLeod from receiving the kind of access and favorable endorsements he and FEBG

enjoyed for decades.

137.   Pursuant to 5 C.F.R. § 2365.101(b)(4), government officials and decision makers are prohibited from accepting gifts or other items of monetary value from any person or entity seeking to do business with their agency.

138.   Notwithstanding the aforesaid prohibition, many contracting officers and senior officials with authority in the named agencies accepted gifts from, and attended lavish parties hosted by, McLeod when it was plain that McLeod and FEBG desired to conduct business with their agencies.

139.   Because they received these items and favors, senior agency officials and contracting officers gave preferential treatment to McLeod and FEBG, giving him unprecedented and nearly exclusive access to the lives, trust, and confidence of federal employees. McLeod and FEBG enjoyed a near monopoly within the government retirement education industry. No other contractor received anything near the same level of access or engagements to provide federal retirement education and advice as did McLeod and FEBG.

140.   The preferential treatment given to McLeod and FEBG, which also employed retired agency officials, was contrary to the prohibition contained in 5 C.F.R. § 2365.101(b)(8), which specifically prohibits government officials from showing favor to private individuals or organizations.

141.   In addition to violating the above regulations, the acceptance of valuable gifts and favors violated one or more federal criminal statutes addressing conflicts of interest, including 18 U.S.C. §§ 201, 203 and 208.

142.   In addition to the forgoing, the Ethics in Government Act of 1978 (5 U.S.C. App. § 101 *et seq.*), Executive Order 12674 (as modified by Executive Order 12731), and federal financial disclosure regulations (5 C.F.R. Part 2634), required senior agency employees to disclose their financial interests in FEBG, including the purported investment income being

28

generated through the FEBG Bond Fund, in their annual financial disclosure reports filed with the Office of Government Ethics.  These disclosure requirements exist "to prevent conflicts of interest and to identify potential conflicts, by providing for a systematic review of the financial interests of both current and prospective officers."  5 C.F.R. § 2634.104(b).

143.    Upon information and belief, many of the senior agency officials who hired McLeod and FEBG to provide retirement financial education and training labored under a conflict of interest because those same senior agency officials were investors in the FEBG Bond Fund and therefore had a significant financial interest in the success of FEBG.

144.    The failure of senior agency officials investing in the FEBG Bond Fund to disclose their financial interests in FEBG served to perpetuate a conflict of interest and enabled McLeod to implement and continue his fraudulent scheme.   Alternately, if these senior agency officials did disclose their financial interests in FEBG as required, then other agency employees responsible for identifying and preventing such conflicts of interest were negligent in failing to do so.

### The OPM Retirement Strategy

145.    The OPM Retirement Strategy articulated a long-standing policy prohibiting federal agencies from providing specific financial investment advice in connection with their retirement financial education activities mandated by 5 U.S.C. § 8350 and the TSP Act.

146.    Each agency had an obligation to abide by the policy and owed its employees a duty to ensure contractors engaged to assist the agency with retirement financial education activities did not violate the policy.  Specifically, as expressly required by the OPM Retirement Strategy, agencies were required to "insure that their financial education activities are

informational and educational in nature and that they **do not** provide specific financial

investment advice." *See* **Exhibit 2** at 11 (emphasis added).

147. The obligation of the agencies of the United States to abide by the above OPM

Retirement Strategy was mandatory. The directive to insure agency financial education activities

did not involve providing specific financial investment advice did not involve any element of

judgment or choice, and was therefore not discretionary.

## VI.   CAUSES OF ACTION

### Count I
### Negligence

148. Paragraphs 1 through 147 of this Complaint are incorporated by reference as if set

forth verbatim herein.

149. Legislative enactments and administrative regulations are traditional sources of

tort law duty. *See* McCain v. Florida Power Corporation, 593 So.2d 500, 503 (Fla. 1992).

150. Additionally, whenever one undertakes to perform a service for others, even

gratuitously, the undertaker assumes a duty to act carefully and not put others at undue risk. *See*

Clay Electric Cooperative, Inc. v. Lance, Inc., 873 So.2d 1182, 1185 (Fla. 2003).

