**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

RENE ALVAREZ, *et al.*,

     Plaintiffs,

v.

UNITED STATES OF AMERICA,

     Defendant.

Case No. 13-cv-00174-J-99-TJC-MCR

**PLAINTIFFS' MEMORANDUM**
**IN OPPOSITION TO UNITED STATES' RENEWED MOTION**
**TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

**Table of Contents**

INTRODUCTION…………………………..……………………………………...1

STANDARD OF REVIEW……………………………………..…………………………2

    I.    MCLEOD WAS ONE OF THE MANY NEGLIGENT
        GOVERNMENT EMPLOYEES IN THIS CASE……………………………...3

    II.    GOVERNMENT LIABILITY FOR MCLEOD'S NEGLIGENCE…………15

    III.    THE DISCRETIONARY FUNCTION EXCEPTION DOES
        NOT APPLY……………………………………………………………………20

        A.  The failure to observe and enforce criminal regulations
            prohibiting commercial solicitation, vending and the display of
            commercial advertising in federal facilities constitutes
            noncompliance with a mandatory directive under the first
            prong of *Berkovitz*…………………………………………………………22

        B.  Even if the law enforcement agencies involved had discretion to
            facilitate or permit McLeod's illegal behavior in their
            GSA-controlled offices, exercising that type of judgment is not
            the kind of decision-making that the discretionary function
            exception was designed to shield, and therefore the exception
            would still not apply under the second prong of *Berkovitz*………………35

        C.  The government's failure to comply with additional mandatory
            directives contained in the OPM's Retirement Strategy,
            Benefits Administration Letter 06-107, and as implemented
            through training of agency benefits officers prevents application
            of the discretionary function exception under *Berkovitz*…………………39

        D.  Even if the law enforcement agencies involved had discretion to
            facilitate or permit the provision of specific financial investment
            advice—a form of commercial solicitation—at
            agency-sponsored retirement seminars, that decision-making
            is not of the kind the discretionary function exception was
            designed to shield, and therefore the exception would still not
            apply under the second prong of *Berkovitz*……………………………...43

    IV.    THE MISREPRESENTATION EXCEPTION DOES NOT APPLY………..45

CONCLUSION………………………………………………………………………51

i

**Table of Authorities**

## CASES

*AFGE v. Webb,*
  580 F.2d 496, *cert. denied,* 439 U.S. 927 (1978)………………………………………14

*Andrews v. United States,*
  121 F.3d 1430 (11th Cir. 1997)…………………………………………...............44

*Appley Bros. v. United States*,
  7 F.3d 720 (8th Cir. 1993)……………………………………………………...46

*ARA Leisure Servs., Inc. v. NLRB*,
  782 F.2d 456 (4th Cir.1986)……………………………………………………...11

*Autery v. United States*,
  992 F.2d 1523 (11th Cir. 1993)……………………………………………21, 29, 30, 42

*B&A Marine Co., Inc. v. American Foreign Shipping Co., Inc.*,
  23 F.3d 709 (2d Cir.1994)………………………………………………………4

*Baer v. United States,*
  722 F.3d 168 (3d Cir. 2013)………………………………………………………1

*Barnebey v. E.F. Hutton & Co.,*
  715 F.Supp. 1512 (M.D. Fla. 1989)………………………………………………18

*Berkovitz v. United States,*
  486 U.S. 531 (1988)…………………………………21, 22, 29, 30, 34, 35, 36, 39, 42, 43

*Birnbaum v. United States,*
  588 F.2d 319 (2d Cir. 1978)………………………………………………………37

*Block v. Neal,*
  460 U.S. 289, 103 S. Ct. 1089, 75 L. Ed. 2d 67 (1983)…………………...........46, 47, 50, 51

*Boda v. United States,*
  698 F.2d 1174 (11th Cir. 1983)……………………………………………...49

*Brons v. United States,*
  2015 U.S. Dist. LEXIS (N.D.Ga. Feb. 12, 2015)………………………………………36

*Caban v. United States,*
  671 F.2d 1230 (2d Cir. 1982)……………………………………………………..38

*Chang-Williams v. Dept. of the Navy*,
    766 F.Supp.2d 604 (D. Md. 2011)……………………………………………………..51

*Czekalski v. Peters*,
    475 F.3d 360 (D.C. Cir. 2007)…………………………………………………………27

*deJesus v. Seaboard Coast Line R.R. Co.*,
    281 So.2d 198 (Fla. 1973)…………………………………………………………16, 17

*Delong Equip. Co. v. Washington Mills Abrasive Co.*,
    840 F.2d 843 (11th Cir. 1988)………………………………………………………...2, 3

*Delvin v. United States*,
    352 F.3d 525 (2d Cir. 2003)……………………………………………………………46

*Denson v. United States*,
    574 F.3d 1318 (11th Cir. 2009)……………………………………………………...37

*Dichter-Mad Fam. Partners, LLP v. United States*,
    709 F.3d 749 (9th Cir. 2013)……………………………………………………………1

*Dillon v. Axxsys Int., Inc.*,
    385 F.Supp.2d 1307 (M.D. Fla. 2005)……………………………………………18, 19

*Doe v. Sinrod*,
    117 So.3d 786 (Fla. App. 4th 2013)……………………………………………………20

*Downs v. United States Army Corps of Engineers*,
    333 Fed.Appx. 403 (11th Cir. 2009)………………………………………………...48

*Dutton v. United States*,
    __ Fed. App'x __, 2015 U.S. App. LEXIS 10108 (11th Cir. Jun. 16, 2015)……………..15

*Garcia v. United States*,
    826 F.2d 806 (9th Cir. 1987)………………………………………………………...38

*Gray v. Bell*,
    712 F.2d 490 (D.C. Cir. 1983)………………………………………………………38

*Guccione v. United States*,
    847 F.2d 1031 (2d Cir. 1988)……………………………………………………49, 50

*Guild v. United States*,
    685 F.2d 324 (9th Cir. 1982)………………………………………………………...46

*Horta v. Sullivan,*
    4 F.3d 2 (1st Cir. 1993)……………………………………………………………....30

*Howell v. United States,*
    932 F.2d 915 (11th Cir. 1991)………………………………………………………48

*Hughes v. United States,*
    110 F.3d 765 (11th Cir. 1997)……………………………………………21, 33, 34

*In re: Tennessee Valley Auth. Ash Spill Lit.,*
    2012 U.S. Dist. LEXIS 122231 (E.D. Tenn. Aug. 23, 2012)……………………………...27

*Indian Towing Co. v. United States,*
    350 U.S. 61 (1955)…………………………………………………………………48

*JBP Acquisitions, LP v. United States ex rel. FDIC,*
    224 F.3d 1260 (11th Cir. 2000)……………………………………………………46

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich, L.P.A,*
    559 U.S. 573 (2010)………………………………………………………………....38

*K. W. Thompson Tool Co. v. United States,*
    836 F.2d 721 (1st Cir. 1988)………………………………………………………..37

*Kirchmann v. United States,*
    8 F.3d 1273 (8th Cir. 1993)…………………………………………………………44

*Kuhlman v. United States,*
    822 F.Supp.2d 1255 (M.D.Fla. 2011)………………………………………………20

*Limone v. United States,*
    336 F.Supp.2d 18 (D. Mass. 2004)…………………………………………………36

*Logue v. United States,*
    412 U.S. 521 (1973)………………………………………………………3, 4, 10, 14

*Means v. United States,*
    176 F.3d 1376 (11th Cir. 1999)……………………………………………………3

*Merchants Home Deliv. Serv., Inc. v. NLRB,*
    580 F.2d 966 (9th Cir.1978)………………………………………………………...11

*Metropolitan Life Ins. Co. v. Atkins,*
    225 F.3d 510 (5th Cir. 2000)………………………………………………………...46

*Mid-S. Holding Co., Inc. v. United States,*
    225 F.3d 1201, 1207 (11th Cir. 2000)…………………………………………………...22, 35

*Miles v. Naval Aviation Naval Museum Foundation,*
    289 F.3d 715 (11th Cir. 2002)……………………………………………………...22, 35, 43

*Molchatsky v. United States,*
    713 F.3d 159 (2d Cir. 2013)……………………………………………………………………..1

*Mundy v. United States,*
    983 F.2d 950 (9th Cir. 1993)……………………………………………………………...46

*Murphy v. Pleasantville School Dist.,*
    2000 U.S. Dist. LEXIS 22063 (S.D. Iowa May 4, 2000)………………………………36

*Myers & Myers, Inc. v. United States Postal Service,*
    527 F.2d 1252 (2d Cir. 1975)………………………………………………………..37

*NASA v. FLRB,*
    527 U.S. 229 (1999)…………………………………………………………………...27

*OSI, Inc. v. United States,*
    285 F.3d 947 (11th Cir. 2002)………………………………………………………..21

*Ochran v. United States,*
    117 F.3d 495 (11th Cir. 1997)……………………………………………………...43, 48

*Palmer v. Shearson Lehman Hutton, Inc.,*
    622 So.2d 1085, 1090 (Fla. App. 1993)……………………………………………...16, 17, 20

*Pate v. Oakwood Mobile Homes, Inc.,*
    374 F.3d 1081 (11th Cir 2004)…………………………………………………………48

*Patterson & Wilder Constr. Co., Inc. v. United States,*
    226 F.3d 1269 (11th Cir. 2000)………………………………………...3, 4, 5, 6, 10, 11, 15

*Preston v. United States,*
    596 F.2d 232 (7th Cir. 1979)……………………………………………………………...49

*R.L. Stinson & East Coast Lumber Co. v. Prevatt,*
    84 Fla. 416, 94 So. 656 (1922)………………………………………………………...18

*Red Lake Band of Chippewa Indians v. United States,*
    800 F.2d 1187 (D.C. Cir. 1986)……………………………………………………..37

*Redmond v. United States,*
        518 F.2d 811 (7th Cir. 1975)………………………………………………...49

*Reynolds v. United States,*
        549 F.3d 1108 (7th Cir. 2008)……………………………………………...4, 5

*Sandoval United States,*
        980 F.2d 1057 (5th Cir. 1993)…………………………………………………51

*Saraw Partnership v. United States,*
        67 F.3d 567 (5th Cir. 1995)……………………………………………………46

*Schiano v. United States,*
        1996 U.S. Dist. LEXIS 23028 (M.D.Fla. Aug. 7, 1996)…………………………………42

*Schmid v. Dept. of the Army,*
        2013 U.S. Dist. LEXIS 79888 (E.D. Wash. June 6, 2013)…………………………………36

*Sellfors v. United States,*
        697 F.2d 1362 (11th Cir. 1983)……………..…………………………………48

*Sheridan v. United States,*
        487 U.S. 392 (1988)……………………………………………………...3, 50, 51

*Suter v. United States,*
        441 F.3d 306 (4th Cir. 2006)……………………………………………………1

*Sutton v. Earles,*
        26 F.3d 903 (9th Cir. 1994)…………………………………………….........28

*Tonelli v. United States,*
        60 F.3d 492 (8th Cir. 1995)…………………………………………...35, 36, 38, 44

*United States v. Bichsel,*
        395 F.3d 1053 (9th Cir. 2005)……………………………………………………26

*United States v. Faneca,*
        332 F.2d 872 (5th Cir. 1964), *cert. denied,* 380 U.S. 971 (1965)…………………………30

*United States v. Fowler,*
        913 F.2d 1382 (9th Cir. 1990)……………………………………………………46

*United States v. Friedenthal,*
        1997 U.S. Dist. LEXIS 20407 (S.D.N.Y. Dec. 19, 1997)………………...25, 29, 31, 32, 33

vi

*United States v. Gaubert,*
    499 U.S. 315 (1991)………..……………………3, 21, 22, 28, 29, 30, 35, 42, 43, 44, 45

*United States v. Neustadt,*
    366 U.S. 696 (1961)……………………………………………………………..47, 49

*United States v. Orleans,*
    425 U.S. 807 (1976)…………………………………………………………....14

*United States v. Stansell,*
    847 F.2d 609 (9th Cir. 1988)……………………………………………………….25

*Villanueva v. United States,*
    708 F. Supp. 2d 960 (D. Ariz. 2009)………………………………………………33

*Wilde v. County of Kandiyohi,*
    15 F.3d 103 (8th Cir.1994)………………………………………………………11

*Williams v. United States,*
    314 Fed. App'x 253 (11th Cir. 2009)……………………………………..30, 37, 38

*Zelaya v. United States,*
    781 F.3d 1315 (11th Cir. 2015)…………………………1, 21, 28, 35, 39, 45, 46, 48, 49

## STATUTES, CODES AND REGULATIONS

5 U.S.C. § 3109………………………………………………………………………..13

5 U.S.C. § 3109(b)………………………………………………………………………12

5 U.S.C. § 4118(a)………………………………………………………………….40, 43

5 U.S.C. § 4118(a)(2)……………………………………………………………………40

5 U.S.C. § 8350……………………………………………………………………7, 39, 41

28 U.S.C. § 1346(b)………………………………………………………………….48, 51

28 U.S.C. § 2671……………………………………………………………………..3

28 U.S.C. § 2674………………………………………………………………........48

28 U.S.C. § 2680(a)………………………………………………………………..20, 21

28 U.S.C. § 2680(h)……………………………………………………………….45, 50, 51

40 U.S.C. § 318a…………………………………………………………………………25

40 U.S.C. § 318c…………………………………………………………………………25

40 U.S.C. § 1315…………………………………………………………………………26

41 C.F.R. § 101-20.003(d)………………………………………………………………25

41 C.F.R. § 101-20.003(u)………………………………………………………………25

41 C.F.R. § 101-20.103-3 (1999)………………………………………………………30

41 C.F.R. § 101-20.300 (1999)………………………………………………………...25

41 C.F.R. § 101-20.308 (1997)…………………………………………………………32

41 C.F.R. § 101-20.308 (1999)………………………………………………………...25

41 C.F.R. § 101-20.315 (1999) …………………………………………………………25

41 C.F.R. § 101-20.403(a)(2) (1999)……………………………………………………25

41 C.F.R. § 102-74.15 (2003)…………………………………………………….........30

41 C.F.R. § 102-74.365 (2003)………………………………………………………...26

41 C.F.R. § 102-74.410 (2003)……………………………………………………8, 27, 29

41 C.F.R. § 102-74.410 (2006)………………………………………………………...26

41 C.F.R. § 102-74.450 (2003)…………………………………………………………26

48 C.F.R. § 2.101……………………………………………………………………9, 12

48 C.F.R. § 13.003(d)…………………………………………………………………...12

48 C.F.R. § 13.104(a)…………………………………………………………………...12

48 C.F.R. § 13.201(d)…………………………………………………………………...12

48 C.F.R. § 13.202………………………………………………………………………12

48 C.F.R. § 37.101…...…………………………………………………………………9

48 C.F.R. § 37.104(a)…………………………………………………………………...9

48 C.F.R. § 37.104(c)(1)…………………………………………………………………..9

48 C.F.R. § 37.104(c)(2)………………………………………………………………….10

48 C.F.R. § 37.104(d)…………………………………………………………..10, 14

66 Fed. Reg. 5358 (Jan. 18, 2001)……………………………………………………...26

67 Fed. Reg. 76820 (Dec. 13, 2002)…………………………………………………...26

## INTRODUCTION

Lawsuits under the Federal Tort Claims Act ("FTCA") initiated by victims of Ponzi Schemes typically have alleged the Securities and Exchange Commission was negligent in failing to discover and prevent the underlying fraud, and such cases have uniformly failed for lack of subject matter jurisdiction.  *See e.g., Zelaya v. United States,* 781 F.3d 1315 (11th Cir. 2015); *Baer v. United States,* 722 F.3d 168 (3d Cir. 2013); *Molchatsky v. United States,* 713 F.3d 159 (2d Cir. 2013); *Dichter-Mad Fam. Partners, LLP v. United States,* 709 F.3d 749 (9th Cir. 2013); *Suter v. United States*, 441 F.3d 306 (4th Cir. 2006).  The instant lawsuit is unlike any of these cases and, for the reasons discussed herein, this Court has subject matter jurisdiction under the unique facts presented in this case.

