**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

RENE ALVAREZ, et al.,

                Plaintiffs,

vs.                                           Case No. 3:13-cv-174-J-32MCR

UNITED STATES OF AMERICA,

                Defendant.

_____

## ORDER

Plaintiffs are the victims of a Ponzi scheme whose mastermind, Kenneth Wayne McLeod, committed suicide on June 22, 2010. For the most part, the plaintiffs are current or former federal law enforcement officers and their spouses from all over the country who met McLeod at one of many government-sponsored retirement seminars where he pitched his fraudulent bond fund. Many have lost their life savings. Now, plaintiffs seek to hold the United States liable for their losses under the Federal Tort Claims Act.

Although there were numerous red flags that government employees could have heeded to stop McLeod before he cheated these investors, suits against the United States, as a sovereign, are subject to strict limitations. These limitations may bar a suit, even one which would be successful if brought against a private entity. After much study, the Court finds that plaintiffs' claims fail to overcome the government's sovereign immunity from suit. Thus, while the rampant fraud here calls out for a remedy, one cannot be secured from the United States.

I.     **Plaintiffs' Amended Complaint (Doc. 87)[1] and Background Facts**

Federal government agencies began regularly providing retirement education and training for their employees in 1986.  Approximately two years later, various federal law enforcement agencies began contracting with Kenneth Wayne McLeod, who held himself out to be an expert on the federal retirement system, and his Jacksonville, Florida company, Federal Employee Benefits Group, Inc. ("FEBG"), to provide these services to federal employees at seminars, meetings and training events all over the country.

FEBG claimed to be a "financial services and benefits consulting firm focused on [f]ederal retirement options" and "dedicated to the complex issues surrounding special group employees, including [l]aw [e]nforcement [o]fficers . . . ."  Doc. 87 (Amended Complaint) at ¶ 144.  FEBG charged the government up to $15,000 per event and many employees who attended FEBG seminars received educational information about federal retirement benefits from McLeod.   However, in addition to group presentations at seminars and training sessions, McLeod offered private follow-up sessions with individual employees to give advice regarding how best to achieve the employees' personal retirement goals.  These meetings were routinely held in federal agency offices.  During these individual meetings, and frequently at group sessions as well, McLeod would pitch a financial product he created– the

---

[1]Plaintiffs' amended complaint is a shotgun pleading, where each count improperly incorporates every preceding paragraph.  <u>See, e.g.</u>, <u>Magluta v. Samples</u>, 256 F.3d 1282, 1284 (11th Cir. 2001).  However, the Court is able to address the merits of the motion to dismiss without requiring plaintiffs to replead.

FEBG Bond Fund.[2]   While McLeod promoted the FEBG Bond Fund as a long term investment with a guaranteed return of 8-10% offered to a select group of investors and sometimes backed by a "promissory note," in actuality, the FEBG Bond Fund was a Ponzi scheme.  Unaware of the true nature of this "investment," federal law enforcement officers and other federal employees invested or transferred from their TSP accounts to the FEBG Bond Fund tens and hundreds of thousands of dollars, some even more than a million.  They also introduced their parents, friends and other colleagues to McLeod and he convinced them to invest as well.  McLeod kept his investors in the dark over the course of many years by providing fake account statements, emails and memoranda showing the purported gains of their investments.[3]

To gain access to a steady stream of new federal employee investors to perpetuate the scheme, McLeod cultivated and capitalized on personal relationships with senior agency officials, many of whom were themselves FEBG Bond Fund investors.  These senior officials enjoyed lavish parties, all expense paid Super Bowl trips, tax preparation services,

---

[2]The FEBG Bond Fund was sometimes called the "FEBG Special Fund," "Special Fund" or "FEBG Fund."  Doc. 87 at ¶ 148.

[3]FEBG was not a one man shop.  As part of its subsequent investigation, the Office of Inspector General of the United States Department of Justice ("OIG") interviewed "several" individuals who had been FEBG employees. See Doc. 92 (Response to Motion to Dismiss), Ex. 5 at 3.  One former FEBG employee is a plaintiff in this lawsuit, having himself invested $100,000 in the FEBG Bond Fund after observing several of McLeod's seminars. See Doc. 87 (Amended Complaint) at ¶ 98.  FEBG employees other than McLeod sometimes led the retirement seminars but no plaintiff alleges that any FEBG employee other than McLeod solicited them to invest in the FEBG Bond Fund. See id. at ¶¶ 8-101; Doc. 78, Ex. 8 at CM/ECF p. 14 (plaintiff declaration referencing seminar led by other FEBG representatives).

subsidized mortgages and other benefits.  Within the agencies where McLeod maintained these relationships, including the Drug Enforcement Administration ("DEA"), Immigration and Customs Enforcement ("ICE"), and others, FEBG became the nearly exclusive provider of retirement education and advice for those agencies' employees.[4]

According to a later investigation, FEBG began to experience cash flow problems in 2008 and McLeod, who already had a long history of personal financial difficulties, had trouble making interest payments to some of the FEBG Bond Fund investors.  FEBG laid off many of its employees but financial problems continued.  Then, in the spring of 2010, the Securities and Exchange Commission received a complaint from an FEBG investor who tried unsuccessfully to redeem his investment.  The SEC interviewed McLeod, who admitted on June 17, 2010 that the FEBG Bond Fund was a Ponzi scheme.  Five days later, just before McLeod was due to appear for a deposition with SEC lawyers, he committed suicide.  Only then did investors discover that their money was never invested in any fund and that McLeod was a fraud.  The SEC froze McLeod's assets, a receiver was appointed, the OIG opened its investigation and individual investors from all over the country conferred and assembled themselves, hiring counsel to sue the government in an attempt to recoup their losses and recover for emotional damages.[5]

---

[4]According to the amended complaint, DEA, ICE, United States Customs and Border Protection ("CBP"), the Federal Aviation Administration ("FAA"), the United States Fish and Wildlife Service ("FWS"), the Federal Bureau of Investigation ("FBI"), and the United States Postal Service ("USPS") all hired FEBG to provide seminars or training sessions.  Doc. 87 at ¶¶ 8-101.