151. The United States of America, acting through its agents and employees, owed a

duty and obligation to Plaintiffs to exercise due care to prevent unreasonable risks pursuant to:

(1) the federal procurement regulations; (2) ethics regulations and laws; and (3) the OPM

Retirement Strategy. Moreover, when the United States of America, acting through Congress,

the OPM, and its various federal agencies, undertook to assist federal employees with their

retirement education, the United States assumed the duty to act carefully in that undertaking and

to avoid putting government employees at undue risk.

152.    When agency officials and contracting officers did not conduct thorough or even cursory background checks on McLeod or FEBG, or conducted such checks in a negligent fashion, the United States breached its duty owed to Plaintiffs under applicable procurement regulations, as described herein.

153.    By accepting and/or soliciting gifts and valuable favors from McLeod and FEBG, a government contractor, the United States, acting through its senior agency officials, breached its duty to Plaintiffs under applicable ethics regulations and laws.

154.    When senior agency officials having a conflict of interest failed to report their financial interests in FEBG as required by federal laws and regulations, the United States, acting through these employees, breached a duty owed to Plaintiffs under applicable laws and regulations.  Alternatively, if senior agency officials properly disclosed their financial interests in FEBG, then the employees of the United States charged with identifying and preventing serious conflicts of interest breached their duty to Plaintiffs by failing to do so.

155.    The United States further breached its duty owed to Plaintiffs by negligently failing to insure McLeod and FEBG did not give specific financial investment advice to government employees in connection with agency retirement financial education activities, which included agency sponsored seminars featuring McLeod and FEBG, as directed by the OPM Retirement Strategy.

156.    As the direct and proximate result of the aforesaid breaches of duty owed to Plaintiffs by the United States, McLeod and FEBG received unprecedented access to Plaintiffs and enjoyed an aura of trustworthiness that allowed McLeod to defraud Plaintiffs.

157.    As a result of the forgoing, Plaintiffs have each suffered actual loss and damages as is set forth herein.

31

## Count II
## Breach of Fiduciary Duty

158.    Paragraphs 1 through 147 of this Complaint are incorporated by reference as if set forth verbatim herein.

159.    A fiduciary relationship arises when a superior party undertakes to counsel, advise, or protect a weaker party.  Retirement counselors at each federal agency receive mandatory specialized education and training to enable them to assist federal employees with retirement financial education and planning.  Employees rely upon their agencies to help them understand their retirement benefits and to assist them with retirement planning and advice.

160.    The United States occupied a superior position over Plaintiffs with respect to their retirement planning, education and investments, and had superior access to confidential information about McLeod and the investments he recommended.  This superior position necessitated that Plaintiffs repose their trust and confidence in McLeod and FEBG, and Plaintiffs did so by investing in the FEBG Bond Fund.

161.    Plaintiffs reasonably and foreseeably trusted in McLeod's and FEBG's purported expertise and skill, and the United States knew and recognized that Plaintiffs would rely on and repose their trust in McLeod and FEBG when deciding to invest and retain their investments in the FEBG Bond Fund.

162.    The control and superior position over Plaintiffs gave rise to a fiduciary duty on the part of the United States, acting through its agents and employees, to properly counsel, advise, protect and assist Plaintiffs with their retirement education and savings.

163.    The retirement counselors and senior officials at each federal agency described above, as employees and agents of the United States, directed the Plaintiffs as employees of those agencies to attend events on retirement financial education and planning featuring McLeod

32

as the expert and trusted financial advisor.  In addition, the OPM Retirement Strategy embodies the creation of a fiduciary relationship between employees and those within each agency who are entrusted to advise, counsel, and assist agency employees with understanding and planning for retirement.

164.    The fiduciary duty owed by each agency to federal employees was not abdicated when the agency decided to engage an outside expert to assist with the agency's retirement financial education activities.