The instant action involves the unprecedented situation in which current and former federal law enforcement agents (and their spouses) find themselves pitted against their own law enforcement agencies to recover lost retirement savings proximately caused by their agencies' negligent supervision of official, and often mandatory, agency-sponsored retirement and financial education activities.  Neither counsel for the United States nor Plaintiffs' counsel has discovered any decisions under the FTCA in which: (1) the plaintiffs/victims were employees of the agencies alleged to have been negligent, giving rise to a special employer-employee relationship between the parties, (2) negligent supervision of agency-sponsored retirement and financial education activities was alleged, (3) prohibited commercial solicitations were alleged to have occurred during these activities, many times in government facilities where such solicitations were prohibited by federal criminal regulations; (4) commercial solicitations were made in violation of other published agency policies that prohibited such solicitations during agency-sponsored retirement and financial education activities, regardless of where the activities occurred; (5) the prohibited

commercial solicitations occurred in the presence of employees of the government responsible for preventing such solicitations, or (6) the agency employees alleged to have negligently permitted criminal solicitations to continue in their presence were law enforcement officers of the United States.   These circumstances are unique and are sufficient to establish subject matter jurisdiction in the U.S. District Court for the Middle District of Florida.

The First Amended Complaint ("FAC") continues to focus on the government's liability under the FTCA for the negligent and wrongful acts of its employees ***other than McLeod*** just as the original complaint did before.[1]  The FAC, however, alleges McLeod is another negligent government employee in this case and adds Counts I and II.   The government accuses Plaintiffs of "radically altering their theories of recovery in this case," Gov't Br. [Dkt. #88] at 2, however, the FAC simply adds McLeod among the various other government employees alleged to have been negligent in this case.  For the reasons that follow, the government's renewed motion to dismiss must be denied in its entirety.

## STANDARD OF REVIEW

The government's motion relies on matters outside of the FAC to challenge some allegations, and therefore presents a "factual attack" to subject matter jurisdiction as to those matters.  *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990).   While this Court may consider testimony and affidavits in connection with the government's motion, "All pleadings and affidavits introducing evidence relating to jurisdictional facts are to be construed in the light most favorable to the plaintiff." *Delong Equip. Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843,

---

[1] The procedural history of this case is set forth in this Court's Order filed on August 5, 2015 [Dkt. #86].  This Court granted leave to file an Amended Complaint, instructing Plaintiffs to "take into consideration the facts they have uncovered in discovery."  *Id.*  The FAC does so, and alleges all of the unique facts just described.

2

845 (11th Cir. 1988)(quoting *Vest v. Waring,* 565 F.Supp. 674, 693 (N.D.Ga.1983)).  Most of the

factual allegations remain unchallenged by matters outside of the FAC.  All facts alleged in the

FAC unchallenged by extraneous material must be accepted as true.  *United States v. Gaubert*, 499

U.S. 315, 327 (1991).

## I.   MCLEOD  WAS  ONE  OF  THE  MANY  NEGLIGENT  GOVERNMENT  EMPLOYEES IN THIS CASE

Plaintiffs and the government agree that an alleged tortfeasor's status as an employee of the

government is essential to a finding of liability under the FTCA. *Patterson & Wilder Constr. Co.,*

*Inc. v. United States,* 226 F.3d 1269, 1273-1274 (11th Cir. 2000); *Means v. United States*, 176

F.3d 1376, 1379 (11th Cir. 1999)(citing *Sheridan v. United States*, 487 U.S. 392, 400-401 (1988)).

We disagree, however, regarding whether McLeod may be deemed to have had such a status in

this case.

The FTCA defines "employee of the government" to include "officers or employees of any

federal agency ... and persons acting on behalf of a federal agency in an official capacity,

temporarily or permanently in the service of the United States, whether with or without

compensation." 28 U.S.C. § 2671.  The Act also defines "federal Agency" to exclude from the

definition "any contractor with the United States."  *Id.*  The Supreme Court has held that these

definitions preserve the common law distinction between the servant or agent relationship and that

of independent contractor.  *Logue v. United States*, 412 U.S. 521, 527 (1973).

The distinction between employees of the principal and employees of an independent

contractor with the principle "turn[s] on the absence of authority in the principal to control the

physical conduct of the contractor in the performance of the contract."  *Logue*, 412 U.S. at 527-

528.  It is the presence or absence of the government's ***authority*** to control the contractor's

employees that is critical, not whether the government has actually exercised such authority. *Logue*, 412 U.S. at 530 (agreeing the sheriff's employees were employees of a contractor with the United States and not employees of a federal agency under the FTCA because "the deputy marshal ***had no authority*** to control the activities of the sheriff's employees.")(emphasis added); *Means v. United States*, 176 F.3d 1376, 1379 (11th Cir. 1999)("In *Louge,* the Supreme Court held that a person is not an 'employee of the government' unless the government ***has the authority*** to supervise the day-to-day activities of that individual.")(emphasis added).

To be deemed an "employee" for purposes of the FTCA, "it is not necessary that the government continually control all aspects of the individual's activities, so long as it has the authority to do so given the nature of the task." *Patterson & Wilder Constr. Co.,* 226 F.3d at 1274; *Logue,* 412 U.S. at 527-28 (the "critical factor" is "the authority of the principal to control the detailed physical performance of the" individual); and *B&A Marine Co., Inc. v. American Foreign Shipping Co., Inc.*, 23 F.3d 709, 713 (2d Cir.1994)("Courts have found it indicative of an agency relationship if the Government enjoys the power to control the detailed physical performance of the contractor, or if the Government in fact supervises the day-to-day operations.").

The Eleventh Circuit has made clear that the "control test" announced in *Logue,* in addition to focusing on the government's authority to control performance of the work, requires the totality of the working relationship with respect to the project at hand to be examined; the issue is not determined by labels given to the person performing the work. *Patterson & Wilder Constr. Co.,* 226 F.3d at 1275-1276.  In *Patterson & Wilder Constr. Co.*, the plaintiff ("P&W") sued under the FTCA for the destruction of a P&W-leased aircraft destroyed during a covert narcotics operation in Columbia. *Id.* at 1270.  Federal agents contacted a private pilot, Reynolds, for the purpose of having Reynolds assist the DEA and Customs in an undercover drug interdiction operation.

4

Reynolds executed documents with Customs, which identified him as a "confidential source" and set certain guidelines for his conduct, but also indicated he was "not a Customs employee." *Id.* at 1270. Agents told Reynolds that the job would require Reynolds to locate a suitable aircraft, fly it to Colombia, purchase drugs in a pre-arranged transaction, and return to the United States. *Id.* at 1270.  Later, Reynolds and another pilot received specific instructions regarding where and when to fly, and who to meet. *Id.* at 1271. The government made two payments of $10,000 each to cover rental of the aircraft, operational expenses, insurance and fuel for seven days. *Id.* at 1271. During the operation, Columbian police arrested the undercover pilots and crashed the plane when they attempted to confiscate it. *Id.* at 1272. The government later paid the pilots $270,000 for their services. *Id.*

The district court dismissed the FTCA case finding that the pilots were not government employees because the government did not exercise sufficient supervision and control over the pilots' activities. *Patterson & Wilder Constr. Co.,* 226 F.3d at 1272. The sole issue on appeal was whether the pilots were "employees" of the government within the meaning of the FTCA. The Eleventh Circuit vacated and remanded, finding that the pilots had "been retained not just to perform a particular task, but to perform it in a particular way at a particular location at a particular time in accordance with the Government's precise instructions" and therefore "were sufficiently under the Government's control to be deemed employees." *Id.* at 1278. The "government did not simply hire two contractors to accomplish a broadly-defined task while leaving to their discretion how the task was accomplished." *Id.* at 1274.  The Eleventh Circuit vacated notwithstanding that, the pilots had signed documents expressly stating they were "not employees of the government," that the government had nothing to do with acquisition of the aircraft for the mission, and that the

government in no way supervised the pilots during flight or in Columbia.  It was sufficient that the government "dictate[d] the where, why, and how of the informant's mission." *Id.* at 1277.

Just as in *Patterson & Wilder Constr. Co.*, there is substantial evidence in this case that the government controlled the "where, why, and how" of McLeod's accomplishment of the mission for which he was hired.  The government in every instance selected the location of McLeod's seminars, the government selected who would attend, the government selected the dates and times for the training, the government mandated a question-answer period, and the government expressly dictated the topics McLeod was required to cover during the training.  *See* M. Fowler Decl., Tab A [located at Dkt. # 14-1].  For each seminar, the government furnished a microphone, a lectern, a computer and projection screen, and the government required McLeod in advance of a seminar to provide the government written training objectives with performance measures, an agenda, workshop pre-work assignments, and a workshop syllabus for approval.  *Id.*   McLeod was also required by the government to submit workshop evaluation instruments and a summary report. *Id.*

In addition to the above evidence of actual government control over McLeod's performance of his contracted services, there is additional evidence that the government retained ***full authority*** to supervise McLeod's seminars.  In her September 8, 2015 deposition, Mary Lamary, the Assistant Director for Human Resources, Policy and Advisory Services within the Department of Justice ("DOJ") testified that each component agency within the DOJ (includes DEA and FBI) has the authority and responsibility to provide retirement education and counseling to their employees.  Lamary Depo. (**Exhibit 1**) at 31-33.  More specifically, Ms. Lamary testified "the head of the agency has the responsibility to ensure that someone in the agency delivers [retirement and financial education] information" to agency employees.  *Id.* at 66.  Ms. Lamary further testified that agency heads delegate this responsibility to "agency benefits officers [or]

retirement and benefits counselors," who have the primary responsibility to ensure that agency employees receive the retirement and financial education they are required to have. *Id.* at 67; *see also* Lamary Depo. Ex. 1 (5 U.S.C. § 8350(a) defining "retirement counselor" as an "employee of the agency who is designated by the head of the agency to furnish information on benefits … and counseling services relating to such benefits to other employees of the agency."); and Lamary Depo. Ex. 2 at 11 ("Agency benefits officers have the primary responsibility to provide retirement financial education to their employees.").   Significantly, Ms. Lamary testified that agency retirement counselors cannot contract away their duties and responsibilities simply by engaging a third party to conduct the training:

> Q My question is more of a "where does the buck stop" sort of thing. It's my job as the retirement counselor to convey the information --
> **A Correct.**
> Q -- to the agency employees.
> **A Correct.**
> Q And there's certain information that has to be conveyed for me to do my job.
> **A Correct.**
> Q So I couldn't, for example, omit talking about the TSP or talking about this particular aspect of their federal retirement. I mean there are certain core topics that I assume that, as the retirement counselor, I have to talk about --
> **A Correct.**
> Q -- or convey in some way.
> **A Correct.**
> Q Okay. So whether I choose to do that myself with a Power Point, with a handout, or I hire Phil to do it, I still have the ultimate responsibility to make sure it's being done?
> **A Correct.**
> Q Okay. All right. And, so, I think you've answered my question, and that is a retirement counselor doesn't contract away their ultimate responsibility simply by engaging a third party.
> **A It -- okay. Correct.**
> Q Do you agree? I mean the agency still is the -- in other words, if the agency has the responsibility as the organization to do the training, they have all these different options of how they may do it, but, ultimately, whether it gets done or not falls to the agency. So, if the agency were to hire a third party and say, "We're going to privatize this. You take over for me," and they don't do it, they just never show up and never conduct any education, the agency is still the responsible party?