[5]Some investors made a modest recovery from the receiver of McLeod's estate; some pursued claims in a FINRA arbitration proceeding against brokerage firms associated with

4

In this suit, 141 individuals– including employees of DEA, CBP, ICE, FBI, FAA, FWS, USPS, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and Naval Criminal Investigative Service ("NCIS"), their spouses, other family members and friends, two friends of McLeod's, and one FEBG employee, who all invested in the FEBG Bond Fund, as well as three people who hired McLeod to manage their money– have sued the United States under the FTCA, 28 U.S.C. § 2671 et seq.

Plaintiffs claim McLeod, acting as an employee of the government under a contract, was negligent per se when he violated the Florida Securities and Investor Protection Act ("FSIPA"), by selling unregistered Florida securities to plaintiffs (Count I); that government

---

McLeod.  As of May 2014, over $13 million in settlements had been paid through the FINRA proceeding (including to some of the plaintiffs here).  See Doc. 92-5 (OIG report) at 25; Doc. 87 (Amended Complaint) at ¶ 225.

In December 2014, the OIG issued a Report on its investigation of the DEA's relationship with McLeod.  See Doc. 92-5, redacted version (Counsel for plaintiffs reports that an unredacted version (which was not filed and which the Court has not seen) does not enlighten any of the issues before the Court.).  The thorough report describes McLeod's background, the nature of McLeod's business, and his relationship with the DEA, and opines on the failures of DEA employees to take actions that might have prevented the fraud (the Report noted that one DEA Training Director had banned McLeod from further access to a DEA facility in 2006, finding McLeod to be incompetent and unstable, but the Director's efforts to warn others within DEA were not communicated or were not heeded).  The OIG Report found that while some DEA officials were aware of adverse facts about McLeod, that information was not so widely known that officials could be faulted for allowing his continued access to DEA employees.  The OIG further found that two DEA employees used "extremely poor judgment" and violated ethics regulations by accepting gifts from McLeod.  Doc. 92-5 at 89.  The Report concludes with recommendations for improvement to DEA policies and practices with regard to selection, vetting and monitoring of financial education instructors; implementation of best practices to ensure compliance with prohibitions on advertising and commercial activities in government facilities; and measures to avoid showing favoritism. DEA's response to the OIG Report stated that the DEA was considering whether to take disciplinary action against certain employees based on the OIG Report.  The DEA also concurred with the OIG's recommendations for future improvement.  See Doc. 92-5 at Appendix A.

employees who invited McLeod to attend the government sponsored seminars, who arranged private follow-up meetings between McLeod and individual plaintiffs, and/or in whose presence McLeod sold securities in violation of Florida law are liable for aiding and abetting McLeod's negligence in violating the FSIPA (Count II)[6]; that McLeod and the government employees who assisted him acted negligently by breaching a duty to their federal agency employees when they failed to adhere to various policies, regulations and standards of care governing solicitation, commercial activities and endorsements; by failing to supervise McLeod; by failing to warn government employees that McLeod was not endorsed by the government and that his securities were unregistered; by failing to vet or investigate McLeod's background or qualifications; and by favoring McLeod's services in violation of ethics laws, regulations and policies (Count III); that McLeod and the retirement counselors at the federal agencies who invited McLeod to speak to or meet with government employees breached fiduciary duties owed to the plaintiffs by permitting prohibited commercial solicitations during government-sponsored events, promoting McLeod's products during those events, failing to adhere to ethics laws and regulations that would have eliminated McLeod's ability to defraud employees, and failing to vet McLeod or FEBG before

--------

[6]In its motion to dismiss, the government assumed (as did the Court) that plaintiffs were alleging a violation of the Florida Securities and Investor Protection Act in Counts I and II. However, unless the purchaser has sold the security (which is not alleged here), the only available remedy under that statute is rescission, which is not available from the government under the FTCA. See Fla. Stat. §§ 517.07, 517.211(1); 28 U.S.C. § 1346(b). In their response to the motion to dismiss, plaintiffs clarified that they are suing for negligence based on violations of the Florida statute, and not for the statutory violations themselves. The government's reply addresses why, in its view, the negligence claims are likewise unsustainable.

engaging him to provide retirement financial education to employees (Count IV); that the agencies that employed McLeod under personal service contracts negligently supervised him (Count V); and that the conduct of the government resulted in the negligent infliction of emotional distress (Count VI).  Plaintiffs allege their investment losses total approximately $20 million but they seek lost amounts their Thrift Savings Plan accounts or pensions would have earned and emotional damages, bringing the damages claimed to approximately $120 million.