165.    The fiduciary duty owed by each agency to federal employees was breached in a number of ways,  including but not limited to:  failing to insure McLeod and FEBG did not provide specific financial investment advice to government employees,  failing to adhere to ethical standards and laws that would have eliminated McLeod's ability to defraud employees, and  failing to adequately vet McLeod or FEBG before engaging McLeod to provide retirement financial education and advice to vulnerable employees.  The United States had a duty to take all of these actions.

166.    When agency officials breached their fiduciary duties to the Plaintiffs, they facilitated McLeod's fraud and caused the Plaintiffs to suffer both economic and non-economic damages, as set forth herein.

## Count III
## Aiding and Abetting McLeod's Breach of Fiduciary Duty

167.    Paragraphs 1 through 147 of this Complaint are incorporated by reference as if set forth verbatim herein.

168.    McLeod owed a fiduciary duty to each Plaintiff, which he breached by reason of the acts alleged above.  The statements and representations made by McLeod to Plaintiffs, and the written account statements sent to Plaintiffs, were false, and were known by McLeod to be

false when they were made, and were intended to and did induce Plaintiffs to invest and maintain

funds with McLeod and FEBG.  Plaintiffs reasonably relied on McLeod's and FEBG's statements

and representations.

169.    The United States owed a duty to Plaintiffs to insure McLeod did not provide

specific financial investment advice in connection with agency retirement education activities

and, in breaching that duty, affirmatively assisted McLeod's fraudulent scheme, helped to

conceal his fraudulent scheme, and failed to act when required to do so, thereby enabling the

breach of McLeod's fiduciary duty to occur.   Lerner v. Fleet Bank, N.A., 459 F.3d 273, 295 (2d

Cir. 2006).

170.    The United States was aware of the investment promises made by McLeod, his

lavish lifestyle, the lack of transparency into his operations, his lack of segregation of important

functions, his lack of an auditing firm, his use of paper trading records, and his implausibly

consistent investment returns.   Through the Internal Revenue Service and the Federal

Bankruptcy Court, the United States was also aware that both McLeod and his investment

company Federal Employee Investment Services, Inc. had consistent tax deficiencies since at

least 1990 and that McLeod had filed for personal bankruptcy.  Through the Director of Training

at the DEA Academy in Quantico, Virginia, John McCarty, the United States also was aware that

McLeod was banned from further access to the Academy in or about 2006, and that McCarty

found McLeod to be unstable and incompetent.  Given the Defendant's general experience in

providing financial education services to federal employees, its long-standing relationship with

McLeod, and its knowledge of the above "red flags," the United States consciously avoided

confirming facts that, if known, would demonstrate the fraudulent nature of the scheme by

McLeod that the United States substantially furthered.   Fraternity Fund Ltd. v. Beacon Hill

Asset Mgmt. LLC., 479 F. Supp. 2d 349, 368 (S.D.N.Y 2007);  Anwar v. Fairfield Greenwich

Ltd., 728 F. Supp. 2d 372, 442 (S.D.N.Y 2010).

171.    The United States substantially assisted McLeod by: failing to investigate

McLeod or FEBG, allowing McLeod to give specific financial investment advice to government

employees in connection with agency sponsored retirement education activities, failing to follow

its own procedures regarding McLeod's procurement and supervision, failing to review any of

McLeod's investment materials, failing to investigate McLeod's false education credentials,

failing to advise Plaintiffs of McLeod's  tax deficiencies since at least 1990 and of his

bankruptcy,  and failing to advise or warn Plaintiffs that in 2006 the DEA Academy banned

McLeod from further access to the Academy and found that McLeod was unstable and

incompetent.  The United States had a duty to take all of these actions.

172.    By virtue of the foregoing, the United States aided and abetted McLeod's breach

of his fiduciary duties to the Plaintiffs.

173.    Defendant's conduct caused Plaintiffs to suffer damages as set forth herein.

### Count IV
### Negligent Retention and Supervision

174.    Paragraphs 1 through 155 of this Complaint are incorporated by reference as if set

forth verbatim herein.