**A That's correct.**

Lamary Depo. (**Exhibit 1**) at 70-71.  In addition, Ms. Lamary testified that under no version of the DOJ Financial Literacy Plan (modeled on the OPM's Retirement Strategy) have commercials, prospecting, or the promotion of specific products, firms or services ever been permitted in connection with DOJ's retirement and financial education activities.  *Id.* at 41-46.  Under these circumstances, agencies retained sufficient authority to supervise McLeod's financial seminars for him to be deemed an employee under the FTCA, especially where they occurred in government facilities subject to the GSA's anti-solicitation regulations discussed *infra.*[2]

Ms. Lamary also testified that McLeod fit the definition of a "consultant" for DOJ.  Lamary Depo. (**Exhibit 1**) at 81.  In the parlance of federal government contracting, when a consultant provides "personal services" to the government, they are considered an employee of the government, as opposed to when they provide "nonpersonal services," in which case the consultant is considered an independent contractor.  *See* 48 C.F.R. § 37.104.  Thus, a "[*p*]*ersonal* service

---

[2] Both the DEA and FBI produced in discovery policy directives that further evidence not only the prohibited activities McLeod engaged in but also demonstrate the significant authority retained by agencies using McLeod to supervise his activities during seminars.  The DEA's Division Order 206, attached as **Exhibit 2,** expressly provides that adjunct instructors from outside the DEA "shall not promote their business or solicit customers while at the Office of Training or any government owned or leased facility," and describes the "[t]ypes of prohibited solicitation" to include "distributing business cards, promoting his or her business or soliciting customers while providing instruction, providing gifts, trinkets, or other promotional items, [or] inviting students to upcoming promotional events."  *Id.* at 2.  Similarly, FBI Policy Directive 0754DPG, attached as **Exhibit 3,** expressly provides that "FBI employees who arrange for training to be given by a non-government entity (e.g. a financial planner) must … not permit the sale or exchange of any product or service during the training session (*See* GSA regulations at 41 C.F.R. § 102-74.410)."  *Id.* at 4-101.  These directives demonstrate the authority of each agency to control their own training activities, regardless of whether civil service personnel or contractors conduct the training.

contract[3] means a contract that, by its express terms or as administered, makes the contractor personnel appear to be, in effect, Government employees."  48 C.F.R. § 2.101.  "A personal services contract is characterized by the employer-employee relationship it creates between the Government and the contractor's personnel."  48 C.F.R. § 37.104(a).  "An employer-employee relationship under a service contract occurs when, as a result of (i) the contract's terms or (ii) the manner of its administration during performance, contractor personnel are subject to the relatively continuous supervision and control of a Government officer or employee."  48 C.F.R. § 37.104(c)(1).  By contrast, a "[*n*]*onpersonal* services contract means a contract under which the personnel rendering the services are ***not*** subject, either by the contract's terms or by the manner of its administration, to the supervision and control usually prevailing in relationships between the Government and its employees."  48 C.F.R. § 37.101 (emphasis supplied).

To determine whether a consultant has been hired to provide ***personal*** services, and therefore is to be considered an employee rather than independent contractor, the Federal Acquisition Regulations ("FARs") set forth the following descriptive elements to be used as a guide: "(1) Performance on site; (2) Principal tools and equipment furnished by the Government; (3) Services are applied directly to the integral effort of agencies or an organizational subpart in furtherance of assigned function or mission; (4) Comparable services, meeting comparable needs, are performed in the same or similar agencies using civil service personnel; (5) The need for the type of service provided can reasonably be expected to last beyond one year; and (6) The inherent nature of the service, or the manner in which it is provided reasonably requires directly or

---

[3] A "service contract" means "a contract that directly engages the time and effort of a contractor whose primary purpose is to perform an identifiable task rather than to furnish an end item of supply."  *See* 48 C.F.R. § 37.101.

indirectly, Government direction or supervision of contractor employees in order to— (i) Adequately protect the Government's interest; (ii) Retain control of the function involved; or (iii) Retain full personal responsibility for the function supported in a duly authorized Federal officer or employee." 48 C.F.R. § 37.104(d).

The government asserts the "descriptive elements" set forth at 48 C.F.R. § 37.104(d) are "completely irrelevant when determining whether a particular individual is an 'employee of the government' for purposes of the FTCA." Gov't Br. [Dkt. #88] at 10. This argument is odd, since the descriptive elements are designed to assess the extent to which the government has authority to supervise a service contractor's performance—precisely the test required under the FTCA. The preceding section of the regulation makes this clear: "Each contract arrangement must be judged in the light of its own facts and circumstances, *the key question always being*: Will the Government exercise relatively continuous supervision and control over the contractor personnel performing the contract?" 48 C.F.R. § 37.104(c)(2)(emphasis added). As the government states in the next sentence of its brief, "the determination of an individual's employment status under the FTCA … turns on whether the contract at issue gives the United States the authority to supervise the contractor's detailed physical performance." Gov't Br. [Dkt. #88] at 10-11.

Nothing in the FAR is inconsistent with the "control test" articulated in *Logue*, *Means,* and *Patterson & Wilder Constr. Co* discussed *supra,* and the government has cited no authority supporting its position that the factors set forth at 48 C.F.R. § 37.104(d) are irrelevant to the inquiry of McLeod's status under the FTCA. To the contrary, the Eleventh Circuit has made clear that when considering a contractor's employment status under the FTCA, the government's relationship with the contractor must be "viewed in its totality." *Patterson & Wilder Constr. Co.,*

10

226 F.3d at 1278.[4]  Considering the totality of circumstances surrounding the use of McLeod to conduct required agency training, there is sufficient evidence to find he was an "employee" of the government for purposes of the FTCA.

The remainder of the government's arguments on this issue demonstrate government counsel's naivety in the area of government contracting.  For example, government counsel suggests, "Plaintiffs' characterization of the agreements at issue as contracts for 'personal services' is ... easily refuted [because a] federal regulation specifically requires the Government's Contracting Officer to insert a specific [termination clause] in solicitations and contracts for personal services" which is absent from the contracts before the court.  Gov't Br. [Dkt. #88] at 10. Counsel fails to appreciate that the contracting level at which McLeod's services were procured makes the termination clause cited unnecessary.  The Office of the Inspector General, U.S. Department of Justice *Report of Investigation Regarding the DEA's Relationship with K. Wayne McLeod* (December 2014)(hereinafter "OIG Report") indicates at page 18 that, "McLeod's seminar fees generally ranged from $1,500 to $3,000."  *See* **Exhibit 5.**  An agency's acquisition of McLeod's services at these amounts is by definition a "micro-purchase."  For the periods

---

[4] *See also Patterson & Wilder Constr. Co.,* 226 F.3d at 1276, quoting the following cases: *Birchem v. Knights of Columbus*, 116 F.3d 310, 312 (8th Cir.1997) ("In applying the common law of agency test, the Supreme Court looks at a large number of factors that define the parties' ***total contractual relationship***" (emphasis added))(citing *Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 751-53 (1989)); *Wilde v. County of Kandiyohi*, 15 F.3d 103, 105 (8th Cir.1994) ("To decide whether a person is an employee or independent contractor under the common law of agency, the ***totality of the working relationship*** is examined." (emphasis added)); *ARA Leisure Servs., Inc. v. NLRB*, 782 F.2d 456, 460 (4th Cir.1986) (under control test, "we must examine ***the relationship in its entirety***, considering all the circumstances that suggest either employee or independent contractor status" (emphasis added)); *Merchants Home Deliv. Serv., Inc. v. NLRB*, 580 F.2d 966, 973 (9th Cir.1978) ("'Of the considerations employed in reaching a decision under general agency law [as to whether a person is an employee], the determination of who has the right to control and direct the work is foremost ... tempered, however, by other considerations relevant to the ***relationship in its entirety***.' " (emphasis added) (citation omitted)).

11

relevant to the FAC, the threshold for a micro-purchase was $3,000 or less.  *See* 48 C.F.R. § 2.101.

Pursuant to 48 C.F.R. § 2.101, an agency's micro-purchase of services is subject to the simplified

acquisition procedures[5] found at 48 C.F.R. Part 13.

As a micro-purchase, an agency's acquisition of McLeod's expert or consultative services

was not subject to the same procedural formalities otherwise applicable to acquisitions exceeding

the micro-purchase threshold.  Pursuant to 48 C.F.R. § 13.201(d), "[m]icro-purchases do not

require provisions or clauses, except as provided at 13.202 and 32.1110."  The termination clause

cited by the government is not required, as the government argues.  Further, 48 C.F.R. § 13.201(d)

makes clear that this section of the FARs "takes precedence over any other FAR requirement to

the contrary."  *Id.*

The government's further suggestion that "only services of a truly nonpersonal nature may

be obtained by contract" is also not correct. Gov't Br. [Dkt. #88] at 10.  Any agency with authority

to acquire "personal services" of an expert or consultant "may use simplified acquisition

procedures to acquire those services."   48 C.F.R. § 13.003(d).  Further, 48 C.F.R. § 37.104(a)

provides expressly that "personal services" may be obtained "by contract, rather than by direct

hire…"  *See also* 5 U.S.C. § 3109(b)(authorizing procurement "by contract the temporary [] or

intermittent services of experts or consultants…").  Accordingly, the government is incorrect when

it argues acquisition of personal services cannot be obtained by contract and "must be effected in

accordance with the procedural formalities applicable to any other civil service appointment."

Gov't Br. [Dkt. #88] at 9. The government relies upon a 1977 General Accounting Office ("GAO")

Study, *Government Consultants: Standard Definition and Uniform Data Needed,* FPCD-78-5,

---

[5] Purchases up to $150,000 are also subject to simplified acquisition procedures.  48 C.F.R. § 2.101.

November 29, 1977, to argue that personal consultant services may be obtained only through "appointment." *See* Gov't br. [Dkt. #88] at 10.  The government, however, obviously did not read the Study, attached hereto as **Exhibit 6.**

Chapter Two of the Study is devoted to a discussion of the government-consultant relationship, and focuses on agencies acquiring consultant services under 5 U.S.C. § 3109.[6] This discussion, contrary to the government's representations to this Court, makes abundantly clear that "appointment" is only one of several means available to federal agencies hiring consultants. Agencies may also "acquire consultant services under 5 U.S.C. 3109 either by contracting with firms, individuals, educational institutions, foundations, or other organizations or by hiring individuals as employees." **Exhibit 6** at 4.  The discussion further makes explicit the fact that *personal* consultant services can, and very often are, acquired under contract without any "appointment." *Id.* (presenting a chart illustrating "that two or more relationships can exist under each of the three means used to secure consultant services,…").  While an "appointed consultant" is always a government employee, a "consultant under contract" can be a government employee or an independent contractor "depending on the nature and duration of the services provided." *Id.*

---

[6] It should be noted that federal agencies may employ experts and consultants independent of 5 U.S.C. § 3109 under section 213.3102(l) of Schedule A for "positions requiring the temporary or intermittent employment of professional, scientific, or technical experts for consultation purposes."  See 5 C.F.R. § 213.3102(l).  The Federal Personnel Manual, Chapter 304, Section 1-5(d), attached as **Exhibit 7**, provides that section 213.3102(l) of Schedule A "excepts the employees from OPM competitive examination" and "primarily is intended for agencies which do not have authority to use section 3109 or other statutory expert and consultant authority." Accordingly, even were the government able to identify a particular agency involved in this case lacking authority to use section 3109 or other statutory expert and consultant authority, the agency nevertheless could retain McLeod and/or FEBG to provide personal consultant services. Furthermore, 48 C.F.R. § 13.003(d) makes it very clear that personal services (i.e. arrangements that create an employer-employee relationship) may be acquired using simplified acquisition procedures.  Formal appointments are not required when simplified acquisition procedures are applicable to the acquisition of personal services. 48 C.F.R. Part 13.

The Study goes on to reference a 1967 opinion of the Civil Service Commission's General Counsel,[7] in which the Comptroller General concurred, containing "elements," the presence of which "may indicate existence of the type of supervision that will establish an employer-employee relationship" with a contracted consultant.   The elements identified in the Study are: (1) The contract is performed at a Government site; (2) The contractor is using Government-furnished equipment; (3) The services contracted for are applied directly to an integral effort of the agency; (4) Comparable services meeting comparable needs are performed in the same or similar agency by civil service personnel; and (5) The need for a type of service can reasonably be expected to last beyond 1 year.  *Id.* at 5-6.  Thus, the Study relied upon by the government recounts five of the six elements at 48 C.F.R. § 37.104(d).

Plaintiffs have no quarrel with the government's statement that characterization of McLeod's service contracts "as being for personal services is completely beside the point." Gov't Br. [Dkt. #88] at 12.  We agree that the nomenclature used is not important.  What is important is that, "A critical element in distinguishing an agency from a contractor" under the FTCA "is the power of the Federal Government 'to control the detailed physical performance of the contractor.'" *United States v. Orleans,* 425 U.S. 807, 814 (1976)(citing *Logue,* 412 U.S. at 528).  In the words of the Study cited by the government, the factors now codified at 48 C.F.R. § 37.104(d)(the "Pellerzi" factors, *supra* n.6) are relevant because they are designed to "indicate existence of the

---

[7] In October of 1967, General Counsel Pellerzi of the U.S. Civil Service Commission issued an opinion concerning the legality of certain contracts at the Goddard Space Flight Center. That opinion set forth six specific criteria for determining whether the individuals furnished by the independent contractors were employees of the contractors or of the United States.  *See Lodge 1858, AFGE v. Webb,* 580 F.2d 496, 499-500 & n.9, *cert. denied,* 439 U.S. 927 (1978).  The six so called "Pellerzi" factors are now codified at 48 C.F.R. § 37.104(d).  The five elements described in the Study consist of the first five Pellerzi factors.

type of supervision that will establish an employer-employee relationship."   Furthermore, as *Patterson & Wilder Constr. Co.* teaches, when considering a contractor's employment status under the FTCA in the Eleventh Circuit, the government's relationship with the contractor must be "viewed in its totality."[8]   *Patterson & Wilder Constr. Co.,* 226 F.3d at 1278.   Because the government retained full authority over McLeod's activities at agency-sponsored seminars, McLeod was an employee of the government for purposes of the FTCA.

## II.   GOVERNMENT LIABILITY FOR MCLEOD'S NEGLIGENCE

The Federal Tort Claims Act ("FTCA") waives the federal government's sovereign immunity when its employees are negligent within the scope of their employment.   *Levin v. United States,* 133 S.Ct. 1224, 1228 (2013).   As described in the preceding section, there exists substantial evidence demonstrating the government's authority to control McLeod's contractual performance sufficient to qualify McLeod as an employee of the government for purposes of the FTCA.   The FAC alleges the following about McLeod's negligence:

a.   McLeod was negligent *per se* because McLeod violated the Florida Securities and Investor Protection Act ["FSIPA"] by selling and offering to sell unregistered securities in and/or from Florida, to Plaintiffs who are within the class of persons intended to be protected by the FSIPA. FAC ¶¶ 179-181 [Count I];

b.   McLeod was negligent because McLeod: (1) failed to adhere to OPM's policies prohibiting commercial activities, the provision of specific financial investment advice, and the promotion of any specific product, firm or service in connection with agency-sponsored retirement and financial education activities; and (2) failed to adhere to GSA's anti-solicitation regulations prohibiting commercial activities and/or the provision of specific financial investment advice in connection with agency-sponsored retirement and financial education activities conducted at

---

[8] In *Dutton v. United States,* __ Fed. App'x __, 2015 U.S. App. LEXIS 10108 (11th Cir. Jun. 16, 2015), Gov't Br. [Dkt. #88] at 11, the Eleventh Circuit did not ignore that that the VAMC supplied Dr. Riggens with medical equipment and an identification card listing him as an "employee," rather, the Court simply found these facts could not "overcome the myriad other facts suggesting he was an independent contractor."   The unreported decision is entirely consistent with *Patterson & Wilder Constr. Co.'s* directive to consider the totality of the government's relationship with the contractor.

government owned or leased facilities subject to the GSA's anti-solicitation regulations.  FAC ¶ 201 [Count III].