Following two earlier rounds of motion practice (Docs. 11, 14, 15, 21, 25, 26, 74, 75, 77, 78, 82), two hearings (Docs. 31, 84), a period of discovery, an unsuccessful effort to settle the case (Doc. 54), and the filing of an amended complaint (Doc. 87), the United States now moves to dismiss plaintiffs' amended complaint for lack of subject matter jurisdiction (Doc. 88), plaintiffs have responded (Doc. 92), and the government filed a reply (Doc. 96).  On August 12, 2016 the Court held argument on the motion to dismiss.  The record of all three hearings is incorporated by reference.

For purposes of this motion, the Court is viewing the claims from plaintiffs' "best case" scenario; thus, it is putting aside those investors who were not employed by the government, those who did not invest in the FEBG Bond Fund but hired McLeod to manage their investment portfolio, those who did not meet McLeod at a government-sponsored seminar or who did not attend a seminar at a GSA-controlled venue.  For venue purposes, the Court is also presuming a plaintiff who  resides in Florida and attended a seminar in Florida.  At least two of the 141 plaintiffs present allegations of a paradigm case:  both Rachel Cannon and Jacqueline Fruge are Florida residents, employed by federal agencies (Cannon by ICE

and Fruge by the FBI), both attended government-sponsored seminars led by McLeod in GSA-controlled buildings in Florida where senior agency employees were present, both completed financial questionnaires provided by their supervisors, both heard McLeod pitch his "special" bond fund at the seminar, both invested in the FEBG Bond Fund (Cannon, $309,000; Fruge, $30,000), and both claim losses as a result.[7]  See Doc. 87 at ¶¶ 22, 44, 240, 262.  Because these paradigm plaintiffs cannot demonstrate that subject matter jurisdiction is proper here, the Court need not address the government's numerous challenges to the claims of the other plaintiffs.[8]

## II.  Standard of Review

Barring an applicable waiver, sovereign immunity protects the United States from any claim.  Zelaya v. United States, 781 F.3d 1315, 1321 (11th Cir.) (citations omitted), cert. denied, 136 S.Ct. 168 (2015).  One such waiver, the FTCA, "makes the United States liable

---

[7]As was typical of many of the federal law enforcement investors, Cannon and Fruge unfortunately introduced their families to McLeod.  McLeod convinced Cannon's parents to invest $277,500 in the FEBG Bond Fund and Fruge's father to invest $1,000,000.  See Doc. 87 at ¶¶ 21, 45.

[8]When the Court granted an earlier motion to dismiss, giving plaintiffs leave to file an amended complaint, it instructed the government that any renewed motion to dismiss should not raise certain issues thoroughly covered by the filings already on hand, including the interference with contract rights exception, failure to exhaust administrative remedies, venue, or whether the case should be stayed pending a determination of Federal Employees' Compensation Act coverage.  The government additionally points to an inherent conflict in that some of the plaintiffs may also be some of the alleged tortfeasors (see, e.g., Doc. 92-5 (OIG report) at 57-58 (naming certain plaintiffs as recipients of Super Bowl tickets from McLeod)).  The parties' briefs and this Order address only subject matter jurisdiction on the grounds discussed herein; these other issues are not addressed.  See, e.g., Chhetri v. United States, 823 F.3d 577, 583, n.5 (11th Cir. 2016) (affirming dismissal based on discretionary function exception and declining to reach other issues, including venue).

for money damages 'caused by the negligent or wrongful act or omission of any employee of the Government.'" Logue v. United States, 412 U.S. 521, 525-26 (1973) (citation omitted).[9] However, there are many exceptions to this waiver of immunity, "which must be strictly construed in favor of the United States." JBP Acquisitions, LP v. United States, 224 F.3d 1260, 1263 (11th Cir. 2000) (quotation and citation omitted). "If the alleged conduct falls within one of these statutory exceptions, the court lacks subject matter jurisdiction over the action" under the FTCA. Id. at 1263-64 (citations omitted). In other words, "when an exception applies to neutralize what would otherwise be a waiver of immunity, a court will lack subject matter jurisdiction over the action." Zelaya, 781 F.3d at 1322 (citation omitted).

The government argues that the FTCA's misrepresentation and discretionary function exceptions bar plaintiffs' claims. See 28 U.S.C. §§ 2680(a) and (h). Both parties rely on material outside the four corners of the amended complaint;[10] thus, this motion raises a factual (as opposed to a facial) challenge to the Court's subject matter jurisdiction under Rule

---

[9] Section 1346(b)(1) of Title 28 provides that, subject to the provisions enumerated in chapter 171, claims may be brought

> against the United States, for money damages, accruing on or after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

[10] Following an earlier round of motion practice, the Court denied the United States' motion to dismiss without prejudice to renewal and permitted plaintiffs to undertake a significant period of discovery designed to flesh out the evidentiary bases supporting subject matter jurisdiction over their claims. Plaintiffs have now filed deposition transcripts and various documents in support of their response to the government's motion to dismiss. Neither party has argued that more discovery is needed to reach decisions on the issues before the Court.

12(b)(1).   Generally, when presented with such a motion, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990) (quotation and citation omitted).