175.    The United States had a duty to Plaintiffs to retain competent and trustworthy

investment advisors to conduct retirement education and planning seminars and, in connection

with those seminars, to insure instructors and advisors did not provide specific financial

investment advice to those in attendance.

176.    The United States also had a duty to Plaintiffs to supervise its seminar instructors,

including McLeod, as required by the OPM Retirement Strategy.

177.    The United States breached its duties to Plaintiffs by failing to supervise, direct and control the activities of McLeod and FEBG in connection with agency retirement education activities, and by failing to properly conduct compliance reviews of McLeod and FEBG for more than 20 years.

178.    As the direct and proximate result of the aforesaid breaches of duty owed to Plaintiffs by the United States, McLeod and FEBG received unprecedented access to Plaintiffs and enjoyed an aura of trustworthiness that allowed McLeod to defraud Plaintiffs.

179.    As a result of the forgoing, Plaintiffs have each suffered actual loss and damages as is set forth herein.

## Count V
## Negligent Infliction of Emotional Distress

180.    Paragraphs 1 through 155, 163, 170 and 171 of this Complaint are incorporated by reference as if set forth verbatim herein.

181.    The conduct of the United States, acting through its employees, was (i) reckless and wanton, (ii) evidenced an entire want of care of attention to duty, (iii) with great indifference to Plaintiffs' rights, and (iv) was such reckless disregard of Plaintiffs' rights that Defendant's conduct is equivalent to a conscious indifference.  As a result, Plaintiffs suffered severe and substantial emotional distress and mental anguish.

182.    Plaintiffs, who lost all or a significant part of their retirement savings, suffered and continue to suffer mental anguish and stress as a natural and foreseeable consequence of Defendant's wrongful acts and/or negligence.

183.    Defendant's conduct caused Plaintiffs to suffer damages as set forth herein.

## VII.    DAMAGES

184.    Simone and Rene Alvarez lost their entire principal amount of $115,000 and $43,507 that their TSP would have earned, had the tortious conduct not occurred. They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $475,521.

185.    Anthony Anglada lost his entire principal amount of $216,000 and $74,154 that his TSP would have earned, had the tortious conduct not occurred. He also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $870,462.

186.    Adam Arbitman lost his entire principal amount of $45,000 and $16,103 that his TSP would have earned, had the tortious conduct not occurred. He also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $183,309.

187.    Joseph Begley lost his entire principal amount of $5,050 and $1,344 that his TSP would have earned, had the tortious conduct not occurred. He also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $19,182.

188.    Joseph and Donna Bendig lost their entire principal amount of $200,000 and $163,315 that their TSP would have earned, had the tortious conduct not occurred. They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $1,089,945.

189.    Delores Benson lost her entire principal amount of $4,415 and $1,823 that her TSP would have earned, had the tortious conduct not occurred. She also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $18,714.

190.     Brian Bonifant lost his entire principal amount of $128,000 and $90,268 that his TSP would have earned, had the tortious conduct not occurred.  He also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $654,804.

191.     Robert and Lana Botelho lost their entire principal amount of $143,773 and $36,208 that their TSP would have earned, had the tortious conduct not occurred.  They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $539,943.

192.     Ronald Branch lost his entire principal amount of $110,000 and $42,071 that his TSP would have earned, had the tortious conduct not occurred.  He also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $456,213.

193.     Rebecca Branum lost her entire principal amount of $35,000 and $21,515 that her TSP would have earned, had the tortious conduct not occurred.  She also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $169,545.

194.     Daniel and Martha Brown lost their entire principal amount of $7,000 and $4,117 that their TSP would have earned, had the tortious conduct not occurred.  They also suffered and continued to suffer extreme mental anguish and other non-economic losses in the amount of $33,351.

195.     Marcus Brown lost his entire principal amount of $70,000 and $24,406 that his TSP would have earned, had the tortious conduct not occurred.  He also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $283,218.

196.     Thomas and Cynthia Bush lost their entire principal amount of $205,000 and $34,334 that their TSP would have earned, had the tortious conduct not occurred.  They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $718,002.