Accepting for purposes of argument that McLeod was a government employee, the government offers multiple arguments for why it cannot be held liable under the FTCA for McLeod's violation of the FSIPA.  Gov't Br. [Dkt. #88] at 13-16.  All of the government's arguments fail for one simple reason, Count I alleges the government is vicariously liable for McLeod's *negligence*; Count I does not seek to hold the government liable under the FSIPA.  The relevance of the FSIPA to Count I is that it establishes a statutory duty, the noncompliance with which may demonstrate negligence under Florida law.  This is made explicit in Count I.  *See* FAC at ¶¶ 176-181. (Citing *McCain v. Florida Power Corporation*, 593 So.2d 500, 503 (Fla. 1992); *Palmer v. Shearson Lehman Hutton, Inc.,* 622 So.2d 1085, 1090 (Fla. App. 1993); and *deJesus v. Seaboard Coast Line R.R. Co.,* 281 So.2d 198 (Fla. 1973)).  With the proper focus of Count I in mind, we address each of the government's arguments in turn.

The government first argues that because Plaintiffs do not allege they sold any of the securities they obtained from McLeod, under FSIPA § 517.211 the only available remedy is rescission, not money damages, which equates to an equitable remedy unavailable under the FTCA.   Gov't Br. [Dkt. #88] at 13.  In *Palmer,* however, the Florida Court of Appeal, First District, held that the remedies in § 517.211 are not "exclusive of all other remedies recognized by law," referencing specifically FSIPA § 517.241.  *Palmer,* 622 So.2d at 1091-1092 and n.12.  The FSIPA § 517.241(2) preserves expressly the "common-law right of a person to bring an action in a court for an act involved in the sale of securities or investments,…"  Plaintiffs have done just that, and seek money damages on a common law negligence theory.  The FSIPA violation simply

aids the Plaintiffs' proof of negligence by demonstrating violation of a statutory duty owed to them.

Next, the government argues that the failure to register securities under the FSIPA § 517.211 "results in strict liability for the rescission of the transactions" and the FTCA does not permit the government to be held liable on a strict liability theory.  Gov't Br. [Dkt. #88] at 13.  The government's argument would be correct if Count I alleged liability under the FSIPA itself, but the argument fails for the same reason as the government's first contention.  Accepting the government's argument, it remains true that the remedies in § 517.211 are not "exclusive of all other remedies recognized by law," and here Plaintiffs allege, "the United States is liable for McLeod's **negligence per se**."  FAC at ¶ 186.  Negligence *per se* is not strict liability.

"[T]he violation of a duty created by statute is recognized at common law as satisfying the duty requirement in a negligence action, provided the injured party is in the class the statute seeks to protect and the injury suffered is the type the statute was enacted to prevent."  *Palmer,* 622 So.2d at 1089 n.8 (citations omitted).  This is **not** the same as a strict liability claim.  As the Supreme Court of Florida explained in *deJesus v. Seaboard Coast Line R.R. Co.,* 281 So.2d 198, 201 (Fla. 1973), "the fact of negligence *per se* resulting from a violation of this type of statute does not necessarily mean there is **actionable** negligence."  Unlike strict liability, "It must also be established by a plaintiff that he is of the class the statute was intended to protect, that he suffered injury of the type the statute was designed to prevent, and that the violation of the statute was the proximate cause of his injury." *deJesus,* 281 So.2d at 201.

The government's third argument is that liability under the FTCA is permitted only "based on the intentionally wrongful or careless conduct of Government employees, for which the Government was to be made liable according to state law under the doctrine of *respondeat*

*superior,"* and that under FSIPA § 517.211's liability provisions there can be no vicarious liability without personal participation by the government in the sale of unregistered Florida securities. Gov't Br. [Dkt. #88] at 14.  This argument fails for the same reasons that the government's first two arguments fail, and for one additional reason.  First, as already explained, Plaintiffs are not limited by the remedies in FSIPA § 517.211.  There can be no reasonable doubt that *respondeat superior* liability has long existed in Florida, as at common law, for an employee's negligence at work.  *R.L. Stinson & East Coast Lumber Co. v. Prevatt,* 84 Fla. 416, 418, 94 So. 656, 657 (1922)("As a general rule under the principles of the common law an employer is liable in damages for the wrongful act of his employee that causes injury to another person, if the wrongful act is done while the employee is acting within the apparent scope of his authority as such employee.").

Second, even if Plaintiffs were required to establish vicarious liability under the FSIPA itself, which they are not, "[f]or over fifty years, the [FSIPA] has literally incorporated the federal remedies under Florida law."  *Barnebey v. E.F. Hutton & Co.,* 715 F.Supp. 1512, 1550 (M.D. Fla. 1989)(citing FSIPA § 517.241(3), which provides: "The same civil remedies provided by laws of the United States for the purchasers or sellers of securities, under any such laws, in interstate commerce extend also to purchasers or sellers of securities under [the FSIPA].").  Under this provision, Florida law expressly recognizes the same civil remedies available under federal law, including those associated with the Uniform Sale of Securities Act of 1929—the federal statute from which Florida's FSIPA derives.  *See Dillon v. Axxsys Int., Inc.,* 385 F.Supp.2d 1307, 1313 n.4 (M.D. Fla. 2005)(noting "Florida's Blue Sky Law [FSIPA] derives from the Uniform Sale of Securities Act of 1929.").

While Florida has not kept pace with all of the amendments to the Uniform Sale of Securities Act of 1929 since FSIPA was enacted in 1931, FSIPA § 517.241(3) does effectively

incorporate such amendments under Florida law to the extent they relate to "civil remedies …

[available to] purchasers … of securities."  In 1956, the federal statute was amended to provide

the exact type of vicarious liability the government argues is unavailable under FSIPA.  Under the

1956 provision:

> Every person who directly or indirectly controls a seller liable under subsection (a), every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale, and every broker dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller, unless the non-seller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There is contribution as in cases of contract among the several persons so liable.

Uniform Securities Act § 410(b) (1956).[9]

Fourth, ignoring § 517.241(3)'s incorporation of the above amendment to the federal law

in the FSIPA, the government argues that because FSIPA § 517.211 is "limited to the seller and

any 'director, officer, partner, or agent of or for the seller,'" there can be no separate claim for

aiding & abetting a violation of FSIPA as alleged in Count II of the FAC.  Gov't Br. [Dkt. #88] at

15. This argument fails for the same reasons as those above.  That is, Plaintiffs need not rely upon

§ 517.211's remedies for their negligence-related claims, and the amendment to FSIPA's federal

counterpart effectively broadens liability to those with the authority to control the securities seller

under FSIPA § 517.241(3).

Finally, the government argues that any claims Plaintiffs may have had under FSIPA have

expired under the two-year statute of limitations and five-year statute of repose applicable to

FSIPA violations.  Gov't Br. [Dkt. #88] at 15.  This argument, like the rest, fails because it ignores

---

[9] *See also Dillon,* 385 F.Supp.2d at 1313 n.4 (noting that Florida has not amended the FSIPA to track the federal amendment, but not considering whether § 517.241(3) has incorporated the amendment nevertheless.

that Plaintiffs are pursuing a common law negligence theory of liability.  The violation of a duty created by statute is recognized at common law as satisfying the duty requirement in a negligence action. *Palmer,* 622 So.2d at 1089 n.8.  The government has presented no authority to suggest that such a violation loses its evidentiary value where the negligence claim is timely, but a separate action under the statute violated might be time barred.  To the contrary, an "amendment shall relate back to the date of the original pleading" so long as the "claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading."  *Doe v. Sinrod,* 117 So.3d 786, 789 (Fla. App. 4th 2013)(citing Fla. R. Civ. P. 1.190(c)).  The federal rule is substantially the same.  *See* Fed. R. Civ. P. 15(c).

## III.    THE DISCRETIONARY FUNCTION EXCEPTION DOES NOT APPLY

The discretionary function exception serves to preserve sovereign immunity by depriving the Court of jurisdiction over any claim based on a federal agency or employee's performance or non-performance of a ***discretionary*** task.  The relevant statutory provision precludes jurisdiction over:

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

The plain text of this statutory provision makes *two* exceptions to the FTCA's waiver of immunity. *See Kuhlman v. United States,* 822 F.Supp.2d 1255, 1260 (M.D.Fla. 2011).  First, it precludes jurisdiction over "any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid."  The government has not raised this exception in this case, so it is

20

irrelevant.  Section 2680(a) also precludes jurisdiction over any claim "based upon the exercise or performance *or the failure to exercise or perform a discretionary function or duty* **on the part of** *a federal agency or an employee of the Government*, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a)(emphasis supplied).   This part of § 2680(a) is the so-called "discretionary function" exception, and is the exception asserted by the government in this case.

The Eleventh Circuit has recently summarized the legal test for application of the discretionary function exception as follows:

> In guiding the courts' application of the discretionary function exception, the Supreme Court has formulated a two-part test. First, the conduct that forms the basis of the suit must involve an element of judgment or choice by the employee. *Berkovitz v. United States*, 486 U.S. 531, 536 (1988); *Autery v. United States*, 992 F.2d 1523, 1526-28 (11th Cir. 1993). In determining whether judgment or choice is present in the particular conduct at issue, the inquiry focuses on "whether the controlling statute or regulation mandates that a government agent perform his or her function in a specific manner." *Hughes v. United States,* 110 F.3d 765, 768 (11th Cir. 1997) (internal quotation marks omitted). If a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, the Government will have failed to show that the action at issue allowed for the employee's exercise of judgment or choice because, in that case, "the employee ha[d] no rightful option but to adhere to the directive." *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (internal quotation marks omitted). Conversely, unless a "federal statute, regulation, or policy specifically prescribes a course of action embodying a fixed or readily ascertainable standard," it will be presumed that the particular act involved an element of judgment or choice. *Autery*, 992 F.2d at 1529 (internal quotation marks, citation, and emphasis omitted).

> If the Government has met this first element of the test for applying the exception, then the second part of the test requires the court to "determine whether that judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536. A particular decision will be of the kind protected by the exception if it is the type of decision that one would expect to be inherently grounded in considerations of policy. *Autery,* 992 F.2d at 1530-31. Indeed, when a government agent is permitted to exercise discretion in making a particular decision--whether that permission is express or implied--"it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324; *accord OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002). Finally, in examining whether an employee's discretion is of the type grounded in public policy, one uses an objective test, and the

employee's subjective intent is irrelevant. *Gaubert,* 499 U.S. at 325; *accord Mid-S. Holding Co., Inc. v. United States,* 225 F.3d 1201, 1207 (11th Cir. 2000).

*Zelaya v. United States,* 781 F.3d 1315, 1329-30 (11th Cir. 2015).  If the government conduct at issue does not involve an element of judgment or choice, the discretionary function exception does not apply and the Court need not consider the second prong of the analysis.  *Miles v. Naval Aviation Naval Museum Foundation,* 289 F.3d 715, 721-22 (11th Cir. 2002).

### A. The failure to observe and enforce criminal regulations prohibiting commercial solicitation, vending and the display of commercial advertising in federal facilities constitutes noncompliance with a mandatory directive under the first prong of *Berkovitz*

It is uncontested that the vast majority of McLeod's seminars occurred in field offices of the various law enforcement agencies involved in this case, where the GSA's anti-solicitation regulations discussed *infra* and at FAC ¶¶ 120-129 clearly applied.[10]  Robert Vance, who worked for McLeod for the five years preceding McLeod's suicide in 2010 and who provided Information Technology and programming services to McLeod documented approximately 195 such seminars given between February 15, 2006 and December 16, 2008.  *See* Vance Decl. [located at Dkt. #78-2].  Mr. Vance describes the seminars as McLeod's "marketing strategy" used to "promote his investment services."  *Id.*  McLeod "always provided FEBG fliers and business cards at the seminars" and during the seminars McLeod "would provide specific advice on how to structure individual finances for retirement, as evidenced by [McLeod's] PowerPoint presentation" Mr. Vance observed on many occasions.  *Id.*

---

[10] *See* FAC ¶¶ 8-101 and 120-129.  The government admits these allegations, or at least does not contest these allegations with contrary evidence.  Accordingly, this Court must accept them as true.  *Gaubert,* 499 U.S. at 327; Gov't Admissions [Exh. C located at Dkt #78-4 – Dkt. #78-7].

Mr. Vance's observations are confirmed by the OIG Report [**Exhibit 5**], which confirms, "FEBG files contain records for seminars given by McLeod dating back to 1997 at a wide range of government agencies, including the U.S. Secret Service, IRS Criminal Investigation, U.S. Immigration and Customs Enforcement (ICE), the FBI, and the DEA." *Id.* at 18. Further, the OIG found "[b]etween October 1997 and May 2010, McLeod gave at least 130 seminars in DEA field offices, at DEA management conferences, and at the DEA Training Academy." *Id.* at 27. Several witnesses told the OIG "that McLeod had substantial access to DEA personnel and facilities, including use of DEA conference rooms and management offices to meet with prospective clients after seminars, [11] transportation in a DEA plane to provide a seminar to a small number of agents in a remote resident office, … and an unescorted visitor's pass to the DEA Training Academy." *Id.*

The OIG further reported:

> Witnesses told us that McLeod was a compelling speaker, and he generally earned highly positive reviews from seminar attendees. However, some attendees complained that McLeod promoted himself and his companies during seminars. One DEA agent who attended a seminar given by McLeod at the DEA Training Academy stated in an evaluation, "Mr. McLeod is very arrogant. It would have been more interesting to listen to if he hadn't been talking so much about himself and his accomplishments." A written evaluation by an ICE agent who attended a June 2008

---

[11] By way of example, McLeod held two DEA seminars in 2006, a 2-day seminar at the El Paso Intelligence Center (EPIC) on April 13 and 14, 2006, and one at the Special Operations Division (SOD) in Chantilly, Virginia, on May 12, 2006. *See* Vance Decl. at 2 [located at Dkt. #78-2]; OIG Report [**Exhibit 5**] at 42. The SOD in Chantilly, Virginia, was then a leased facility under the authority, charge and control of the General Services Administration. *See* First Supplement to United States' Responses and Objections to Plaintiffs' Requests for Admission #60-61 [located at Dkt. #78-5]. On April 21, 2006, the Unit Chief of Training for the SOD at the time sent an e-mail to SOD staff announcing the May 12 seminar and stating, "Additional time will be set aside to consult with people on an individual basis in the privacy of one of the smaller conference rooms. If you are interested in a private consultation, please stop in the training office and obtain a copy of the Employee Benefits Questionnaire." *See* OIG Report [**Exhibit 5**] at 43. Derek Maltz, then Special Agent in Charge at the SOD, told the OIG that "McLeod met separately with individual employees in a conference room at SOD." *Id.* In fact, Maltz informed the OIG that he himself met personally with McLeod after the 2006 seminar, "and that the information provided by McLeod in this meeting led him to become a client." *Id.*

23

seminar stated that McLeod earned high marks for knowledge of the retirement system but gave "[w]ay too many sales pitches for his company! ... Was this an infomercial? Did the Gov[ernmen]t pay for this? Too many side issues regarding his other businesses."