However, where the jurisdictional basis for the claim is intertwined with the merits, the Court must view the jurisdictional facts as it would at summary judgment, construing all inferences in favor of plaintiffs as the non-moving party. Douglas v. United States, 814 F.3d 1268, 1275-76 (11th Cir. 2016); see also Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel, 657 F.3d 1159, 1169-70 (11th Cir. 2011) (citation omitted) (explaining that facts should be viewed in light most favorable to plaintiff on a 12(b)(1) motion when the jurisdictional basis for the claim is intertwined with the merits).   Here the jurisdictional basis is intertwined with the merits of plaintiffs' claims; thus, the Court will construe all inferences in plaintiffs' favor.   See, e.g., Freeman v. U.S. Marshal Service, 310 F. App'x 355, 358 (11th Cir. 2009) (vacating order of summary judgment for lack of subject matter jurisdiction in advance of discovery where evidence viewed in light most favorable to plaintiff might show that Court Security Officer was a government employee for FTCA purposes, which would establish subject matter jurisdiction and necessary element of tort claim).

Yet while the Court will construe all factual inferences in plaintiffs' favor, "[i]n the face of a factual challenge to subject matter jurisdiction, the burden is on the plaintiff to prove that jurisdiction exists." OSI, Inc. v. United States, 285 F.3d 947, 951 (11th Cir. 2002) (citations omitted).   Thus, plaintiffs must prove that the exceptions invoked by the government do not apply.   See id. (explaining that plaintiff bore the burden of proving that the discretionary

10

function exception did not apply).  Stated otherwise, it is plaintiffs' burden to allege facts falling outside the exceptions.  See, e.g., Douglas, 814 F.3d at 1276 ("At the pleading stage, [plaintiff] must allege a plausible claim that falls outside the discretionary function exception.").

## III.   Discussion

A typical FTCA case might involve an auto accident caused by a negligent government driver, a medical malpractice suit involving a VA or Navy hospital, or perhaps a premises liability suit involving injuries sustained at a federal facility.  It is far less common to have an FTCA case where the main injury is investment loss.  Plaintiffs themselves recognize that investor suits against the government have not fared well.  See Doc. 92 (Plaintiffs' Response) at 1 (citing Zelaya, 781 F.3d 1315; Baer v. United States, 722 F.3d 168 (3d Cir. 2013); Molchatsky v. United States, 713 F.3d 159 (2d Cir. 2013); Dichter-Mad Fam. Partners, LLP v. United States, 709 F.3d 749 (9th Cir. 2013); Suter v. United States, 441 F.3d 306 (4th Cir. 2006), as examples of failed efforts by Ponzi scheme victims to sue the government under the FTCA).  This case is also unusual in that typical FTCA plaintiffs are not themselves government employees.[11]  Nonetheless, plaintiffs claim that the government is liable for the negligent conduct of McLeod and other government employees who allegedly allowed McLeod's fraudulent scheme to flourish.

---

[11]Suits by federal employees are often handled under the Civil Service Reform Act, 5 U.S.C. § 1101 et seq., which is the "exclusive remedial regime for federal employment and personnel complaints."  Mahoney v. Donovan, 721 F.3d 633, 635 (D.C. Cir. 2013) (quotation and citation omitted).  The government has not argued that the CSRA covers plaintiffs' claims.

The government argues that it cannot be liable for McLeod's conduct because he was not an employee within the meaning of the FTCA and that even if he was, his fraudulent activities would be outside the scope of any federal employment, thereby barring government liability as to Count I in its entirety and barring government liability as to Counts III, IV, V and VI to the extent those counts allege liability premised on McLeod's actions as an employee. The government also argues that the misrepresentation exception and the discretionary function exception bar all of plaintiffs' claims. The government further contends it cannot be liable for Counts I and II arising under the FSIPA and that, to the extent plaintiffs are attempting to state a claim of negligence per se arising out of a FSIPA violation, those claims are barred by Florida's statute of repose, Fla. Stat. § 95.11(4)(e).

A.      McLeod's Status as an Employee or Contractor

Having previously maintained that McLeod was a non-employee contractor whose actions only subjected the United States to liability via the enabling negligent conduct of other government employees, plaintiffs now allege McLeod himself acted as an employee of the United States and that the United States is directly liable for his conduct as well as that of other government employees.[12]  For purposes of the FTCA, those deemed employees of the United States include "officers or employees of any federal agency" and "persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service

---

[12]In their Amended Complaint, plaintiffs allege, in addition or in the alternative, that McLeod's company, FEBG, is also an employee of the government. See Doc. 87 at ¶ 143. The FTCA definition of an employee contemplates that it is a natural person. See 28 U.S.C. § 2671 (referencing "officers" "employees" "members" "persons"). However, the Court need not determine whether FEBG's conduct alone could subject the government to liability because plaintiffs have not alleged any FEBG conduct separate from McLeod's.

12

of the United States, whether with or without compensation." 28 U.S.C. § 2671.  A "[f]ederal agency," however, "does not include any contractor with the United States." Id.  Thus, the United States is generally not liable for the tortious conduct of its contractors' employees. Logue, 412 U.S. at 528-32 (discussing Congressional decision to exempt the United States from liability for injury caused by employees of a contractor and holding that for purposes of the FTCA, county sheriff's employees who allegedly failed to prevent death of federal detainee at county jail were employees of a contractor, not employees of the United States). However, where the parties' contract grants the United States the authority to "control the physical conduct of the contractor in the performance of the contract," id. at 527, a contractor may be deemed to be "acting on behalf of a federal agency," and the United States will be liable for the contractor's employees' tortious conduct as though they were employed by the United States.  Means v. United States, 176 F.3d 1376, 1379 (11th Cir. 1999).  Thus, in certain situations, "even private individuals who are not on the Government's payroll may be considered employees for purposes of establishing the Government's liability" under the FTCA. Patterson & Wilder Constr. Co., Inc. v. United States, 226 F.3d 1269, 1274 (11th Cir. 2000).