197.    John and Laura Cannon lost their entire principal amount of $277,055 and $120,598 that their TSP would have earned, had the tortious conduct not occurred. They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $1,192,959.

198.    Rachel Cannon lost her entire principal amount of $309,000 and $209,318 that her TSP would have earned, had the tortious conduct not occurred. She also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $1,554,954.

199.    Bettina Catalano lost her entire principal amount of $75,000 and $53,111 that her TSP would have earned, had the tortious conduct not occurred. She also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $384,333.

200.    Michael and Julie Cashman lost their entire principal amount of $1,057,000 and $574,961 that their TSP would have earned, had the tortious conduct not occurred. They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $4,895,883.

201.    Mary Cindric lost her entire principal amount of $275,000 and $267,117 that her TSP would have earned, had the tortious conduct not occurred. She also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $1,626,351.

202.    Thomas and Gena Cindric lost their entire principal amount of $48,000 and $43,454 that their TSP would have earned, had the tortious conduct not occurred. They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $274,362.

203.    Nicklous Cooper lost principal in the amount of $92,977 and $157,935 that his TSP would have earned, had the tortious conduct not occurred. He also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $752,736.

204.    Kurt and Clara Coront lost their entire principal amount of $458,500 and $126,884 that their TSP would have earned, had the tortious conduct not occurred. They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $1,756,152.

205.    Clara Cosgrove lost her entire principal amount of $85,000 and $23,010 that her pension would have earned, had the tortious conduct not occurred. She also suffered and continued to suffer extreme mental anguish and other non-economic losses in the amount of $324,030.

206.    John and Wanda Cox lost their entire principal amount of $22,850 and $4,612 that their TSP would have earned, had the tortious conduct not occurred. They also suffered and continued to suffer extreme mental anguish and other non-economic losses in the amount of $82,386.

207.    Kyle Craig lost his entire principal amount of $25,000 and $7,340 that his TSP would have earned, had the tortious conduct not occurred. He also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $97,020.

208.    Michael and Sharon Craw lost their entire principal amount of $265,253 and $334,587 that their pension would have earned, had the tortious conduct not occurred. They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $1,799,520.

209.    Montye Crawford lost her entire principal amount of $85,000 and $28,782 that her TSP would have earned, had the tortious conduct not occurred. She also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $341,343.

210.     Gladys Crespo lost her entire principal amount of $112,535 and $75,588 that her pension would have earned, had the tortious conduct not occurred.  She also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $564,369.

211.     James and Mary Beth Davidson lost their entire principal amount of $44,403 and $32,055 that their TSP would have earned, had the tortious conduct not occurred.  They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $229,374.

212.     Weston and Lori Davis lost their entire principal amount of $896,550 and $261,463 that their TSP would have earned, had the tortious conduct not occurred.  They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $3,474,039.

213.     Colette Dennehy lost her entire principal amount of $50,000 and $18,809 that her TSP would have earned, had the tortious conduct not occurred.  She also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $206,427.

214.     Barbara and Robert Devine lost their entire principal amount of $60,000 and $31,379 that their TSP would have earned, had the tortious conduct not occurred.  They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $274,137.

215.     James DiCaprio lost his entire principal amount of $95,000 and $76,319 that his TSP would have earned, had the tortious conduct not occurred.  He also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $513,957.

216.     Tracy and Susan Donahue lost their entire principal amount of $36,000 and $24,535 that their TSP would have earned, had the tortious conduct not occurred.  They also

41

suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $181,605.

217.    Frank Doyle lost his entire principal amount of $100,000 and $17,433 that his TSP would have earned, had the tortious conduct not occurred.  He also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $352,299.

218.    Gail Fagan lost her entire principal amount of $518,000 and $239,285 that her TSP would have earned, had the tortious conduct not occurred.  She also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $2,271,855.

219.    Joe Figueroa lost his entire principal amount of $176,000 and $52,917 that his TSP would have earned, had the tortious conduct not occurred.  He also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $686,751.