An audio recording of a seminar in at a DEA field office obtained by the OIG included statements by McLeod that he helped create the retirement system for federal judges, had offices in 38 states and planned to add 50 more offices by the end of the year, and did seminars for Congress and the federal judiciary. … During this seminar, McLeod told attendees, "If you are going to use outside financial advisors, call me on my business card number," and "I manage money for a living; you are welcome to call me to ask for a second opinion."

Other information provided to the OIG further confirms that McLeod promoted himself and his businesses during agency seminars. Several versions of the PowerPoint presentations that McLeod used during seminars contained information about McLeod's businesses, such as "[FEIS] is a financial planning firm opening up offices coast to coast to better serve your needs. . . . [FEBG] will ... coordinate with personal assets to help develop a complete Financial Plan, which will encompass money management, tax planning & estate planning." Other versions of his presentation had the FEBG corporate logo on every page.

McLeod also distributed promotional materials at some seminars. For example, one FEBG Bond Fund investor gave us copies of FEBG brochures she said she received during seminars held in the DEA's Phoenix Field Division as early as 2001. One brochure included contact information for McLeod and the retired federal agents who worked for him, listing their former titles. Additionally, during a July 2008 seminar at the DEA's North Central Lab in Chicago, Illinois, McLeod handed out a brochure for FEBG and FSAMG, a separate brochure for term life insurance offered through FEBG, and an advertisement entitled, "Six (6) Reasons to Invest with FSAMG."

*Id.* at 20.

In addition to the OIG's findings, nearly all of the Plaintiffs in this case experienced first-hand McLeod's illegal commercial solicitation and related business activities at agency-sponsored retirement training seminars conducted in field offices subject to the GSA's anti-solicitation regulations. *See* FAC ¶¶ 8-101; *See also* Plaintiffs' Decl.'s [located at Dkt. #78-8 - #78-18]. The GSA's anti-solicitation regulations prohibited, and in fact made it a criminal offense, to engage in

commercial solicitation activities while in government-owned or leased buildings or grounds under the authority or control of the General Services Administration ("GSA").

Before December 13, 2002, the GSA's anti-solicitation regulation—contained in the Federal Property Management Regulations[12]—prohibited "[s]oliciting alms, commercial or political soliciting, and vending of all kinds, displaying or distributing commercial advertising, or collecting private debts on GSA-controlled property…" 41 C.F.R. § 101-20.308 (1999). Violations were subject to criminal penalties. *See* 41 C.F.R. § 101-20.315 (1999) and 40 U.S. Code § 318c. *See also United States v. Friedenthal,* 1997 U.S. Dist. LEXIS 20407 (S.D.N.Y. Dec. 19, 1997)(criminal prosecution of an insurance salesperson under GSA's anti-solicitation regulation). The GSA's anti-solicitation regulation applied to "all property under the charge or control of the General Services Administration and to all persons entering in or on such property." 41 C.F.R. § 101-20.300 (1999). Accordingly, government employees were subject to the regulations upon entering a covered facility. The regulations also spelled out that "[e]ach occupant agency[13] shall be responsible for the observance of these rules and regulations." *Id.* Additionally, 41 C.F.R. § 101-20.403(a)(2) (1999), required GSA to disapprove any application for a permit and to cancel any existing permit to use GSA-controlled buildings or grounds when the proposed use was "a commercial activity." 41 C.F.R. § 101–20.003(d) defined "commercial activities" as "activities undertaken for the primary purpose of producing a profit for the benefit of an individual or organization organized for profit."

---

[12] The Authority for the Federal Property Management Regulations is derived from 40 U.S.C. § 318a, which provides for criminal penalties at 40 U.S.C. § 318c. *See United States v. Stansell,* 847 F.2d 609, 614 n.6 (9th Cir. 1988).

[13] An "occupant agency" means, "an organization which is assigned space in a facility under GSA's custody and control through formal procedures outlined in part 101-17 of the Federal Property Management Regulations." *See* 41 C.F.R. § 101-20.003(u) (1999).

25

Beginning on January 18, 2001, the GSA began to transition from the Federal Property Management Regulations to the Federal Management Regulations.[14]  See 66 Fed. Reg. 5358 (Jan. 18, 2001) and 67 Fed. Reg. 76820 (Dec. 13, 2002).  GSA's anti-solicitation regulation was recodified at 41 C.F.R. § 102-74.410, and provides, "All persons entering in or on Federal property are prohibited from soliciting commercial or political donations, vending merchandise of all kinds, displaying or distributing commercial advertising, or collecting private debts, …" 41 C.F.R. § 102-74.410 (2003)(effective Dec. 13, 2002).[15]  The Federal Management Regulations clearly prohibit "all persons," including government employees, from engaging in commercial solicitations while in or on Federal property, and expressly provides "[e]ach occupant agency shall be responsible for the observance of these rules and regulations."  41 C.F.R. § 102-74.365 (2003).  Violations are subject to criminal penalties.  See 41 C.F.R. § 102-74.450 (2003).

Attempting to divert attention away from McLeod's clear violations of the regulations prohibiting "vending merchandise of all kinds and displaying or distributing commercial advertising" while in or on Federal property (and in the presence of federal officials, including seminar monitors, benefits counselors, and senior agents in charge), the government maniacally focuses on use of the terms "alms" and "donations" to suggest later versions of the anti-solicitation regulations "do not apply to McLeod's alleged conduct."  Gov't Br. [Dkt. #88] at 27.  The government suggests that because the anti-solicitation regulations lack sufficiently clear, objective

---

[14] The Federal Management Regulations are promulgated under 40 U.S.C. § 1315, derived from the former 40 U.S.C. § 318.  *United States v. Bichsel,* 395 F.3d 1053, 1055 (9th Cir. 2005).

[15] The current version of the GSA anti-solicitation regulation prohibits, "All persons entering in or on Federal property" from "soliciting alms (including monetary and non-monetary items) or commercial or political donations, vending merchandise of all kinds, displaying or distributing commercial advertising, or collecting private debts, …"  41 C.F.R. § 102-74.410 (2006)(effective Nov. 8, 2005).

criteria, interpreting when a violation has occurred requires exercise of discretionary judgment. *Id.* at 27-29.  In order to make this argument, the government must ignore whole parts of the regulation that were very clearly violated.  Here the government's own Inspector General agrees with Plaintiffs.

The government's Inspector General has made findings, *i.e.,* admissions of fact, which contradict the government's arguments in this Court.  For example, the OIG found, "DEA officials permitted McLeod to promote himself and his businesses in DEA facilities, and using DEA official channels," and that, "Allowing McLeod to promote and distribute advertisements for his business on federal property violated 41 C.F.R. § 102-74.410."  **Exhibit 5** at 65; 87-88.  The OIG didn't just conclude "that these actions violated 41 C.F.R. § 102-74.410, which prohibits the use of government facilities to promote private business," the OIG also determined DEA officials "failed to comply with OPM guidance for conducting financial seminars issued in October 2006."[16] *Id.* at 87-88.  These admissions are binding on the government and dispense with any argument that the regulations and OPM's guidance, discussed *infra,* failed to provide fixed or readily ascertainable standards—the government, without equivocation, has admitted it violated the standards!  An agency's Inspector General is part of, and is a representative of, the parent agency. *See NASA v. FLRB,* 527 U.S. 229 (1999).  In this case, the DOJ OIG is part of, and represents, the Department of Justice (which includes the DEA, FBI and ATF).  The OIG Report is admissible evidence against the government.  *See e.g., Czekalski v. Peters,* 475 F.3d 360, 366 n.2 (D.C. Cir. 2007); *In re: Tennessee Valley Auth. Ash Spill Lit.,* 2012 U.S. Dist. LEXIS 122231, *128 (E.D. Tenn. Aug. 23, 2012)("the OIG Report is admissible as a public record and report" under Fed. R. Evid. 803(8)).

---

[16] *See* Note 1 *supra* discussing DEA's Division Order 206, attached as **Exhibit 2,** and FBI Policy Directive 0754DPG, attached as **Exhibit 3.**

Counsel for the DOJ, recognizing his quandary, invites this Court not to dwell on McLeod's violations of the GSA anti-solicitation regulation because, "what is relevant is whether there is a statute or regulation 'for **an employee** to follow.'" Gov't Br. [Dkt. #88] at 28 (emphasis in original)(citing *Gaubert,* 499 U.S. at 322 and *Sutton v. Earles,* 26 F.3d 903, 908 (9th Cir. 1994)("There is an important distinction, however, between a regulation that mandates certain private behavior, leaving the government to enforce it, and a regulation that mandates particular action by the government.")).  The problem for the government is that the GSA anti-solicitation regulation expressly **does** mandate particular action "by the government," because it: (1) applies to "all persons entering in or on Federal property," and therefore applies directly to government employees in or on Federal property, (2) McLeod was a government employee while in or on Federal property conducting training, and (3) the regulation expressly charges each occupant agency with "observance[17] of these rules and regulations."  Thus, whether the focus is on McLeod's behavior or on the agency "officials" who permitted McLeod's behavior, there is no avoiding the reality that the anti-solicitation regulations were clearly violated by government employees who had no rightful option but to adhere to the directive, just as the OIG concluded. The anti-solicitation regulations may "provide the standard of care against which the government's conduct should be assessed" for Plaintiffs' negligence claims. *Zelaya,* 781 F.3d at 1324.

The government acknowledges that the anti-solicitation regulations expressly provide that "[e]ach occupant agency shall be responsible for the observance of these rules and regulations," but argues the regulations do not "mandate a particular response to a violation" or require agencies to "address any violations" or prescribe "the specific manner in which [violations] are to be

---

[17] "Observance" is defined in Webster's II New College Dictionary to mean, "The act or practice of complying with a law, custom, rule, or command."

prevented, enforced or addressed." Gov't Br. [Dkt. #88] at 30-31.  The government's argument must be rejected for several reasons.

First, the government's argument ignores McLeod's direct violation of the regulations by promoting himself and his businesses, and by distributing advertisements and business cards at agency retirement and financial education seminars.  Because McLeod was then an employee of the government acting within the scope of his employment, McLeod's commercial activities very clearly violated the mandate prohibiting such activities.  If this Court agrees with Plaintiffs that the government retained sufficient authority to control McLeod's contractual performance at seminars such that McLeod was an employee for purposes of the FTCA, then there can be no question that the discretionary function exception does not shield the government from liability for McLeod's "intentionally wrongful or careless" failure to comply with the mandate.  *Laird v. Nelms,* 406 U.S. 797, 801 (1972); *Berkovitz,* 486 U.S. at 536; *Gaubert*, 499 U.S. at 322; *Autery v. United States*, 992 F.2d 1523, 1526-28 (11th Cir. 1993).

Second, even if McLeod is not deemed an employee for FTCA purposes, the Inspector General was correct to find that, "Allowing McLeod to promote and distribute advertisements for his business on federal property violated 41 C.F.R. § 102-74.410," which carries criminal penalties.  *See* **Exhibit 5** at 65; *United States v. Friedenthal,* 1997 U.S. Dist. LEXIS 20407 (S.D.N.Y. Dec. 19, 1997)(criminal prosecution under GSA's anti-solicitation regulations).  As the government itself previously noted in this case, "It is … significant that Plaintiffs' employing agencies are, first and foremost, law enforcement agencies, …"  *See* Dkt. #74 at 28 n.25.  As such, each law enforcement agency in this case had a "mandatory duty … to enforce the law," independent of the regulatory mandate prohibiting commercial advertising and solicitations and independent of the directive that each agency be "responsible for the observance" of the anti-

solicitation rules, retaining discretion only for "decisions as to how best to fulfill that duty." *Williams v. United States,* 314 Fed. App'x 253, 257 (11th Cir. 2009)("it is the mandatory duty of law enforcement agents to enforce the law, [but] decisions as to how to best fulfill that duty are protected by the discretionary function exception"); *accord Horta v. Sullivan,* 4 F.3d 2, 21 (1st Cir. 1993)("although law enforcement agents have a mandatory duty to enforce the law, decisions as to how best to fulfill that duty are [discretionary].")(citing *e.g., United States v. Faneca,* 332 F.2d 872, 874-75 (5th Cir. 1964), *cert. denied,* 380 U.S. 971 (1965)).  Plaintiffs here do not allege the manner in which the agencies chose to enforce the anti-solicitation law caused them harm; rather, they allege harm caused by the federal agencies' complete failure to enforce the law; *i.e.,* failure to perform their ***mandatory*** function or duty to enforce the law.  Because agencies had a mandatory duty to enforce the law, and they did not perform that duty, the discretionary function cannot apply.[18]  *Berkovitz*, 486 U.S. at 536; *Gaubert*, 499 U.S. at 322; *Autery*, 992 F.2d at 1526-28.