While this exception is a narrow one, construing all inferences in plaintiffs' favor for purposes of the motion, the Court addresses the government's arguments assuming, as plaintiffs have alleged, that McLeod acted as an employee of the government.[13]

_____

[13]From the beginning, plaintiffs and their counsel have recognized the difficulty of suing the government under the FTCA in these circumstances.  Faced with motions to dismiss by the government invoking numerous exceptions to the FTCA and other jurisdictional barricades, plaintiffs have at times altered their primary theories of liability to try to state a

**B.    Misrepresentation Exception**

The government contends that all of plaintiffs' claims are barred by the FTCA's misrepresentation exception captured within 28 U.S.C. § 2680(h): the United States' waiver of sovereign immunity "shall not apply" to "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights . . . ." (emphasis supplied).

The misrepresentation exception covers direct miscommunications by government employees, JBP Acquisitions, 224 F.3d at 1266, implied misrepresentations, Baroni v. United States, 662 F.2d 287, 288 (5th Cir. 1981), and failures to communicate, JBP Acquisitions, 224 F.3d at 1266, and applies to both negligent and intentional misrepresentations.  Block v. Neal, 460 U.S. 289, 296 (1983).  Particularly relevant here, the misrepresentation exception applies when the claim "is based on the communication or miscommunication of

─────────────────────────

viable FTCA claim.  Also, the Court granted plaintiffs an opportunity to conduct extensive jurisdictional discovery to try to support their claims.  The current and final iteration of their case is premised on the contention that McLeod was an "employee" of the United States when he committed his wrongs.  All causes of action in the amended complaint assume that McLeod was an employee.  While this is different from plaintiffs' earlier contention that McLeod was not an employee (see, e.g., Doc. 26 (sur-reply to earlier motion to dismiss) at 10 (arguing that because McLeod was not an employee, the intentional torts exception did not bar plaintiffs' claims), the Court assumes for purposes of testing plaintiffs' claims that McLeod was an employee of the United States.

Though the government's brief argued why McLeod should not be deemed to have been an employee, at oral argument the government conceded that the Court could decide the motion to dismiss by assuming that McLeod was an employee.  However, if the case were to go forward, plaintiffs would have to prove McLeod was an employee by showing that the government controlled McLeod's "physical performance," determined from the parties' entire relationship, and depending in large part on the terms of any contract between them.  See, e.g., Logue, 412 U.S. at 529-32; Means, 176 F.3d at 1379; Patterson & Wilder, 226 F.3d at 1274; Bravo v. United States, 532 F.3d 1154, 1160 (11th Cir. 2008); Tisdale v. United States, 62 F.3d 1367, 1371 (11th Cir. 1995).

information upon which others might be expected to rely in economic matters." <u>Zelaya</u>, 781 F.3d at 1334.   Moreover, the misrepresentation exception bars not only claims for misrepresentations, but claims "arising out of" misrepresentations. <u>Id.</u> at 1333.  Whether a claim "arises out of" a misrepresentation "is interpreted broadly to include all injuries that are dependent upon" the misrepresentation. <u>Id.</u>[14]

For example, in <u>JBP Acquisitions</u>, the plaintiff real estate loan purchaser sued the United States for, <u>inter</u> <u>alia</u>, conversion, trespass, negligence, and interference with property rights when the government sold it a loan secured by a housing project and then sold the property to another buyer who bulldozed the project before plaintiff could intervene in the proceeding. 224 F.3d at 1262.  The district court dismissed the claims for lack of subject matter jurisdiction and the Eleventh Circuit affirmed, rejecting JBP's argument that the suit was over the government's failure to perform operational tasks in connection with the loan transfer. <u>Id.</u> at 1263.  Instead, the Court held the misrepresentation exception applied because "the basis of the Government's negligence, in fact what makes it negligence in the first place, is the Government's misrepresentation to [the bulldozing buyer] regarding [the government's] current ownership of the loan." <u>Id.</u> at 1265 (emphasis omitted).  "It is that misrepresentation which is the 'crucial element of the chain of causation' upon which JBP's claims are founded." <u>Id.</u> (citations omitted).

---

[14]In evaluating whether the exception applies, "[i]t is the substance of the claim and not the language used in stating it which controls whether the claim is barred by an FTCA exception." <u>JBP Acquisitions</u>, 224 F.3d at 1264 (quotation and citation omitted).  Thus, a party's own characterization of its claim is not determinative. <u>Id.</u> at 1265.

Thus, if the government's misstatements are essential to the negligence claim, the misrepresentation exception will apply. Block, 460 U.S. at 296. Otherwise, the exception does not apply. Id. In other words, the exception "does not bar negligence actions which focus not on the [g]overnment's failure to use due care in communicating information, but rather on the [g]overnment's breach of a different duty." Id. at 297. Therefore, "if a plaintiff can show that the [g]overnment has breached a duty distinct from the duty not to make a misrepresentation and if that breach has caused the plaintiff's injury, the fact that the [g]overnment may have also made a misrepresentation will be insufficient to trigger the misrepresentation exception to a waiver of sovereign immunity." Zelaya, 781 F.3d at 1336.