220.    Jacqueline Fruge lost her entire principal amount of $30,000 and $11,289 that her TSP would have earned, had the tortious conduct not occurred.  She also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $123,867.

221.    Wilfred Fruge lost his entire principal amount of $1,000,000 and $365,165 that his pension would have earned, had the tortious conduct not occurred.  He also suffered and continues to suffer extreme mental anguish and other non-economic losses  in the amount of $4,095,495.

222.    Milton Galanos lost his entire principal balance of $32,549 and $20,906 that his TSP would have earned, had the tortious conduct not occurred.  He also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $160,365.

223.    Douglas and Laurie Garner lost their entire principal balance of $170,000 and $120,009 that their TSP would have earned, had the tortious conduct not occurred.  In addition, after following McLeod's negligent financial advice concerning their TSP, they lost $250,000

including paying penalties and losing CBP's matching contributions. They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $1,620,027.

224.    Harold Garner lost his entire principal balance of $599,728 and $306,284 that his TSP would have earned, had the tortious conduct not occurred. He also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $2,718,036.

225.    Jimmy and Nancy Garza lost their entire principal balance of $13,000 and $11,331 that their TSP would have earned, had the tortious conduct not occurred. They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $72,993.

226.    Sandra Gilley lost her entire principal balance of $98,000 and $63,085 that her pension would have earned, had the tortious conduct not occurred. She also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $483,252.

227.    Sandra Goetz lost her entire principal balance of $100,000 and $24,337 that her pension would have earned, had the tortious conduct not occurred. She also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $373,011.

228.    David Grant lost his entire principal balance of $40,000 and $24,589 that his TSP would have earned, had the tortious conduct not occurred. He also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $193,767.

229.    Ronald and Shigemi Grimes lost their entire principal balance of $145,500 and $118,814 that their TSP would have earned, had the tortious conduct not occurred. They also

suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $792,942.

230. Mark and Theresa Hamlet lost their entire principal balance of $350,000 and $124,759 that their TSP would have earned, had the tortious conduct not occurred. They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $1,424,277.

231. Sandra Hill lost her entire principal amount of $100,000 and $75,235 that her TSP would have earned, had the tortious conduct not occurred. She also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $525,705.

232. John Kelley lost his entire principal amount of $95,000 and $33,688 that his TSP would have earned, had the tortious conduct not occurred. He also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $386,064.

233. John and Kristine Kelley lost their entire principal amount of $502,000 and $146,048 that their TSP would have earned, had the tortious conduct not occurred. They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $1,944,144.

234. Larry and Leanne Klumb lost their entire principal amount of $100,000 and $18,350 that their TSP would have earned, had the tortious conduct not occurred. They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $355,050.

235. Edward Kohn lost his entire principal amount of $675,000 and $433,291 that his TSP would have earned, had the tortious conduct not occurred. He also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $3,324,873.

236.    Keith and Gladys Kruskall lost their entire principal amount of $525,386 and

$162,017 that their TSP would have earned, had the tortuous conduct not occurred.  They also

suffered and continue to suffer extreme mental anguish and other non-economic losses in the

amount of $2,062,209.

237.    James and Elsa Krutak lost some of their principal in the amount of $278,442.

They also suffered and continue to suffer extreme mental anguish and other non-economic losses

in the amount of $835,326.

238.    Joey Lenseigne lost his entire principal amount of $20,000 and $22,745 that his

TSP would have earned, had the tortious conduct not occurred.  He also suffered and continues

to suffer extreme mental anguish and other non-economic losses in the amount of $128,262.

239.    Deborah Loftus-Errthum lost her entire principal amount of $1,269,661 and

$957,122 that her TSP would have earned, had the tortious conduct not occurred.  She also

suffered and continues to suffer extreme mental anguish and other non-economic losses in the

amount of $6,680,349.

240.    Robert and Colleen Marchi lost their entire principal amount of $363,000 and

$181,158 that their TSP would have earned, had the tortious conduct not occurred.  They also

suffered and continue to suffer extreme mental anguish and other non-economic losses in the

amount of $1,632,474.