Third, the regulatory mandate itself that "[e]ach occupant agency shall be responsible for the observance of these rules and regulations" is a sufficiently clear directive to have required agencies to observe and enforce the anti-solicitation rules within their own field offices.  The prohibition of commercial advertising and promoting private business on federal property is not

---

[18] The government's argument is further defeated because the regulations at issue do require a specific course of action for agencies and employees to follow when they have notice of crimes occurring within their government offices.  Pursuant to 41 C.F.R. § 101-20.103-3 (1999), occupants of GSA-controlled properties must, at a minimum, "[p]romptly report all crimes … occurring on GSA-controlled property to the regional Law Enforcement Branch and other designated law enforcement agencies and then through internal agency channels."  The occupant agencies in this case failed to do so.  *See also*  41 C.F.R. § 102-74.15 (2003)(containing nearly identical language).

ambiguous, as the Inspector General's findings confirm.[19]  The government addresses the elephant in the room—the OIG Report—only in a footnote and tries in vain to downplay the report's significance.  Gov't Br. [Dkt. #88] at 30 n.23.  The government takes solace from the report's failure to identify any examples of criminal prosecution under the regulation and cites two cases that bear no resemblance to the issue presented.

First, there have been criminal prosecutions based upon the anti-solicitation rules.  *See United States v. Friedenthal,* 1997 U.S. Dist. LEXIS 20407 (S.D.N.Y. Dec. 19, 1997).   In *Friedenthal,* the Court recognized that the GSA's anti-solicitation rules were "enacted by GSA, pursuant to Congress's grant of authority to GSA to make 'all needful rules and regulations for the government of Federal property under their charge and control, ***and to annex to such rules and regulations such reasonable penalties . . . as will insure their enforcement.***'" *Id.* at *3-4 (citing 40 U.S.C. § 318(a)(emphasis added).  The Court went on to find the anti-solicitation regulation clear and unambiguous—just as the Inspector General has here.  *Id.* at *6 (considering the plain meaning of the regulations).

The facts in *Friedenthal* were less egregious than the facts in this case.  Defendant Friedenthal was a full-time employee of Mutual of New York Insurance Company.  *Friedenthal,* 1997 U.S. Dist. LEXIS 20407 at *2.  Friedenthal specialized in the sale of low-cost life and disability insurance programs for federal employees. *Id.* In conducting his business, defendant communicated with federal employees by telephone and in person. *Id.* Sometimes federal employees called Friedenthal to inquire about his company's insurance programs and, in other instances, Friedenthal initiated the contacts. *Id.*  Once the initial contact was made, Friedenthal

---

[19] The DEA and FBI have demonstrated no difficulty understanding the anti-solicitation rules. *See* DEA Division Order 206 [**Exhibit 2**] and FBI Policy Directive 0754DPG [**Exhibit 3**].

usually provided preliminary information about insurance coverage programs and suggested that the employee and he meet at a mutually convenient time to further discuss the insurance programs that Mutual of New York offered. *Id.* The meetings usually occurred, for the employee's convenience, over lunch in the cafeteria at the federal facility where the employee worked. *Id.*

The court found Friedenthal's conduct "clearly and unambiguously" fell within the broad "soliciting" and "vending" prohibitions of 41 C.F.R. § 101-20.308 (1997).[20] First, the court found:

> Solicitation of business goes beyond an initial encounter. Solicitation is a process by which the solicitor asks, requests or attempts to persuade an individual to act in a certain manner. Whether consensual or not, meetings following an initial encounter, to discuss and attempt to persuade an individual to purchase insurance or any other product, are part of the process of soliciting business as it is commonly understood, and would therefore be prohibited by the regulation.

*Friedenthal,* 1997 U.S. Dist. LEXIS 20407 at *9. The court ruled further that Friedenthal's conduct also "clearly falls within the regulation's prohibition of 'vending of all kinds.'" *Id.* at *13. The court said:

> The language of § 101-20.308 -- prohibiting **vending of all kinds on GSA-controlled property** -- is extremely broad and unqualified. Had GSA intended to restrict its scope, it would not have utilized such expansive and all inclusive language. *Cf. St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 550, 98 S. Ct. 2923, 2934, 57 L. Ed. 2d 932 (1978) ("If Congress had intended to limit its scope . . . it is not unreasonable to assume that it would have made this explicit."). The plain meaning of the term "vending" is selling or dispensing. *See* Webster's Third New International Dictionary 2539 (1993)("to engage in selling"; "to transfer to another for a pecuniary equivalent"); *see also* Random House Compact Unabridged Dictionary 2110 (2d ed. 1996) (to vend is "to sell as one's business or occupation"). Defendant's conduct clearly and unambiguously falls within the regulation's broad language.

---

[20] 41 C.F.R. § 101-20.308 (1997) prohibited, "Soliciting alms, commercial or political soliciting, and vending of all kinds, displaying or distributing commercial advertising, or collecting private debts on GSA-controlled property…"

32

*Id.* at *13-14 (emphasis in original).  The OIG's failure to cite *Friedenthal* does not change the plain language of the regulation.

Next, the government cites in its footnote *Villanueva v. United States*, 708 F. Supp. 2d 960, 975 (D. Ariz. 2009) and *Shansky v. United States*, 164 F.3d 688, 695 (1st Cir. 1999), two cases that have no relevance to the issue presented—whether the GSA's anti-solicitation regulations contain a sufficiently clear and unambiguous mandate for the government to follow.   The *Villanueva* case asked whether a mine inspector was required to initiate a mine inspection based on a "vague and nondescriptive" anonymous complaint.  *Villanueva*, 708 F. Supp. 2d at 974. Understandably, the court found no "mandatory directive that [the inspector] failed to follow."  *Id.* In *Shansky,* the court found no mandatory directive to install handrails and warning signs during building refurbishment contained within the Park Service's operating manual that provided broadly, "the saving of human life will take precedence over all other management actions." *Shansky*, 164 F.3d at 691.   These cases have nothing to do with the GSA's anti-solicitation regulations, nor do they even involve regulations annexed with criminal penalties.  As the Southern District of New York recognized in *Friedenthal,* the criminal penalties applicable to the GSA's anti-solicitation regulations were intended by Congress to ensure their enforcement.   The government agencies involved simply failed to enforce the regulations, but this does not mean they had **discretion** not to do so.

The government's reliance on *Hughes v. United States,* 110 F.3d 765 (11th Cir. 1997) to argue the regulations "in no way require that agencies address any violations, let alone prescribe the specific manner in which they are to be prevented, enforced, or addressed" is also misplaced. Gov't Br. [Dkt. #88] at 30-31.  In *Hughes,* the plaintiff was shot in the parking lot of a U.S. Post Office in Ocala, Florida.  The plaintiff sued and cited regulations designating the Chief Postal

Inspector as the security officer for the Postal Service and which made him "responsible for the issuance of instructions and regulations pertaining to security requirements within the Postal Service." *Id.* at 768. Further, at each post office, the regulation designates the postmaster or supervisor as the Security Control Officer "responsible for the general security of the post office, its stations and branches, in accordance with rules and regulations issued by the Chief Postal Inspector." *Id.* The court correctly found the discretionary function exception applied, stating:

> These general guidelines do not mandate a specific course of conduct regarding security at a post office. Instead, security decisions such as the ones challenged here—the posting of security personnel in the lobby or in the parking lot, the location and intensity of lighting, and the planting and maintenance of trees and shrubbery—are left to the discretion of the Security Control Officer for each post office in accordance with the regulations established by the Chief Postal Inspector.

*Hughes,* 110 F.3d at 768. The plaintiff in *Hughes* did not allege a complete failure of security precautions at the post office; rather, the plaintiff took issue with the postmaster's determination of what security measures were required. The Postal Operations Manual, however, expressly stated the postmaster had "discretion in assessing the need for security with regards to providing twenty-four hour access." *Id.* The regulations simply did not mandate any particular security measure. *Hughes* is easily distinguished here. The postmaster in *Hughes* obviously was not on notice of the criminal behavior in the parking lot before it occurred, had no way of anticipating the crime would occur as it did, and was under no duty to implement any particular kind of security measure. Here, the government was on notice of the specific criminal behavior to be prevented in their offices (solicitation and vending), and despite the clear prohibitions, often helped to facilitate such behavior, or at least did not act in any way to prevent it. Accordingly, the discretionary function exception cannot apply and the Court need not consider the second prong of the *Berkovitz*

analysis. *Miles v. Naval Aviation Naval Museum Foundation,* 289 F.3d 715, 721-22 (11th Cir.

2002).

> **B.  Even if the law enforcement agencies involved had discretion to facilitate or permit McLeod's illegal behavior in their GSA-controlled offices, exercising that type of judgment is not the kind of decision-making that the discretionary function exception was designed to shield, and therefore the exception would still not apply under the second prong of *Berkovitz***

Assuming *arguendo* the Government has met the first element of the *Berkovitz* test for

applying the discretionary function exception to agency enforcement of the GSA anti-solicitation

regulations,[21] then the second part of the test requires the Court to "determine whether that

judgment is of the kind that the discretionary function exception was designed to shield."

*Berkovitz*, 486 U.S. at 536; *Zelaya,* 781 F.3d at 1329-30.  A particular decision will be of the kind

protected by the exception if it is the type of decision that one would expect to be inherently

grounded in considerations of policy. *Id.*  In examining whether the discretion found is of the type

grounded in public policy, one uses an objective test, and the employee's subjective intent is

irrelevant. *Gaubert,* 499 U.S. at 325; *Zelaya,* 781 F.3d at 1329-30; *Mid-S. Holding Co., Inc. v.

United States*, 225 F.3d 1201, 1207 (11th Cir. 2000).

Because the regulations at issue carry criminal penalties and because the agencies clearly

had notice of the criminal behavior, often facilitating McLeod's illicit commercial activities within

their own conference rooms and offices, failing to enforce the law in this case is not the kind of

policy decision that can be protected by the discretionary function exception.  In *Tonelli v. United

States*, 60 F.3d 492, 496 (8th Cir. 1995), the Eighth Circuit considered whether the discretionary

---

[21] If McLeod is a government employee in this case, there can be no question that his illegal behavior cannot involve any legitimate policy considerations.  No government employee has discretion to violate the law.

35

function exception could apply when the United States "fails to act when it had notice of illegal behavior."  The Eighth Circuit observed that "[f]ailure to act after notice of illegal action does not represent a choice based on plausible policy considerations," and found that the discretionary function exception did not apply.[22]  *Id.*  The court reversed summary judgment for the government on plaintiff's claims of negligent supervision and retention of the postal employee.[23]  *Id.*  Although the Eleventh Circuit has not yet considered the issue, one district court recently predicted the Eleventh Circuit would follow the reasoning of *Tonelli.  See Brons v. United States,* 2015 U.S. Dist. LEXIS (N.D.Ga. Feb. 12, 2015)("The Court concludes that *Tonelli* is consistent with our Circuit's consideration of the 'discretionary function' exception in other types of cases and its reasoning would be followed in our Circuit."); *see also Limone v. United States,* 336 F.Supp.2d 18, 41 (D. Mass. 2004)(following *Tonelli* and refusing to apply the discretionary function exception where FBI agents had knowledge of their informant's criminal behavior); *Murphy v. Pleasantville School Dist.,* 2000 U.S. Dist. LEXIS 22063, *22 (S.D. Iowa May 4, 2000)(following *Tonelli* and refusing to apply the discretionary function exception where district officials were aware of employee's sexual harassment); *Schmid v. Dept. of the Army,* 2013 U.S. Dist. LEXIS 79888, *40 (E.D. Wash. June 6, 2013)(recognizing "*Tonelli's* illegal conduct rationale … relied on the fact that no response to illegal conduct had occurred.").

The reasoning of *Tonelli* is consistent with the reasoning of the Eleventh Circuit and other circuit courts who have held that employees acting outside the scope of their authority cannot be

---

[22] The *Tonelli* case involved allegations of negligent supervision of a postal employee caught pilfering mail from a post office box.  The case did not involve any statute or regulation like the anti-solicitation regulation in this case requiring the postal agency to enforce the law.  Accordingly, the decision in *Tonelli* rests entirely upon the second prong of the *Berkovitz* test. *Berkovitz v. United States*, 486 U.S. 531, 536 (1988).

[23] *See* FAC Count V (alleging a similar cause of action in this case).

exercising the kind of discretion shielded by the discretionary function exception.  *See e.g., Denson v. United States,* 574 F.3d 1318, 1347 (11th Cir. 2009)("Indeed, it is a tautology that a federal officer's actions lie outside the scope of his [discretionary] authority when the officer fails to comply with the affirmative requirements of federal statutory or regulatory law."); *Red Lake Band of Chippewa Indians v. United States,* 800 F.2d 1187, 1196 (D.C. Cir. 1986) ("An employee of the government acting beyond his authority is not exercising the sort of discretion the discretionary function exception was enacted to protect."); *Birnbaum v. United States,* 588 F.2d 319, 329 (2d Cir. 1978) ("An act that is clearly outside the authority delegated cannot be considered as an abuse of discretion."); *K. W. Thompson Tool Co. v. United States*, 836 F.2d 721, 727 n.4 (1st Cir. 1988) ("It has been held that implicit in [the Supreme Court's decisions in] *Varig* and *Dalehite* is the proposition that a 'decision cannot be shielded from liability if the decisionmaker is acting without actual authority.'"); *Myers & Myers, Inc. v. United States Postal Service*, 527 F.2d 1252, 1261 (2d Cir. 1975)("It is, of course, a tautology that a federal official cannot have discretion to behave unconstitutionally or outside the scope of his delegated authority.").

It is axiomatic that law enforcement agencies and officers are without authority to ignore or facilitate criminal violations.[24]  The decision to enforce federal criminal law does not require officers or agents to make difficult policy choices; Congress, either directly or through its delegated power to an agency, like the GSA here, has already promulgated such policy considerations into the criminal statutes and/or regulations themselves. *See e.g., Williams v. United*

---

[24] Frank Santella, the former Deputy Assistant Commissioner for the GSA Public Buildings Service, testified that agencies in GSA-controlled properties were not free to authorize criminal violations within their offices and that he was not aware of any mechanism under which an occupant agency could ignore the Federal Property Management Regulations or Federal Management Regulations.  *See* **Exhibit 9** at 77-78; 81-82.