In Zelaya, plaintiff investors who lost money in a Ponzi scheme operated by the Stanford Group sued the SEC claiming it violated its statutory duty to notify the Securities Investor Protection Corporation (SIPC) which might have acted on the SEC's information that the Stanford Group was in financial trouble. Id. at 1334. In arguing that the government's negligence was more than a failure to communicate (which would bar the claim as a misrepresentation), the investors argued that the SEC's duty to notify the SIPC was an "operational task devoid of any communicative aspect." Id. at 1337. The Eleventh Circuit rejected that argument, finding it made "no sense at all" because it was the content of the communication which would have triggered action by the SIPC and not the mere fact of compliance with an operational task of notification. Id. Thus, the investors' effort to engage in a "semantical sleight-of-hand" "to end-run the misrepresentation exception" was unsuccessful. Id.

By contrast, in <u>Block</u>, a homeowner sued the government when a federal lending agency failed to inspect and supervise construction of her home, resulting in defects.  460 U.S. at 290-91.  The Supreme Court held that while misrepresentations may have been made along the way, the government had undertaken an independent duty to inspect and supervise the construction and it was these failures that formed the basis of the homeowner's claim.  <u>Id.</u> at 297.  In so ruling, the Supreme Court contrasted the facts of <u>Block</u> with those of <u>United States v. Neustadt</u>, where the plaintiff homeowner alleged a faulty government inspection and appraisal failed to reveal structural defects.  <u>Id.</u> at 296 (citing <u>Neustadt</u>, 366 U.S. 696 (1961)).  In holding that the misrepresentation exception barred Neustadt's claim, the Supreme Court rejected the Fourth Circuit's characterization of the claim as one for "the careless making of an excessive appraisal" in violation of the government's statutory duty under the National Housing Act and instead found that Neustadt's claim was that she was misled by statements in the appraisal, in other words, the communication of misinformation upon which she relied.  <u>Neustadt</u>, 366 U.S. at 704, 706-07.  As the Court in <u>Block</u> explained, whereas the essence of Neustadt's claim was a negligent misrepresentation (barred by the FTCA exception), in <u>Block</u>, the homeowner alleged an injury proximately caused by the government's failure to perform a duty that was distinct from its duty to use due care in communicating to the homeowner.  <u>Block</u>, 460 U.S. at 297.  Thus, the suit did not arise out of misrepresentations and was not barred by the FTCA exception.  <u>Id.</u> at 298-99.  <u>See also</u> <u>JM Mechanical Corp. v. United States</u>, 716 F.2d 190, 195 (3d Cir. 1983) (reversing order granting motion to dismiss under the misrepresentation exception and remanding where plaintiff's allegations of negligence were separate from misrepresentation

17

because, although government failed to communicate regarding lack of a valid bond (which was not actionable), plaintiff's injuries were caused by the government's breach of duty to secure a valid bond).

Plaintiffs argue that, as in Block, McLeod and other government employees committed negligent acts independent of any misrepresentations.

In Counts I and II, plaintiffs claim that McLeod and government employees engaged in negligence per se when McLeod sold unregistered securities and government employees aided and abetted his doing so by inviting McLeod to government sponsored seminars, arranging meetings between him and employees, and/or allowing him to sell securities, in violation of FSIPA (Fla. Stat. § 517.07).  Doc. 87 (Amended Complaint) at ¶¶ 175-192.  Yet had the FEBG Bond Fund been legitimate, the fact of its being unregistered would have had no effect on plaintiffs.  And conversely, if McLeod had registered the fraudulent securities (lying about them to do so since they didn't exist), plaintiffs would still have suffered the same harm.  Plaintiffs' injuries flow from the securities and McLeod's representations which underlay them being fraudulent, not because they were unregistered.  Moreover, the basis for plaintiffs' FSIPA claim is that McLeod told some investors that the investment in the FEBG Bond Fund was a loan backed by a promissory note which, if true, would be required to be registered.  But of course his statements were false.  Thus, McLeod's violation of FSIPA was based on a misrepresentation and the failure to register the security was not itself an independent act that caused plaintiffs harm.  See Zelaya, 781 F.3d at 1337 (rejecting plaintiffs' claim that the content of the communication the SEC was required-- and failed-- to provide was immaterial).  Notwithstanding plaintiffs' characterization of this claim,

18

the underlying element causing their injuries was McLeod's misrepresentations about the FEBG Bond Fund; thus this is a claim which "arises out of" McLeod's misrepresentations and is therefore barred.  See id. at 1333-34 (explaining that "'arising out of' is interpreted broadly to include all injuries that are dependent upon [a misrepresentation]" regardless of how plaintiff has framed the claim).  Since McLeod's conduct is not actionable, neither is that of government employees alleged to have aided or abetted him as alleged in Count II.  Even so, to the extent plaintiffs were harmed by any government employee who engaged in conduct that aided or abetted McLeod in his violation of FSIPA, it was due to an implied misrepresentation or failure to communicate on their part or alternatively, would be deemed to "arise out of" McLeod's misrepresentations.  Id.