241.    Anthony and Jean Marotta lost their entire principal amount of $405,000 and

$340,164 that their TSP would have earned, had the tortious conduct not occurred.  They also

suffered and continue to suffer extreme mental anguish and other non-economic losses in the

amount of $2,235,489.

242.    Julie Marotta lost her entire principal amount of $50,000 and $51,839 that her

pension would have earned, had the tortious conduct not occurred.  She also suffered and

continues to suffer extreme mental anguish and other non-economic losses in the amount of $305,517.

243.    Phillip and Janice Martin lost their entire principal amount of $146,000 and $72,327 that their TSP would have earned, had the tortious conduct not occurred. They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $655,041.

244.    Thomas and Karen Martin lost their entire principal amount of $225,000 and $156,579 that their TSP would have earned, had the tortious conduct not occurred. They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $1,144,737.

245.    Brian and Kryssa Miller lost their entire principal amount of $250,000 and $57,344 that their TSP would have earned, had the tortious conduct not occurred. They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $922,032.

246.    Elaine Morgan lost her entire principal amount of $1,075,000 and $256,441 that her pension would have earned, had the tortious conduct not occurred. She also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $3,994,323.

247.    Walter and Elaine Morrison lost their entire principal amount of $35,815 and $19,561 that their TSP would have earned, had the tortious conduct not occurred. They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $166,128.

248. Sean O'Brian lost his entire principal amount of $6,800 and $811 that his TSP would have earned, had the tortious conduct not occurred. He also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $23,214.

249. Michael Parra lost his entire principal amount of $252,145 and $194,926 that his TSP would have earned, had the tortious conduct not occurred. He also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $1,341,213.

250. Kimberly Pribble lost her entire principal amount of $25,000 and $24,773 that her TSP would have earned, had the tortious conduct not occurred. She also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $149,319.

251. Mitchell and Jami Price lost their entire principal amount of $43,355 and $29,436 that their TSP would have earned, had the tortious conduct not occurred. They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $218,373.

252. Brian and Victoria Quirk lost their entire principal amount of $82,000 and $61,858 that their TSP would have earned, had the tortious conduct not occurred. They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $431,574.

253. Derek and Jennifer Ranger lost their entire principal amount of $200,000 and $86,612 that their pension would have earned, had the tortious conduct not occurred. They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $859,836.

254. Richard and Carol Reck lost their entire principal amount of $160,000 and $87,460 that their TSP would have earned, had the tortious conduct not occurred. They also

suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $742,380.

255.    Harry Richards lost his entire principal amount of $217,904 and $155,943 that his TSP would have earned, had the tortious conduct not occurred. He also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $1,121, 541.

256.    John and Monica Riley lost their entire principal amount of $400,000 and $112,853 that their TSP would have earned, had the tortious conduct not occurred. They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $1,538,559.

257.    Michael Roselle lost his entire principal amount of $50,000 and $17,981 that his TSP would have earned, had the tortious conduct not occurred. He also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $203,943.

258.    J. Andrew Rosenhamer lost his entire principal amount of $180,001 and $98,993 that his pension would have earned, had the tortious conduct not occurred. He also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $836,982.

259.    Michael  Russo lost his entire principal amount of $60,829 and $49,366 that his TSP would have earned, had the tortious conduct not occurred. He also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $330,585.

260.    Mary Salazar lost her entire principal amount of $495,425 and $456,522 that her TSP would have earned, had the tortious conduct not occurred. She also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $2,855,841.

261.    Albert and Jo Anne Schreiber lost their entire principal amount of $95,000 and $66,244 that their TSP would have earned, had the tortious conduct not occurred. They also

suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $483,732.

262.   Rick Sell lost his entire principal amount of $350,000 and $130,800 that his TSP would have earned, had the tortious conduct not occurred.  He also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $1,442,400.

263.   Donald Shruhan lost his entire principal amount of $200,000 and $132,120 that his TSP would have earned, had the tortious conduct not occurred.  He also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $996,360.