*States,* 314 Fed. App'x 253, 257 (11th Cir. 2009)("it is the mandatory duty of law enforcement agents to enforce the law, [but] decisions as to how to best fulfill that duty are protected by the discretionary function exception"); *Garcia v. United States*, 826 F.2d 806, 809 (9th Cir. 1987)("While law enforcement involves exercise of a certain amount of discretion on the part of individual officers, such decisions do not involve the sort of generalized social, economic and political policy choices that Congress intended to exempt from tort liability."); *Caban v. United States,* 671 F.2d 1230, 1234-35 (2d Cir. 1982)(holding INS agents' decisions to detain suspected illegal aliens "are not the kind that involve weighing important policy decisions."); *Gray v. Bell*, 712 F.2d 490, 508 (D.C. Cir. 1983)("police officers … jobs do not typically include discretionary functions…").  Once the law enforcement agencies in this case became aware of McLeod's illicit solicitations,[25] and most certainly in those instances where the agencies actually facilitated McLeod's solicitation and vending activities by scheduling one-on-one meetings and providing other assistance to McLeod when the anti-solicitation rules applied, the agencies could not have

---

[25] *Tonelli's* holding prevents application of the discretionary function exception when the United States "fails to act when it had notice of illegal behavior."  The government suggests that *"Tonelli* involved serious criminal conduct (obviously recognized as such at the time), not an after-the-fact argument that a violation of a Federal [criminal] regulation occurred." Gov't Motion [Dkt. #88] at 35.  Here, by contrast, the government says the criminal violations were not so obvious and agency officials did not "view [McLeod's] conduct as illegal or even harmful" at the time.  *Id.* Accordingly, says the government, because "there are over 300,000 federal regulations that may be enforced criminally," it would be "a drastic expansion of *Tonelli*" to apply its holding in this case.  *Id.* at 35-36.  Even if agency officials did not recognize McLeod's commercial solicitations in their field offices as illicit, however, this may not excuse an agency's failure to comply with its mandatory duty to enforce the law. The United States Supreme Court has "long recognized the 'common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally.'" *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich, L.P.A,* 559 U.S. 573, 581-582 (2010)(quoting *Barlow v. United States*, 32 U.S. 404 (1833); *see also Cheek v. United States*, 498 U.S. 192, 199 (1991) ("The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system."); *Utermehle v. Norment,* 197 U.S. 40, 55 (1905)("We know of no case where mere ignorance of the law, standing alone, constitutes any excuse or defense against its enforcement.")).

been engaged in the kind of decision-making the discretionary function exception was designed to shield. *Berkovitz*, 486 U.S. at 536; *Zelaya,* 781 F.3d at 1329-30.

   **C. The government's failure to comply with additional mandatory directives contained in the OPM's Retirement Strategy, Benefits Administration Letter 06-107, and as implemented through training of agency benefits officers prevents application of the discretionary function exception under *Berkovitz***

The discussion to this point has focused on McLeod's retirement seminars conducted within GSA-controlled federal facilities where McLeod's commercial solicitations, vending activities, and use of commercial advertising were all criminal violations of the GSA's anti-solicitation regulations. While the vast majority of McLeod's retirement seminars occurred at agency field offices where the GSA's regulations expressly applied, some occurred at agency training academies and a couple occurred in rented space at private locations, such as hotels or convention centers. *See* FAC ¶¶ 8-101. The OIG Report confirmed, "[a]t various times between 2002 and 2009, McLeod taught retirement and financial planning classes at the DEA Training Academy, the FBI Academy, and the Federal Law Enforcement Training Center." **Exhibit 5** at 18. Although the locations were different, McLeod's tactics were the same. For example, Plaintiffs who attended seminars at training academies witnessed commercial solicitation and the use of commercial advertising by McLeod just as these things occurred in various agency field offices. *See e.g.,* Decl. of Thomas B. and Karen S. Martin [located at Dkt. #78-14](describing McLeod seminars held at the USCS/ICE Academy); Decl. of Thomas Cindric [located at Dkt. #78-9](describing a McLeod seminar held at the DEA Academy in Quantico, VA).

In 2004, Congress passed the Thrift Savings Plan Open Elections Act, subsequently codified at 5 U.S.C. § 8350 note. The 2004 Act included various financial literacy provisions, including a requirement that the Office of Personnel Management ("OPM") develop and

39

implement a retirement financial literacy and education strategy for federal employees and submit a report to Congress on this strategy. *See* 150 Cong. Rec. S6106-01 (daily ed. May 21, 2004) (statement of Sen. Akaka). OPM submitted its Retirement Financial Literacy and Education Strategy to Congress in October 2005. In this strategy, OPM confirmed that agencies bore the primary responsibility for providing financial education to their federal employees, stating:

> Each agency must develop a retirement financial education plan based on the educational model in this strategy. *Agencies must [e]nsure that their financial education activities* are informational and educational in nature *and that they do not provide specific financial investment advice.*

OPM, Retirement Financial Literacy and Education Strategy (Oct. 2005), pg.11 [located at FAC Ex. 2](emphasis added). Raymond Kirk, the former Manager of Training at OPM, was the principal author of the OPM's retirement Strategy. *See* **Exhibit 4** at 10. According to Mr. Kirk, OPM's strategy constituted "guidance" that federal agencies were required to follow. *Id.* at 16; 65-67. "OPM [has] the authority to require agencies to do something," but lacks its own "enforcement authority" if an agency refuses to comply with OPM's guidance.[26] *Id.* at 29-30; 65-67.

In addition to the Retirement Strategy, OPM also published a Benefits Administration Letter ("BAL") 06-107 on October 25, 2006, which provided additional mandatory guidance to Federal Agencies. *See* **Exhibit 8** at 23. BAL 06-107 included an attachment setting forth specific

---

[26] Mr. Kirk is correct when he says, "OPM [has] the authority to require agencies to do something" when it comes to training. Pursuant to 5 U.S.C. § 4118(a), the OPM, "after considering the needs and requirements of each agency for training its employees and after consulting with the agencies principally concerned, ***shall prescribe regulations*** containing the principles, standards, and related ***requirements*** for the programs, and plans thereunder, for the training of employees…" OPM regulations "shall cover, among other things, "the scope ***and conduct*** of the agency training programs and plans." 5 U.S.C. § 4118(a)(2)(emphasis supplied).

"ground rules" for agencies to follow when utilizing outside speakers, like McLeod.   The "ground rules," like the GSA regulations prohibiting commercial solicitation, vending, and commercial advertising, prohibited speakers from "promot[ing] any particular products, services, professional credentials, firms or individuals," prohibited distribution of business cards during agency-sponsored events, and prohibited endorsement of the speaker by the agency.   *Id.* at. 14.   As with the GSA's anti-solicitation regulations, the Inspector General found that McLeod's behavior at seminars also violated these policies.   **Exhibit 5** at 65; 88.

Mr. Kirk testified that providing specific investment advice, handing out business cards, displaying corporate logos, and introducing McLeod as the agency's "go-to" person for financial education and retirement issues were all prohibited activities and contrary to the Strategy and/or BAL 06-107.   **Exhibit 4** at 44-51.   The "ground rules" for outside speakers, according to Mr. Kirk, were intended to assist agencies to comply with the Retirement Strategy's prohibition against providing specific investment advice at agency-sponsored seminars. *Id.* at 23.

Decades before the OPM Strategy and BAL 06-107, Congress enacted the Federal Employees' Retirement System Act of 1986 (FERS Act).   The FERS Act granted the Office of Personnel Management ("OPM") and federal agencies broad authority to design and implement retirement education programs for employees covered by the Civil Service Retirement System (CSRS) and the Federal Employees' Retirement System (FERS).    In particular, it authorized agencies to designate "retirement counselors," also called "benefits officers," responsible for providing employees with retirement benefits information and mandated that OPM establish a training program for these retirement counselors. See 5 U.S.C. § 8350.   During his testimony in this case, Mr. Kirk explained that the OPM's training program for agency retirement counselors prior to 2005 was fully consistent with the OPM's Retirement Strategy published in 2005:

Our previous guidance would consistently—consistently was do not provide specific investment advice.

***

At points prior to 2005, OPM would have had training sessions for benefits officers. There are some other benefits administration letters published in that time frame. And a consistent message from OPM would have been that the [agencies' retirement education] program should be educational in nature and not provide specific investment advice.

**Exhibit 4** at 15; 18-19.

Thus, while OPM did not publish its guidance prohibiting specific investment advice until 2005, the OPM "consistently" communicated that same guidance to agency benefits officers and retirement counselors before 2005 as part of the OPM's training program for retirement counselors mandated by the FERS Act of 1986. Accordingly, the Retirement Strategy and BAL 06-107 simply articulate in writing what had previously been the unwritten policy or "guidance" given consistently by OPM to agency retirement counselors and agency benefits officers. Although Mr. Kirk labeled the OPM's Retirement Strategy and BAL 06-107 as "guidance" rather than "policy" or "regulation,"[27] agency "regulations, for the purposes of a governmental immunity analysis, may be in the form of 'internal guidelines,' and these guidelines may even be promulgated orally." *See Schiano v. United States*, 1996 U.S. Dist. LEXIS 23028. *12 (M.D.Fla. Aug. 7, 1996)(*citing Gaubert*, 499 U.S. at 323); *Berkovitz,* 486 U.S. at 547 (finding that the unwritten policy of testing all vaccine lots for compliance with safety standards before release adopted by the Bureau of Biologics could, if proved, render the discretionary function inapplicable); *Autery*, 992 F.2d at 1528 (considering whether an unwritten tree inspection plan adopted by the Park Service contained a directive sufficient to prevent application of the discretionary function exception).

---

[27] *See* **Exhibit 4** at 16.

The federal policy regarding outside speakers at agency-sponsored retirement seminars, as articulated in the Retirement Strategy and BAL 06-107, specifically prescribes a course of action for employees to follow and provides fixed or readily ascertainable standards to be applied at agency-sponsored retirement training, *i.e.,* use of a specific disclaimer of endorsement, no specific investment advice may be given, no business cards may be handed out, and no promotion of "any particular products, services, professional credentials, firms or individuals" may be permitted. BAL 06-107 further instructs moderators to "[l]et [sponsoring agencies] know if any speakers violate these terms [ground rules], and intervene if necessary." Thus, government agencies and "employee[s] ha[d] no rightful option but to adhere to the[se] directive[s]" regardless of where the agency-sponsored event occurred. *Gaubert*, 499 U.S. at 322; 5 U.S.C. § 4118(a). The DOJ OIG agreed, finding in its Report "DEA officials … failed to comply with OPM guidance for conducting financial seminars issued in October 2006." **Exhibit 5** at 87-88. Because the government "failed to comply with OPM guidance for conducting financial seminars," the discretionary function exception does not apply and the Court need not consider the second prong of the *Berkovitz* analysis. *Miles,* 289 F.3d at 721-22.

> **D. Even if the law enforcement agencies involved had discretion to facilitate or permit the provision of specific financial investment advice—a form of commercial solicitation—at agency-sponsored retirement seminars, that decision-making is not of the kind the discretionary function exception was designed to shield, and therefore the exception would still not apply under the second prong of *Berkovitz***

The government bears the burden of identifying policy considerations that might influence the challenged conduct. *Ochran v. United States*, 117 F.3d 495, 504 n.4 (11th Cir. 1997). The government has failed to identify any policy considerations that government agencies or employees would be required to contemplate when determining whether to permit commercial

solicitation in the form of specific financial investment advice at agency-sponsored seminars, regardless of where they occurred.  The government simply argues that decisions relating to education and training are "inherently susceptible to policy considerations." Gov't Br. [Dkt. #88] at 33.  All of the cases relied upon by the government—*Gager, Flynn,* and *Echevarria-de-Pena*—involved agencies' failures to provide training on a particular topic where no specific training was mandated.  *Id.* at 33 n.31.  They fairly stand for the proposition that the decision whether or not to train employees in certain topics, such as the use of emergency devices (*Flynn*) or the identification of mail bombs (*Gager*), where no statute, regulation or policy requires such training, falls within the discretionary function exception to tort liability.

In this case, however, Congress and the OPM expressly mandated the retirement and financial education and training activities.  The government argues nevertheless that its selection of contractors and the manner and extent to which an agency supervises a contractor is the kind of decision-making the discretionary function exception was designed to shield.  Gov't Br. [Dkt. #88] at 33 (citing *Andrews v. United States,* 121 F.3d 1430, 1440 (11th Cir. 1997)).  The government is wrong for two reasons.  First, the extent of monitoring required or actually accomplished remains discretionary only when there is no statute, regulation, or policy that controls the government's monitoring of a contractor's work.  *Andrews,* 121 F.3d at 1441 (citing *Kirchmann v. United States,* 8 F.3d 1273, 1276 (8th Cir. 1993)).  Here, the OPM policy prohibited specific investment advice at agency seminars and directed agency monitors to report violations and "intervene if necessary." **Exhibit 4** at 16-17; *See also* **Exhibits 2** and **3**.  Moreover, the agencies here had actual notice of McLeod's misconduct and that changes the calculus.  *See Tonelli*, 60 F.3d at 496.

Second, as the Supreme Court explained in *Gaubert*:

> There are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish.  If one of the officials involved in this case drove an automobile on a mission connected with his official duties and negligently collided with another car, the exception would not apply. Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy.

*Gaubert*, 499 U.S. at 325 n.7.   In this case, the regulatory regime aims to ***educate*** federal employees regarding retirement and financial matters; it has ***nothing*** to do with giving employees specific financial investment advice or selling them financial products or services.   Thus, any discretionary decision to permit McLeod to engage in activity cannot have anything to do with the general policy goals of ***educating*** federal employees.   Such discretion in this case is not the type "grounded in public policy." *Gaubert,* 499 U.S. at 325; *Zelaya,* 781 F.3d at 1329-30.   For all of the foregoing reasons, the discretionary function does not deprive this court of jurisdiction over any claims.

## IV.    THE MISREPRESENTATION EXCEPTION DOES NOT APPLY

The FTCA excepts from its waiver of sovereign immunity "[a]ny claim arising out of . . . misrepresentation [or] deceit[.]"  28 U.S.C. § 2680(h).  The government's argument for application of this exception boils down to a single proposition: Plaintiffs are victims of McLeod's fraudulent Ponzi scheme and "no matter how Plaintiffs label their claim[s]," they cannot be divorced from McLeod's misrepresentations and deceit.  Gov't Br. [Dkt. #88] at 37-39.  Stated alternatively, the government contends the Plaintiffs cannot assert any claims that do not "arise out of" McLeod's misrepresentations about the nonexistent Bond fund.  *Id.* at 38 (arguing, "each claim set forth in the amended complaint arises out of [McLeod's] misrepresentations and deceit").