As to Count III, plaintiffs allege government employees engaged in common law negligence when they failed to adhere to various OPM policies and GSA regulations prohibiting commercial solicitations or the provision of specific investment advice, failed to supervise or control McLeod, failed to warn employees that McLeod was not endorsed by the government and that he was selling unregistered securities, failed to vet or investigate McLeod, and negligently favored his services in violation of ethics rules. Doc. 87 at ¶¶ 193-202.  In Count IV this same conduct is alleged to result in a breach of fiduciary duty to plaintiffs.  Id. at ¶¶ 203-211.  In Count V, plaintiffs allege the government negligently supervised McLeod and FEBG. Id. at ¶¶ 212-219.  In Count VI, plaintiffs allege that all of the foregoing conduct was done in a manner that caused plaintiffs to suffer the negligent infliction of emotional distress.  Id. at ¶¶ 220-224.  Plaintiffs argue these claims are not barred by the misrepresentation exception because "[t]he government's failure to observe

and enforce the anti-solicitation regulations and OPM [Office of Personnel Management] policy directives at agency-sponsored retirement training events" is actionable independent of any government misrepresentation. Doc. 92 (Response) at 46. Plaintiffs also assert that their state law Good Samaritan claim survives because the agencies undertook "a duty to properly conduct and supervise agency retirement and financial education and training," a duty that is "unrelated" to an "agency's duty to make accurate communications," which independent duty was violated by "negligently permitting commercial solicitation and vending when prohibited, negligently permitting commercial solicitation when prohibited, and negligently allowing specific investment advice when prohibited." Doc. 92 (Response) at 48-49. Plaintiffs claim these are failures to perform "operational" duties which are distinct from the duty not to miscommunicate but which nonetheless are linked to plaintiffs' injuries. Id. at 49.

The government argues that it is not the agency employees' failure to follow GSA regulations or some other policy that harmed plaintiffs. Rather, to the extent that government employees harmed plaintiffs (as opposed to it just being McLeod who harmed plaintiffs by his misrepresentations), it was because they vouched for McLeod in a manner which encouraged employees to invest their money with him. According to the government, providing McLeod with airs of respectability and trustworthiness is conduct that falls squarely within the misrepresentation exception. See Boda v. United States, 698 F.2d 1174 (11th Cir. 1983) (holding claim barred by misrepresentation exception where plaintiff lost heirloom diamond ring to man in witness protection program whose credentials were provided by the government). In Boda, the Eleventh Circuit "accept[ed] the reasoning of the [S]eventh

20

[C]ircuit . . . in <u>Redmond v. United States</u>" in finding that <u>Neustadt</u> barred the negligence claims because they arose out of government misrepresentations.  <u>Boda</u>, 698 F.2d at 1176; <u>see also</u> <u>Redmond v. United States</u>, 518 F.2d 811 (7th Cir. 1975) (holding claim barred by misrepresentation exception where the government vouched for a fraudster and plaintiff invested and lost his money).

Plaintiffs claim <u>Boda</u> and <u>Redmond</u> are unpersuasive because they predate the Supreme Court's <u>Block</u> decision which countenanced a Good Samaritan theory of liability as to government employees.  While this statement of <u>Block</u>'s import is true, neither <u>Boda</u> nor <u>Redmond</u> depart from that principle.  Moreover, <u>Block</u> did not abrogate <u>Neustadt</u>, which both <u>Boda</u> and <u>Redmond</u> recognized as binding.  In both <u>Boda</u> and <u>Redmond</u>, the plaintiffs were relying on misrepresentations of government employees or their failures to communicate, notwithstanding, like here, that there was an underlying fraudster who was associated with (or, as plaintiffs allege, employed by), the government. <u>See</u> <u>Boda</u>, 698 F.2d at 1175 (plaintiff's suit alleged government employees failed to warn her about criminal history of participant in witness protection program); <u>Redmond</u>, 518 F.2d at 813 (plaintiff's suit alleged he relied on an "aura of respectability," "credibility and trustworthiness" conferred on defrauding securities dealer by government employees).  Moreover, in <u>Zelaya</u>, where the plaintiffs were ostensibly proceeding on a Good Samaritan theory,[15] the Eleventh Circuit

---

[15]The Eleventh Circuit faulted plaintiffs in <u>Zelaya</u> for not alleging any state law analogue to their alleged violation of the SEC's duty to investors, expounding on whether a Good Samaritan theory would be available in the states where the conduct occurred, but ultimately determining the case could be decided without reaching that issue.  <u>Zelaya</u>, 781 F.3d at 1324-26.

recently reaffirmed that miscommunications or failures to communicate or failures to warn by government employees are barred by the misrepresentation exception.  Zelaya, 781 F.3d at 1335, 1338 (holding that "the misrepresentation exception applies to the breach of the duty to use due care in obtaining and communicating information upon which [the plaintiff] may reasonably be expected to rely in the conduct of his economic affairs") (citing Neustadt, 366 U.S. at 706).

Thus, just because plaintiffs have alleged negligence per se based on a statutory duty under Florida law, negligence under a Good Samaritan theory, and violations of OPM policies and GSA regulations, they still must identify injuries proximately caused by any of that independent negligence;[16] here plaintiffs merely state that the breach of those duties "are sufficiently linked to Plaintiffs' injuries."  See Doc. 92 (Response) at 49.  This is not enough.  Plaintiffs must show that some act of independent negligence was the cause of their injury.  Zelaya, 781 F.3d at 1336.  In Zelaya, the Eleventh Circuit explained that an independent claim of negligence is actionable only where the plaintiff's economic injuries arise out of something other than misrepresentations.  Id. at 1337 (distinguishing Block and other cases).  Plaintiffs must demonstrate injuries suffered from a duty that is distinct from the misrepresentations.  Id. at 1336.  United States v. Shearer, 473 U.S. 52, 55 (1985)

---

[16]Plaintiffs' citation to United States v. Friedenthal, No. 97CRMISC1PAGE13(THK),1997 WL 786371 (S.D.N.Y. Dec. 19, 1997) (a criminal prosecution for violation of a GSA anti-soliciting regulation) as support for the proposition that a GSA violation is an independent tort, is not helpful. The question of whether it is independent is not posed in a vacuum; rather the question for the FTCA misrepresentation exception is whether any injuries the tort caused are independent of those borne out of a misrepresentation, a matter not addressed in Friedenthal.