264.   James and Tamara Slater lost their entire principal amount of $65,000 and $17,527 that their TSP would have earned, had the tortious conduct not occurred.  They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $247,581.

265.   William and Cynthia Smith lost their entire principal amount of $150,000 and $46,793 that their TSP would have earned, had the tortious conduct not occurred.  They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $590,109.

266.   Scott Snyder lost his entire principal amount of $90,000 and $22,848 that his TSP would have earned, had the tortious conduct not occurred.  He also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $338, 544.

267.   Stephen Snyder lost his entire principal amount of $50,000 and $13,763 that his TSP would have earned, had the tortious conduct not occurred.  He also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $191,289.

268.    Debra Sourini lost $318,915 of her principal amount and $517,259 that her TSP would have earned, had the tortious conduct not occurred.  She also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $2,508,522.

269.    Michael and Roberta Stanton lost their entire principal amount of $100,000 and $20,185 that their pension would have earned, had the tortious conduct not occurred.  They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $360,555.

270.    Andrew and Olivia Thompson lost their entire principal amount of $80,000 and $63,193 that their TSP would have earned, had the tortious conduct not occurred.  They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $429,579.

271.    Kristine Tierney lost her entire principal amount of $95,000 and $43,399 that her TSP would have earned, had the tortious conduct not occurred.  She also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $415,197.

272.    Kathy Tilley lost her entire principal amount of $98,000 and $61,608 that her pension would have earned, had the tortious conduct not occurred.  She also suffered and continues to suffer extreme mental anguish and other non-economic losses in the mount of $478,824.

273.    Mark and Mary Ellen Trouville lost their amount principal balance of $75,000 and $10,677 that their TSP would have earned, had the tortious conduct not occurred.  They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $257,031.

274.    Ronald and Nanette Van Gundy lost $11,863 of their principal and $99,904 that their TSP would have earned, had the tortious conduct not occurred.  They also suffered and

continue to suffer extreme mental anguish and other non-economic losses in the amount of $335,298.

275.    Robert Vance lost his entire principal amount of $100,000 and $19,268 that his pension would have earned, had the tortious conduct not occurred.  He also suffered and continues to suffer extreme mental anguish and other non-economic losses in the amount of $357,804.

276.    James and Nancy Woolley lost their entire principal amount of $181,872 and $126,469 that their TSP would have earned, had the tortious conduct not occurred.  They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $925,023.

277.    Steven and Ruth Zellers lost their entire principal amount of $100,000 and $19,084 that their TSP would have earned, had the tortious conduct not occurred.  They also suffered and continue to suffer extreme mental anguish and other non-economic losses in the amount of $357,252.

278.    The Plaintiffs collectively suffered losses of principal in the amount of $19,476,551, losses of TSP earnings in the amount of $10,547,728, and non-economic losses in the amount of $90,073,266.  *See* **Exhibit 7**.

## JURY TRIAL DEMANDED

Plaintiffs demand trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendant the United States of America as follows:

1.    Economic and non-economic damages in the amounts described above; plus

2.    The costs of filing this lawsuit, pursuant to the Federal Tort Claims Act; plus

3.    Such further and additional relief at law or in equity that the Court may deem
      appropriate or proper.

Dated:  February 19, 2013.

Respectfully submitted,

**MARKS GRAY, P.A.**

**/s/ Nicholas V. Pulignano, Jr.**
Nicholas V. Pulignano, Jr.
Florida Bar No.: 0319181
Heath L. Vickers
Florida Bar No.:  0084769
1200 Riverplace Boulevard, Suite 800
Jacksonville, FL 32207
Office: 904-807-2105
Fax: 904-399-8440
Email: npulignano@marksgray.com
Email: hvickers@marksgray.com

Ray M. Shepard, Esquire
(*Pro Hac Vice Pending*)
**Smith, Gildea & Schmidt LLC**
600 Washington Avenue, Suite 200
Towson, MD  21204
Office:  410-821-0070
Fax:  410-821-0071
Email: rshepard@sgs-law.com

*Attorneys for Plaintiffs*

26510/693870