Plaintiffs do not quibble with the government's characterization of McLeod as a lying scoundrel, or with the government's statement of the law regarding the misrepresentation exception, however, Plaintiffs disagree with application of the exception in this case because the misrepresentation exception "does not bar negligence actions which focus not on the Government's failure to use due care in communicating information, but rather on the Government's breach of a different duty." *Block v. Neal,* 460 U.S. 289, 297 (1983); *Zelaya*, 781 F.3d at 1336; *JBP Acquisitions, LP v. United States ex rel. FDIC,* 224 F.3d 1260, 1265 (11th Cir. 2000)(same).  The Eleventh Circuit has explained:

> In short, if a plaintiff can show that the Government has breached a duty distinct from the duty not to make a misrepresentation and if that breach has caused the plaintiff's injury, the fact that the Government may have also made a misrepresentation will be insufficient to trigger the misrepresentation exception to a waiver of sovereign immunity.

*Zelaya*, 781 F.3d at 1336 (citing *Guild v. United States*, 685 F.2d 324, 325 (9th Cir. 1982)("The Government is liable for injuries resulting from negligence in performance of operational tasks even though misrepresentations are collaterally involved."); *JBP Acquisitions, LP*, 224 F.3d at 1265 (also citing *Guild*).[28]  The government's failure to observe and enforce the anti-solicitation regulations and OPM policy directives at agency-sponsored retirement training events in no way depend upon the government's duty not to make a misrepresentation.

In *Block*, a governmental agency oversaw the construction of the plaintiff's house, but the construction turned out to be shoddy. *Block*, 460 U.S. at 297. The agency conducted three

---

[28] *See also Delvin v. United States,* 352 F.3d 525, 543 (2d Cir. 2003); *Metropolitan Life Ins. Co. v. Atkins*, 225 F.3d 510, 512 (5th Cir. 2000)(citing *Saraw Partnership v. United States*, 67 F.3d 567, 570-571 (5th Cir. 1995)); *Mundy v. United States*, 983 F.2d 950, 952 (9th Cir. 1993)(citing *United States v. Fowler,* 913 F.2d 1382, 1387 (9th Cir. 1990)(quoting *Guild*, 685 F.2d at 325)); and *Appley Bros. v. United States*, 7 F.3d 720, 728 (8th Cir. 1993).

inspections throughout the project and represented to the homeowner that the construction met appropriate standards, but the agency's statements were wrong. *Id*. at 292, 296. Eventually learning that she had purchased a lemon, the homeowner sued. Holding that the misrepresentation exception did not apply, the Supreme Court acknowledged that the governmental agency had made misrepresentations to the plaintiff when it provided inaccurate inspection reports. Yet, the Court noted, the plaintiff was proceeding under a state law Good Samaritan doctrine cause of action, claiming that the agency had voluntarily undertaken supervision of the construction. *Id*. at 297. A negligent undertaking does not fall within the tort of misrepresentation. *Id.* Further, while the agency clearly did make misrepresentations to the plaintiff, through erroneous inspection reports, negligent oversight of the construction project was alleged to have caused the injury, and such a claim was not barred by the misrepresentation exception. *Id*. at 298.

The Supreme Court contrasted the facts in *Block* with those of its earlier decision in *United States v. Neustadt*, 366 U.S. 696 (1961), another home construction case in which the Court had held that the misrepresentation exception did apply. In *Neustadt*, the plaintiffs relied on a federal agency's erroneous appraisal of a house, and, as a result, paid more than it was worth. *Neustadt*, 366 U.S. at 700-01. Although plaintiffs alleged that the basis of their claim was the agency's negligent inspection of the house, the Supreme Court concluded that the claim actually arose from a contention that the agency had made a misrepresentation. As such, the claim was barred by the misrepresentation exception. *Id*. at 711.

Reconciling its holding in *Block* with its earlier holding in *Neustadt*, the Supreme Court noted that the only basis alleged for the *Neustadt* action was a claim that the federal agency had made a misstatement in the appraisal report. With only a misstatement claim, the misrepresentation exception necessarily applied. In contrast, a claim in the *Block* action rested not on the agency's

47

duty to make accurate communications, but instead on a different duty—its duty to use due care in supervising a construction project.  Accordingly, the misrepresentation exception did not apply notwithstanding the inaccurate inspection reports given to the plaintiff. *Block*, 460 U.S. at 296-97.

In this case, as in *Block* itself, Plaintiffs are proceeding *inter alia* under a state law Good Samaritan cause of action.[29]  *See* FAC ¶¶ 194-195.  Just as the negligent undertaking in *Block* did not fall within the tort of misrepresentation, so too does the negligent undertaking alleged here not fall within the tort of misrepresentation.[30]  Each agency's undertaking here involved a duty to properly conduct and supervise agency retirement and financial education and training.  That separate duty (unrelated to the agency's duty to make accurate communications) was violated by, *inter alia,* negligently permitting commercial solicitation and vending when prohibited, negligently permitting commercial advertising when prohibited, and negligently allowing specific

---

[29] The Eleventh Circuit recognized in *Zelaya* that the Supreme Court long ago made clear there is no exception from FTCA liability solely because the particular tort arose from the performance of uniquely governmental functions. *Zelaya*, 781 F.3d at 1324 (citing *Indian Towing Co. v. United States*, 350 U.S. 61, 64 (1955)).  The Court continued: "So, the question arises, how should the FTCA be applied when uniquely governmental functions are at issue? We have recognized that '[n]ormally, the most analogous approach in determining whether the government is liable in the regulator-enforcer context under state law is the [G]ood [S]amaritan doctrine.' *Pate*, 374 F.3d at 1086; *see also Indian Towing*, 350 U.S. at 64--65 ('[T]he statutory language [of 28 U.S.C. § 2674] is 'under like circumstances,' and it is hornbook tort law that one who undertakes to warn the public of danger and thereby induces reliance must perform his '[G]ood Samaritan' task in a careful manner.').  Thus, in cases where the plaintiff points to the violation of a federal statutory or regulatory duty, we generally look to the applicable state's Good Samaritan doctrine to decide if the plaintiff has alleged a state tort claim that satisfies the § 1346(b)(1) requirement and thereby opens the door for a claim under the FTCA." *Zelaya*, 781 F.3d at 1324-25 (citing *Sellfors v. United States*, 697 F.2d 1362, 1367 (11th Cir. 1983); *Howell v. United States,* 932 F.2d 915, 918 (11th Cir. 1991); and *Pate v. Oakwood Mobile Homes, Inc.*, 374 F.3d 1081, 1086 (11th Cir. 2004)).

[30]  In determining whether jurisdiction exists, the Court does not consider the merits of the underlying claim.  *Ochran v. United States,* 117 F.3d 495, 504 n.5 (11th Cir.1997); *Downs v. United States Army Corps of Engineers*, 333 Fed.Appx. 403, 406-07 (11th Cir. 2009)(when determining whether [jurisdiction exists], courts "do not consider the merits of [Plaintiffs'] underlying tort claim.").

investment advice when prohibited.  All of these failures concern so-called "operational" duties; that is, they are both distinct from the duty not to miscommunicate and they are sufficiently linked to Plaintiffs' injuries.  *See Zelaya*, 781 F.3d at 1336.  At bottom, even if the agencies' tacit endorsement of McLeod is considered an implied misrepresentation, the Government remains "liable for injuries resulting from negligence in performance of operational tasks" even though misrepresentations are also made.[31]  *Id.*

Finally, the government's reliance on *Guccione v. United States*, 847 F.2d 1031 (2d Cir. 1988) lacks merit in this case.  Gov't Br. [Dkt. #88] at 43-46.  The government argues that, "Here,

---

[31] The government continues in its renewed motion to rely on several cases decided before *Block* that are easily distinguished.  The government relies on *Preston v. United States*, 596 F.2d 232 (7th Cir. 1979); *Redmond v. United States,* 518 F.2d 811 (7th Cir. 1975); and *Boda v. United States*, 698 F.2d 1174 (11th Cir. 1983).  Gov't Br. at 35-37.  In *Preston*, the government conducted negligent audits of a warehouse and thereby implied that the warehouse was safe for use.  Applying the misrepresentation exception, the court noted that plaintiffs presented "no suggestion that apart from the implied misrepresentation the allegedly negligent audits would have constituted a [distinct] tort."  *Preston*, 596 F.2d at 239.  Here, multiple torts independent of any implied misrepresentation are alleged.

In *Redmond*, all of the allegations presented in plaintiff's complaint related to misrepresentations, either expressed or implied, made by government agents to the plaintiff.  "[T]he allegations of the complaint clearly state a course of events calculated to mislead Redmond by a series of misstatements of fact, half-truths, and deception; that the Government's agents are alleged to have been involved in the dissemination of the misleading information, and that the complaint clearly alleges that the agents were attempting to represent Wuensche [a government 'confidence man'] as being something he was not." *Redmond,* 518 F.2d at 814.  Accordingly, the Redmond court found the case was controlled by the Supreme Court's decision in *Neustadt*.  *Id.* As in *Preston*, the plaintiff had not alleged any claim independent of the misrepresentations made. *Redmond*, therefore, also has no application to this case.

In *Boda*, Ms. Boda sued the United States after she entered into a series of business agreements with a participant in the federal witness protection program ("WPP") who used the name Peter Abate.  Ms. Boda alleged that WPP officials furnished Abate with references and other false documents that induced her to enter into the agreements and to give Abate access to her heirloom diamond ring, which Abate stole.  *Boda,* 698 F.2d at 1175.  Accepting the reasoning of *Redmond*, the court found the case was controlled by *Neustadt*.  *Id.* at 1176.  This is unsurprising since Ms. Boda's claim relied entirely on the misrepresentations made by the WPP officials.

49

as in *Guccione,* the gravamen of the complaint is that the Government failed to exercise adequate control over an individual committing intentionally tortious conduct *while acting in some capacity on the Government's behalf.*" *Id.* at 44 (emphasis in original). Accordingly, says the government, the misrepresentation exception applies regardless of McLeod's employment status under the FTCA. *Id.* The government's position is undercut by the Supreme Court's decision in *Sheridan v. United States*, 487 U.S. 392 (1988), decided three months after *Guccione*.

The Supreme Court began its analysis by observing that "it is both settled and undisputed that in at least some situations the fact that an injury was directly caused by an [intentional tort] will not preclude liability against the Government for negligently allowing the [intentional tort] to occur." *Sheridan*, 487 U.S. at 398 (citing *United States v. Muniz,* 374 U.S. 150 (1963), in which a prisoner assaulted by other inmates was permitted to recover damages because prison officials were negligent in failing to prevent the assault). The Court described two separate reasons for this, both of which may apply here.

First, the Court explained, "it might be assumed that since [Muniz] alleged an independent basis for tort liability -- namely, the negligence of the prison officials -- the claim did not arise solely, or even predominantly, out of the assault." *Sheridan*, 487 U.S. at 399. Under this theory, "the attention of the trier of fact is focused on the Government's negligent act or omission; the intentional [tort] is simply considered as part of the causal link leading to the injury." *Id. See also, Sheridan*, 487 U.S. at 407-408 (Kennedy, J. concurring)(The Court did not rely on this theory in reversing application of § 2680(h); however, Justice Kennedy would have reversed on this basis alone, citing *Block,* 460 U.S. at 297-298 ("intentional tort exception does not preclude recovery under a theory of independent government negligence)). Here, if McLeod was a government

employee for FTCA purposes, *Block* permits Plaintiffs' negligence claims even if they overlap with possible misrepresentation claims.

The *Sheridan* Court did not find it necessary to rely upon *Block* to find the intentional tort exception inapplicable.  Rather, contrary to *Guccione*, the court held that § 2680(h)'s exceptions are "simply inapplicable to torts that fall outside the scope of § 1346(b)'s general waiver," which requires an employee of the government acting within the scope of that employment. *Sheridan,* 487 U.S. at 400; *Sandoval v. United States*, 980 F.2d 1057, 1059 (5th Cir. 1993) ("As the intentional tort that injured Sandoval was not perpetrated by an employee of the Government, the exclusion of § 2680(h) is not relevant to the case sub judice."); *Chang-Williams v. Dept. of the Navy*, 766 F.Supp.2d 604, 615 (D. Md. 2011)(where employee acted outside the scope of his employment, § 2680(h) exceptions are "simply inapplicable").  Thus, if McLeod was not an employee or if he exceeded the scope of his employment, the § 2680(h) exceptions are "simply inapplicable."

## CONCLUSION

For the reasons and authorities stated herein, this Court has proper subject matter jurisdiction over all of Plaintiffs' claims and Plaintiffs respectfully pray the government's motion to dismiss will be DENIED in its entirety.

Dated: December 8, 2015                Respectfully submitted,

s/Ray M. Shepard
Ray M. Shepard, Admitted *Pro Hac Vice*
THE SHEPARD LAW FIRM, LLC
1406B Crain Highway South, Suite 102
Glen Burnie, MD 21061
Phone:  443-354-3651
Facsimile: 443-773-1922
Email:  RShepard@ShepardLF.com

**MARKS GRAY, P.A.**
Nicholas V. Pulignano, Jr. Fla. Bar No.: 0319181
Heath L. Vickers Fla. Bar No.: 0084769
1200 Riverplace Boulevard, Suite 800
Jacksonville, FL 32207
Telephone: 904-807-2105
Fax: 904-399-8440
E-mail: npulignano@marksgray.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2015, I electronically filed or caused to be filed the foregoing Plaintiffs' Memorandum in Opposition to United States' Renewed Motion to Dismiss for Lack of Subject Matter Jurisdiction with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to:

Stephen E. Handler
Senior Trial Counsel
U.S. Dept. of Justice
Civil Division, Torts Branch
1331 Pennsylvania Ave., NW
Room 8070N
Washington, DC 20004
Office: (202) 616-4279
Email: stephen.handler@usdoj.gov

Philip D. MacWilliams
Trial Attorney
U.S. Dept. of Justice
Civil Division, Torts Branch
1331 Pennsylvania Ave., NW
Room 8070N
Washington, DC 20004
Office: (202) 616-4279
Email: phil.macwilliams@usdoj.gov

s/ Ray M. Shepard____
Ray M. Shepard