("Section 2680(h) does not merely bar claims <u>for</u> [the listed torts]; in sweeping language it excludes any claim <u>arising out of</u> [those torts].") (emphasis in original).

Plaintiffs attempt to escape the broad reach of the misrepresentation exception by arguing that the government's breach of separate duties is an essential part of the chain of causation that led to their injuries.  Plaintiffs focus on language in <u>Block</u> which explains that where claims of misrepresentation and negligence share factual and legal issues, the negligence claims can go forward notwithstanding the FTCA's misrepresentation exception.  See <u>Block</u>, 460 U.S. at 298.  But where the damages are caused by reliance on the misrepresentation, it cannot be said that a distinct duty has caused a breach.  <u>Id.</u>  To survive the misrepresentation exception, plaintiffs must allege that the "cause of the injury was the breach of a duty that was distinct from the duty not to miscommunicate."  <u>Zelaya</u>, 781 F.3d at 1336.

The crucial component of plaintiffs' claims-- the essence of what caused them harm-- is that McLeod, assumed to be a government employee, lied about the bona fides of the FEBG Bond Fund, and other government employees, either expressly or impliedly, convinced plaintiffs to trust McLeod and invest with him.  Without those misrepresentations, plaintiffs would have suffered no injuries, despite any other negligence by McLeod or other government employees.  Stated otherwise, none of the alleged acts of "independent" negligence by McLeod or other government employees would have resulted in injuries to the plaintiffs had the plaintiffs not relied on misrepresentations by McLeod or other government employees.  Plaintiffs' injuries are dependent on these misrepresentations and therefore are deemed to "arise out of" them.  <u>Id.</u> at 1333 (explaining that "injuries that are dependent" on

a misrepresentation are deemed to "arise out of" the misrepresentation).

"[T]he essence of an action for misrepresentation, whether negligent or intentional, is the communication of misinformation on which the recipient relies." Block, 460 U.S. at 296 (explaining that the claim in Neustadt failed because Neustadt could not identify an injury that he would have suffered independent of his reliance on erroneous appraisal). See also Zelaya, 781 F.3d at 1337 (holding that plaintiffs' claims were barred by the misrepresentation exception because their "injuries here arose precisely from the SEC's failure to notify SPIC"); JBP Acquisitions, 224 F.3d at 1265 ("Without the false representation by the Government that it was the owner of the Property, the consent agreement in the condemnation proceedings never would have been consummated, the Property would not have been demolished, and JBP would have suffered no injury."). So it is here.

## IV.   Conclusion

In fulfilling Congress' mandate that federal agencies educate their employees about their retirement benefits, the federal law enforcement agencies involved here made what, in retrospect, was a disastrous choice in selecting Kenneth Wayne McLeod to take part in that mission. But it was not attendance at the seminars or meeting with McLeod that harmed the employees; rather, it was the additional step of investing in McLeod's bogus FEBG Bond Fund that caused them injury. That decision was made in reliance on McLeod's and other government employees' misrepresentations or omissions. Thus, plaintiffs' injuries "arise out of" misrepresentations made by government employees. The FTCA's misrepresentation

exception bars all of plaintiffs' claims against the government.[17]

In so ruling, the Court is not without empathy for the many law enforcement officers, their families and friends who were duped by McLeod and who lost so much.  While it may seem anomalous that the government may be liable for negligence but not when it makes (even intentional) misrepresentations, such is the way that Congress chose to write the FTCA.  This Court must follow the law.  With McLeod dead, it is not certain where these plaintiffs go to find their remedy.  But, unfortunately, it is not from the United States.

Accordingly, it is hereby

**ORDERED**:

The United States' motion to dismiss (Doc. 88) is **GRANTED**.  Plaintiffs' amended complaint (Doc. 87) is dismissed for lack of subject matter jurisdiction.  The Clerk shall close the file.

---

[17]The government alternatively argued that plaintiffs' claims are barred by the discretionary function exception, which bars any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  Because the Court finds plaintiffs' claims to be barred by the misrepresentation exception, it need not address this alternative ground.  Likewise, while the government also raises several challenges to plaintiffs' FSIPA claims (Counts I and II) (including that they are barred by Florida's statute of repose and that no remedy is available), because the Court finds those claims barred by the misrepresentation exception, it need not address those alternative arguments.  See Chhetri, 823 F.3d at 583, n.5.  Finally, the government has not specifically argued that any of plaintiffs' claims fail for lack of a state law analogue.  While the Court inquired about that at argument (based on the Eleventh Circuit's emphasis on that point in Zelaya , 781 F.3d at 1323-26), the government was satisfied that the Court could rule on the issues before it without delving into that further.  The Court therefore assumes for purposes of this ruling that plaintiffs' claims are supported by state law analogues.

**DONE AND ORDERED** at Jacksonville, Florida this 12th day of September, 2016.

_____
TIMOTHY J. CORRIGAN
United States District Judge

s.
Copies:

counsel of record